ACCEPTED
04-14-00897-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
10/8/2015 7:18:07 PM
KEITH HOTTLE
CLERK

## NO. 04-14-00897-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
10/8/2015 7:18:07 PM
KEITH E. HOTTLE
Clerk

# IN THE COURT OF APPEALS FOR THE FOURTH COURT OF APPEALS DISTRICT OF TEXAS, SAN ANTONIO, TEXAS

## IN THE ESTATE OF WILLIAM T. BOOTH

### APPEAL FROM THE PROBATE COURT NO. 2, OF BEXAR COUNTY, TEXAS TRIAL CAUSE NO. 2012PC2786

## APPELLANT KAY LYNN MAYNARD'S BRIEF

ORAL ARGUMENT
REQUESTED
(CONDITIONALLY)

Adán A. González, III
State Bar No. 08122350
agonzalez@ddrlex.com
THE LAW OFFICE OF
DONATO D. RAMOS, PLLC
6219 McPherson Road, Suite 35
Laredo, Texas 78041
Telephone 956-722-9909
Facsimile 956-727-5884
Counsel on Appeal and Trial for Appellant

James K. Jones, Jr.
State Bar No. 10910200
jkjjr@icloud.com
THE LAW OFFICE OF
JAMES K. JONES, JR.
P.O. Box 560
Laredo, Texas 78042
Telephone 956-723-5575
Counsel at Trial for Appellant

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), Appellant provides this list of all parties to the trial court's judgments and the names and addresses of all trial and appellate counsel:

*Appellant:*

Kay Lynn MAYNARD f/k/a Kay Lynn Maynard Booth

*Trial Counsel in the Divorce and Probate Actions for Kay Lynn Maynard f/k/a Kay Lynn Maynard Booth:*

James K. Jones, Jr.
The Law Office of James K. Jones, Jr.
P.O. Box 560
Laredo, Texas 78042
Telephone 956-723-5575

*Trial and Appellate Counsel in the Divorce and Probate Actions for Kay Lynn Maynard f/k/a Kay Lynn Maynard Booth:*

Adán A. González, III
State Bar No. 08122350
The Law Office of
Donato D. Ramos, PLLC
6219 McPherson Road, Suite 35
Laredo, Texas 78041
Telephone 956-722-9909
Facsimile 956-727-5884

*Appellee:*

Estate of William T. Booth, Deceased

*Trial Counsel in the Divorce Action for William T. Booth:*

    R. Michael Casseb
    Casseb & Casseb
    1470 Frost Bank Tower
    100 West Houston Street
    San Antonio, Texas 78205
    Telephone 210-226-9793
    Facsimile 210-226-9792

*Trial Counsel in the Divorce and Probate Actions for William T. Booth and The Estate of William T. Booth, Deceased:*

    Martha C. DeLlano
    Person, Whitworth, Borchers & Morales, LLP
    602 East Calton Road
    Laredo, Texas 78041
    Telephone 956-727-4441
    Facsimile 956-727-2696

*Trial Counsel in the Probate Action for The Estate of William T. Booth, Deceased:*

    A. Chris Heinrichs
    Heinrichs & DeGennaro, PC
    100 N.E. Loop 410, Suite 1075
    San Antonio, Texas 78216
    Telephone 210-366-0900
    Facsimile 210-366-0981

*Appellate Counsel in the Divorce and Probate Actions for William T. Booth and The Estate of William T. Booth, Deceased:*

    Dan Pozza
    Attorney at Law
    239 E. Commerce Street
    San Antonio, Texas  78205
    Telephone 210-226-8888
    Facsimile 210-224-6373

# TABLE OF CONTENTS

Identity of Parties and Counsel......................................................... ii - iv

Table of Contents............................................................................ v

Index of Authorities........................................................................ vi

Statement of the Case ..................................................................... viii

Statement Regarding Oral Argument............................................. ix

Issue Presented................................................................................ 1

Statement of Facts........................................................................... 1

Summary of Argument.................................................................... 7

Argument and Authorities............................................................... 8

    Issue No. 1. Did the Probate Court's disobedience of an appellate mandate that affirmed a trial court judgment, result in an improper judgment?................................................................. 9

        A. Trial Court actions will be reversed if they disobey a mandate of the Court of Appeals............................................. 9

        B. An unconditional award of attorneys fees cannot be modified after a Final Judgment is Affirmed................... 11

        C. Judge Rickhoff had no discretion except to award Kay her full attorney's fee affirmed in the appellate mandate................................................................................ 15

    Issue No. 2. Did the Probate Court's ignoring Kay's uncontroverted evidence of trial and appellate fees incurred to recover her $200,000.00 fee award, result in an improper judgment? ................................................................................17

Conclusion and Prayer.....................................................................19

Certificate of Compliance........................................................ 21

Certificate of Service……………………………………….. 21

Appendix…..……..…..….……………………………….… 22

# INDEX OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bell Helicopter Textron, Inc. v. Houston Helicopters, Inc.,*
No. 02-12-00037-CV, 2012 WL 5439025 (Tex. App.—
Fort Worth 2012, no pet. h.) (mem. op.)............................................ 11

*Cessna Aircraft Company v. Aircraft Network, LLC,*
345 S.W.3d 139, 145-147 (Tex. App.—Dallas 2011, no pet.).............. 18

*Humble Nat'l Bank v. DCV, Inc.,*
933 S.W.2d 224, 236 (Tex. App.—Houston
[14th Dist.] 1996, writ denied)............................................... 15

*In Re Bandera Downs, Inc.,*
No. 04-9-00699-CV, 1999 WL 792688
(Tex.App.—San Antonio, October 6, 1999, no pet.)
(not designated for publication).............................................. 9

*In Re Castle Tex. Prod. Ltd. P'ship,*
157 S.W.3d 524, 527 (Tex. App.-Tyler 2005, orig. proceeding)............ 16

*In Re Robertson,*
No. 10-09-00005-CV, 2009 Tex. App. LEXIS 2641
(Tex. App.—Waco, April 15, 2009, orig. proceeding)........................ 16

*Jay Petroleum, LLC v. EOG Resources, Inc.,*
332 S.W.3d 534, 541 (Tex. App.—Houston
[1st Dist.] 2009, pet. denied)................................................ 11

*Lee v. Downey,*
842 S.W.2d 646, 648 (Tex. 1992)............................................. 15

*Martin v. Credit Protection Ass'n,*
824 S.W.2d 254, 255 (Tex. App.—Dallas 1992,
writ dism'd w.o.j.)................................................8, 9, 11, 16, 17

*McVeigh v. Court of Appeals,*
849 S.W. 2d 911, 913 (Tex. App.—Houston [1st Dist.]
1993, pet denied)............................................................ 11, 12, 13, 14, 15

*Rittgers v. Rittgers,*
809 S.W.2d 109, 115 (Tex. App.—Corpus Christi
1990, writ denied)................................................................. 15

*Robertson v. Hix,*
383 S.W.3d 170, 173 (Tex. App.—Waco 2012, no pet.)............... 15, 16, 17

*Robinwood Building and Development Co. v. Pettigrew,*
737 S.W.2d 110, 112 (Tex. App.—Tyler 1987, no writ)................ 12, 15, 16

*Schliemann v. Garcia,*
685 S.W.2d 690, 692 (Tex. App.—San Antonio
1984, orig. proceedings)............................................................ 15

*Smith v. Smith,*
757 S.W.2d 422. 426 (Tex. App.—Dallas 1988, writ
denied)............................................................................. 15

*Spiller v. Spiller,*
901 S.W.2d 553, 560 (Tex. App.—San Antonio
1995, reh. denied)................................................................. 15

*Texas Farmer's Ins. Co. v. Cameron,* 24 S.W.3d 386, 400 (Tex. App.—
Dallas 2000, writ denied)........................................................ 15

**Rules**

TEX. R. APP. P. 25.1................................................................ 8

TEX. R. APP. P. 26.1................................................................ 8

TEX. R. APP. P. 40(a)(4)........................................................... 11

TEX. R. APP. P. 44.1(a)(1)........................................................ 8

TEX. R. APP. 184.................................................................... 9

**Statutes**

TEX. CIV. PRAC. & REMS. CODE § 38.001....................................18

TEXAS ESTATES CODE § 32.001(c)......................................... 8

TEXAS ESTATES CODE § 355.003....................................... 17

TEXAS ESTATES CODE § 355.056......................................... 8

TEXAS ESTATES CODE § 355.058......................................... 8

TEXAS ESTATES CODE § 1157.058......................................... 8

## STATEMENT OF THE CASE

*Nature of the case:* Appellant filed claims in probate court to collect attorneys fees awarded in affirmed judgment. Claim was tried and rejected by probate court, and this appeal resulted.

*Course of proceedings:* Appellant's Final Divorce Judgment awarded her, *inter alia*, damages and $200,000.00 in attorney's fees to be paid by William T. Booth, Appellant's former husband. The divorce judgment was affirmed; a mandate issued. Mr. Booth died, then Appellant filed a claim and this action in probate court to collect both her damage awards and the $200,000.00 attorney's fees award. The Estate accepted and paid Appellant's claim for her damage awards, but took no action on, and paid no part of, her $200,000.00 attorneys fee claim. The probate court tried and rejected that later claim, so this appeal followed.

*Trial court:* PROBATE COURT NO. 2 OF BEXAR COUNTY, TEXAS (Rickoff, J.)

*Trial Court Disposition:* The Estate offered neither evidence nor substantive defense to payment of this $200,000.00 attorneys fee award claim. After review of this Court's mandate,

certified copy of the Final Divorce Judgment in the divorce proceedings, the probate court refused to order the Estate to pay this $200,000.00 attorneys fee claim to Appellant, and declined to award trial and appellate fees that Appellant had incurred and would incur in this probate claim proceeding.

## ORAL ARGUMENT REQUESTED
## (CONDITIONALLY)

Neither issue in this appeal requires oral argument, because the applicable law and controlling facts are beyond dispute.

Texas law is well-settled that trial courts cannot disobey the appellate mandates issued when trial judgments are affirmed (Issue 1). This indisputable rule of law is underscored by the Probate Court's erroneous resort to "public policy"—wholly without authority of any kind—as grounds for disobeying the instant mandate. The Texas Estates Code provides for awarding attorney's fees incurred in pursuing payment of claims in probate proceedings, and the Probate Court and Appellee never claimed—and the Appellee never proved—otherwise (Issue 2). The Appendix to this Brief clearly illustrates what was and was not appealed, and what was decided by the trial and appellate courts.

Accordingly, the instant October 2, 2015, Probate Court Order can be reversed and rendered from a review of the record and on the briefs alone. Should the Court desire oral argument, however, the Appellant would be pleased to participate. TEX. R. APP. P. 38.1(k)(1)(A), (C), and (2).

## ISSUES PRESENTED

Issue No. 1.   Did the Probate Court's disobedience of an appellate mandate that affirmed a trial court judgment, result in an improper judgment?

Issue No. 2.   Did the Probate Court's ignoring of Kay's uncontroverted evidence of trial and appellate fees incurred to recover her $200,000.00 attorneys fee award, result in an improper judgment?

## STATEMENT OF FACTS

The affirmed, mandated Final Divorce Judgment unconditionally awarded the entire Two Hundred Thousand dollars ($200,000.00) attorney's fee, without remittitur, to Kay against William T. Booth ("William") before his death, if Kay appealed to the Fourth Court of Appeals and to the Texas Supreme Court. *See* Appendix 1. Specifically, this Final Divorce Judgment awarded Kay:

> " ... Two Hundred Thousand Dollars ($200,000.00); provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000.00) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000.00) shall be remitted."

Court Record, p. 33 (hereinafter "CR [page number]"). Kay attached the entire Final Divorce Judgment as an Exhibit to her Claim in the Probate Court (CR 7 – 94), and that Claim with this Judgment are attached hereto as

1

Appendix 1.[1] Only Kay appealed the Final Divorce Judgment, and she solely appealed to increase a damage item and her attorney's fee award.[2]

This Court affirmed the Final Divorce Judgment, rejecting Kay's appellate arguments. This Court's Opinion and Judgment involving the Final Divorce Judgment are combined as Appendix 2. After the Texas Supreme Court denied Kay's petition for review on June 6, 2014,[3] this Court issued the following June 9, 2014, mandate.

> "TO THE 111[TH] JUDICIAL DISTRICT COURT OF WEBB COUNTY, GREETINGS:
>
> Before our Court of Appeals for the Fourth District of Texas on November 27, 2013, the cause upon appeal to revise or reverse your judgment between
>
> Kay Lynn Maynard f/k/a Kay Lynn Maynard Booth, Appellant
>
> V.
>
> William Booth, Appellee

---

[1] This Final Divorce Judgment was entered in *William T. Booth v. Kay Lynn Maynard, formerly known as Kay Lynn Maynard Booth,* cause no. 2010-CVH-001376-D2, 111th District Court, Webb County, Texas, the Honorable Monica Z. Notzon, presiding. CR 4 – 94.

[2] *Kay Lynn Maynard v. William T. Booth,* appeal no. 04-12-00585-CV, Fourth Court of Appeals, San Antonio, Texas, hereinafter "Kay's Divorce Appeal."

[3] *See* Appendix 3, the denial of Kay's Petition for Writ of Error in *Kay Lynn Maynard, f/k/a Kay Lynn Maynard Booth v. William T. Booth,* case no. 14-0077, Supreme Court of Texas.

was determined, and therein our said Court of Appeals made its order in these words:

**In accordance with this court's opinion of this date, the trial court's judgment is AFFIRMED...**

WHEREFORE, WE COMMAND YOU to observe the order of our said Court of Appeals for the Fourth District of Texas, in this behalf and in all things have the order duly recognized, obeyed, and executed..."

*See* Appendix 4 (emphasis in original). Throughout Kay's Divorce Appeal, neither William T. Booth nor his Estate ever appealed or challenged any portion of that Judgment, and in particular, they never complained that the $200,000.00 award of attorney's fees to Kay was impermissibly unconditional, or any other defense to enforcement of an affirmed judgment. (The Estate paid other portions of the Final Divorce Judgment after the Claim was filed in the Probate Court). The Estate's Response to Kay's Fee Claims did not even plead payment. *See* Appendix 5.

Kay filed numerous Claims in the Probate Action to obtain all the monies that the Final Divorce Judgment awarded to Kay—including her full award of attorney's fee:

    a. on May 23, 2013, Kay filed the *Claim of Kay Lynn Maynard* which sought payment of all items awarded to Kay in the Final Divorce Judgment (see Appendix 1; CR 4 – 94);

b. on April 30, 2014, Kay filed *Kay Maynard's Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce* (see Appendix 6; CR 95 – 105); and

c. on April 30, 2014, Kay filed *Kay Maynard's Supplemental Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce* which sought the full attorney's fee award—and also attorney's fees incurred in pursuing the full attorney's fee award (see Appendix 7; CR 106 – 107) (all of which are collectively referred to herein as "Kay's Fee Claims").

Although the Estate accepted and paid all the items in Kay's initial Claim, as stated above, the Estate has refused to pay a single dollar to Kay for **any** of the attorney's fees awarded in the Final Divorce Judgment.[4] *See* Partial Allowance of Claims, Appendix 8. At an August 30, 2013, hearing, the Probate Court discussed a certified copy of the Final Divorce Judgment at length. Transcript of August 30, 2013, hearing, pp. 5 – 38.

When the October 1, 2014, hearing of Kay's Fee Claims began, the Estate filed a Response. Appendix 5. That Response did not plead that the Estate had paid Kay's Fee Claims nor any other defense to enforcement of the affirmed judgment. *Id.* At that October 1st hearing, Kay argued that the Estate should pay the entire Two Hundred Thousand dollar ($200,000.00)

---

[4] The Probate Court inexplicably denied this $70,000.00 attorney's fee at the trial level in addition to denying the attorney's fees not remitted by further appeal in the Final Divorce Judgment.

4

attorney's fee due under the Final Divorce Judgment, because Kay had appealed at both appellate levels, and because the Final Divorce Judgment could not be revised at this hearing. *See* Reporter's Record[5] of the October 1, 2014, hearing, page 6, lines 2-9; page 13, line 6 to page 16, line 21; page 14, line 12 to page 15, line 1; page 17, lines 17-23. That transcript is attached hereto as Appendix 9. Kay's attorneys also testified without contravention that Kay had incurred another $4,500.00 in attorney's fees at trial pursuing recovery of this $200,000.00 attorneys fee award—and that Kay would incur an additional $25,000.00 at the court of appeals level, and $15,000.00 at the Texas Supreme Court, if Kay had to continue to seek that recovery. *Id.*, RR 41 – 43.

Even though the Estate presented no evidence at October 1st hearing, the Probate Court wondered if "public policy" barred Kay's construction of the fee language in the Final Divorce Judgment. The Probate Court also wondered if such a construction "would encourage frivolous appeals" as the Estate's Response contended—although the Probate Court conceded that the Estate cited no authority for this supposed public policy. *Id.*, RR 7: 3-10 and 11-12. Kay specifically stressed to the Court, however, that William never

---

[5] Transcript references to the Reporter's Record attached hereto as Appendix 12 are hereinafter referred to as "RR [page number]: [line number]."

appealed the fee award in the affirmed Final Divorce Judgment, to either this Court of Appeals or the Texas supreme court, so a lower court could not simply ignore this Court's mandate. *Id.*, RR 7: 13 to 8: 21. The day after this October 1st hearing, Judge Rickhoff denied Kay's Claim Requests by written order. *See* Appendix 10; RR 113.

The colloquy between the Estate and Judge Rickhoff suggest that Judge Rickhoff's denied Kay's Fee Claims in his October 1st Order, based on the "public policy" exception that no Texas case or statute countenance, and on unstated maxims of "reasonable construction"—all after plenary jurisdiction over the Final Divorce Judgment unquestionably expired. *Id.*, RR 28: 14 to 29: 17. Neither the Estate nor the Court ever contended with Kay's insistence that, in any event, this Honorable Court of Appeals had mandated this affirmed fee award language. *Id.*, RR 32: 7-16. No proof or authority was provided to the Probate Court to support the Estate's assertion that this Court's mandate should not be "duly recognized, obeyed and executed" on public policy grounds.

This appeal arises out of a Bexar County Probate Court's[6] erroneous denial on October 2, 2014, of Kay's Claim for the entire above attorney's fee

---

[6] The Probate Action is styled *In the Matter of the Estate of William T. Booth, Deceased,* cause no. 2012-PC-02786, Probate Court No. 2, Bexar County, Texas, the Honorable Tom Rickhoff, presiding judge.

of Two Hundred Thousand dollars ($200,000.00) contained in the affirmed Final Divorce Judgment. Appendix 10; CR 113. Kay seeks reversal and rendition of this October 2nd Order, on the same grounds presented in her overruled Motion for New Trial. Appendix 11. Kay timely filed her Notice of Appeal regarding this October 2nd Order. CR 114 – 115.

Kay also petitioned this Honorable Court of Appeals for mandamus relief from this October 2, 2014, probate order on the grounds contained in this Brief, which petition was denied. *In Re Kay Lynn Maynard,* appeal no. 04-14-00794-CV, Fourth Court of Appeals, San Antonio, Texas.

## SUMMARY OF ARGUMENT

It is well-settled Texas law that, after an appellate court opinion affirms a trial court judgment, and the Texas supreme court affirms that appellate judgment, trial courts cannot deviate from the relief granted by the appellate court. In particular, where a judgment contains an unconditional award of attorneys fees, the party ordered to pay such fees cannot attack the unconditional nature of that fee award for the first time after that appellate affirmance and mandate are issued. The Probate Court erred when it allowed such an attack, and thereby denied Kay her full, unconditional attorney's fee award that was contained in the trial court judgment that this Court affirmed.

7

This Court should thus reverse the Probate Court's October 2, 2014, Order denying Kay her full attorney's fee award; render judgment that Kay recover that award; and also render or remand judgment that Kay recover all her trial and appellate fees that she incurred, in trying to recover her full award of attorney's fees.

## ARGUMENT AND AUTHORITIES

A court dissatisfied with a properly authenticated claim after examination and hearing, if "not convinced that the claim is just... shall disapprove the claim." TEX. ESTATES CODE § 355.056. "If a claimant.... is dissatisfied with the court's action on a claim, the claimant ... may appeal the action to the courts of appeal in the manner other judgments of the county court in probate matters are appealed." *Id.*, §§ 1157.058 and 355.058. "A final order issued by a probate court is appealable to the court of appeals." *Id.*, § 32.001(c). Appeals from probate court rulings use the terms "order" and "judgment" interchangeably. *See id.* Kay timely perfected her appeal of Judge Rickhoff's October 2, 2014, ruling. TEX. R. APP. P. 25.1, 26.1. The "error complained of ... probably caused the rendition of an improper judgment." *Id.*, Rule 44.1(a)(1).

Issue No. 1. Did the Probate Court's Disobedience of an appellate mandate that affirmed a trial court judgment, result in an improper judgment?

A. Trial Court actions will be reversed if they disobey a mandate of the Court of Appeals.

"The district court's authority is limited to trying only those issues specified in the mandate." *Martin v. Credit Protection Ass'n,* 824 S.W.2d 254, 256 (Tex. App.—Dallas 1992, writ dism'd w.o.j.) (reversing post-mandate trial court award to employee for attorney's fees and on counterclaim). In *Martin,* the Texas supreme court mandate reversed the lower court's opinion in the employee's favor, rendered judgment dissolving the employer's injunction, stated employer shall pay court and appellate costs, stated that employee "shall recover his costs in those courts from" employer—and then commanded the district court "to observe the order of our said Supreme Court in this behalf, and in all things to have recognized, obeyed, and executed." When the *Martin* court restricted the employee to the relief afforded in the Texas supreme court mandate, and reversed the employee's recovery on his counter-claim and attorney's fees, it reasoned that:

> "[t]he judgment is final not only in reference to the matters actually litigated, but as to all matters that the parties might have litigated and had decided in this cause. A party cannot try his action in pieces… We presume that, if the supreme court had meant for the district court to address [employee]

9

Martin's additional claims for relief, it would have directed the district court to do so. TEX. R. APP. 184."

*Martin*, at 257 (case citation and quotation marks omitted); *see also In Re Bandera Downs, Inc.,* No. 04-99-00699-CV, 1999 WL 792688 (Tex. App.—San Antonio October 6, 1999, no pet.) (not designated for publication) (reversing trial court requirement of bond before tax foreclosure sale exceeds proceeds disbursal, because the mandate "remanded for the trial court for a determination of the appropriate distribution of" such funds). As in *Martin*, the Final Divorce Judgment is final as to all matters that the parties might have litigated and had decided in Kay's Divorce Appeal, and William and his Estate cannot try their action in pieces. Even if the Estate *had* complained about the instant attorneys fee award in Kay's Divorce Appeal—and the Estate most assuredly did not—this Court could have directed the trial court to address William's or his Estate's additional claims for relief, but this complaint was never made, and this appellate direction was never given to the trial court. Judge Rickhoff's October 2, 2014, Order does not address any Estate claim that this Court directed the lower court to address.

Judge Rickhoff's refusal to award Kay the unconditional fee award contained in the Divorce Judgment that was affirmed in Kay's Divorce

10

Appeal, is analogous to the *Martin* attorneys fee award and counterclaim relief that were not mentioned in that supreme court mandate.

Notably, the succinct mandate affirming the Booth Final Divorce Judgment here, is markedly different from a mandate that reverses a summary judgment and thereby revives counterclaims (*Jay Petroleum, LLC v. EOG Resources, Inc.,* 332 S.W.3d 534, 541 [Tex. App.—Houston (1st Dist.) 2009, pet. denied]), or a mandate that reverses a trial court judgment and remands the case for further proceedings consistent with the appellate opinion. *See Bell Helicopter Textron, Inc. v. Houston Helicopters, Inc.,* No. 02-12-00037-CV, 2012 WL 5439025, at *2 (Tex. App.—Fort Worth 2012, no pet. h.) (mem. op.). In those instances, the trial court receives a "case that is reopened in its entirety." *Id.* The instant appellate mandate did not reopen the divorce at all, much less in its entirety.

B.  <u>An unconditional award of attorneys fees cannot be modified after a Final Judgment is affirmed.</u>

**An affirmed judgment for an unconditional award of appellate attorneys fees to a party constitutes a fully enforceable judgment, even if that party was unsuccessful on appeal, when the judgment debtor never complained about that unconditional award when the case was on appeal, but waited until after the judgment became final and subject to collection, to complain about that fee award.** *McVeigh v. Court of*

*Appeals*, 849 S.W.2d 911, 913 (Tex. App.—Houston [1st Dist.] 1993, pet. denied). In fact, "[a]ny error in the unconditional award of appellate attorney's fees must be challenged on appeal or the award will be enforced in accordance with the terms of the judgment." *Id.*, at 913. *McVeigh* is squarely analogous to the instant facts:

> "In 1987, the McVeighs obtained a legal malpractice judgment which provided: …
>
> A. $ 18,000.00 for the preparation and trial of this case;
> B. $   3,000.00 for an appeal to one of the Courts of Appeals;
> C. $ 6,500.00 for an application for Writ of Error to the Supreme Court of Texas; and
> D. $ 6,500.00 for services to be rendered in the Supreme Court of Texas…
>
> Following this judgment, *the McVeighs brought a limited appeal* pursuant to *TEX. R. APP. P. 40(a)(4)*, contending the judgment should have been for a greater amount… [T]he Fourteenth Court of Appeals … affirmed the malpractice judgment. The judgment became final upon denial of their application for writ of error, on October 25, 1989."

*Id.*, at 912-13 (italics in original). Lerner, the appellee, "raised one cross-point, requesting the imposition of sanctions against the McVeighs… The Fourteenth Court overruled all points and cross-points and affirmed." *Id.*, at 913, fn.1. After this fee award amount was left on deposit with the district court, Lerner obtained a summary judgment which the McVeighs then appealed contending, *inter alia*, that:

"… the district court erred in granting summary judgment because… the 1987 malpractice judgment is clear, unambiguous, and to be afforded full force and effect as written; any error in the attorneys' fee award should have been raised by bringing a cross-point in the limited appeal in the Fourteenth Court or, if necessary, by perfecting an independent appeal of the 1987 legal malpractice judgment."

*Id.,* at 913. Lerner responded, as the Estate did in its Response before Judge Rickhoff, by invoking *Robinwood Building and Development Co. v. Pettigrew,* 737 S.W.2d 110, 112 (Tex. App.—Tyler 1987, no writ) for the proposition that "the award of appellate attorneys' fees to the McVeighs, included in the 1987 judgment was 'implicitly conditioned' on the McVeighs' success on appeal…" *Id.*

The instant Probate Court should have rejected this *dicta* from *Robinwood* as the Court did in *McVeigh*:

"*Robinwood* stands, at most, for the proposition that **if a judgment is overturned on appeal**, then all awards of attorneys' fees are thereby voided just as are awards of actual or punitive damages, and those fee awards are, in that event, not to be enforced, even if they are 'unconditional' in that they are not expressly conditioned upon the appellant failure to prevail on appeal [citing *Robinwood* at 112] … *Robinwood* does not address the question of whether a facially unconditional award of appellate attorney's fees to the party who prevailed in the trial court is to be enforced as written if *that party* takes a limited appeal and fails to prevail. **Nor does *Robinwood* authorize a party to wait until a judgment successfully survives the appellate process and stands at the threshold of execution and then complain for the first time about the facially unconditional nature of an attorneys' fees [sic] contained in the judgment. <u>Any error</u>**

13

**in the unconditional award of appellate attorneys' fees must be challenged on appeal or the award will be enforced in accordance with the terms of the judgment.**"

*McVeigh*, at 913 (original emphasized "that party"; all other emphasis supplied). "When the Texas Supreme Court denied the McVeighs' application for a writ of error from the judgment of the Fourteenth Court of Appeals, that judgment was dispositive of any claim for declaratory relief that Lerner raised or could have raised in the district court concerning the attorneys' fees involved." *Id.*, at 914 (citations omitted).

It is difficult to imagine a case more squarely on point here than *McVeigh*: the *McVeigh* affirmed judgment contained an unconditional attorneys fee award that was not contested in that appeal, just as that contained in the instant Final Divorce Judgment; the *McVeigh* trial court judgment was affirmed in all respects, just as the Final Divorce Judgment was; the fee paying party in *McVeigh* did not complain of the unconditional nature of this fee award by either cross-appeal or by an independent appeal, just as the Estate failed to complain here; the fee paying party complained about the unconditional nature of the fee award after the mandate issued and the judgment survived the appellate process, just as the Estate belatedly complained before Judge Rickhoff. With the instant Booth mandate, this Court "was dispositive of any claim for declaratory relief that

14

[the Estate] ... raised or could have raised in the district court concerning the attorneys' fees involved"—just as the court reasoned in *McVeigh*. *Id.*, at 914 (citations omitted).

The Estate's Response cannot escape this compelling *McVeigh* rationale by relying on *Robinwood*, moreover, because the Booth Final Divorce Judgment was not "overturned on appeal" like that in *Robinwood*. Even less can they rely on cases where the unconditional nature of the attorneys fee award was actually complained about in the appeal of the judgment containing that award.[7]

C. Judge Rickhoff had no discretion except to award Kay her full attorney's fee affirmed in the appellate mandate.

The finality of a trial court judgment means that complaints that the judgment "... erroneously included causes of action that were not included in the motion for summary judgment or that necessary parties were not joined [were] waived..." *Robertson v. Hix*, 383 S.W.3d 170, 173 (Tex. App.—Waco 2012, no pet.) (hereinafter *Robertson II*). In recalling its

---

[7] *See* Estate's Response to Kay's Request for Appellate Attorney's Fees (Appendix 5), p. 4, citing *Texas Farmer's Ins. Co. v. Cameron*, 24 S.W.3d 386, 400 (Tex. App.—Dallas 2000, writ denied); *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 236 (Houston [14th Dist.] 1996, writ denied); *Spiller v. Spiller*, 901 S.W.2d 553, 560 (Tex. App.—San Antonio 1995, reh. denied); *Rittgers v. Rittgers*, 809 S.W.2d 109, 115 (Tex. App.—Corpus Christi 1990, writ denied); *Smith v. Smith*, 757 S.W.2d 422, 426 (Tex. App.—Dallas 1988, writ denied).

reasoning in *Robertson I*,[8] the *Robertson II* court may as well have been instructing Judge Rickhoff:

"As we stated in Robertson I,

> A district court has no discretion to interpret or review an appellate court's mandate or judgment. *In re Castle Tex. Prod. Ltd. P'ship,* 157 S.W.3d 524, 527 (Tex. App. –Tyler 2005, orig. proceeding); *Martin v. Credit Protection Ass'n,* 824 S.W.2d at 255 [*supra*]; *Schliemann v. Garcia,* 685 S.W.2d 690, 692 (Tex. App.—San Antonio 1984, orig. proceedings). A trial court's failure or refusal to comply with a court of appeals mandate is an abuse of discretion. *Lee v. Downey,* 842 S.W.2d 646, 648 (Tex. 1992).
>
> Therefore, it was an abuse of discretion for Judge Lykes to even hear the post-judgment motions after the issuance of this Court's mandate for the original appeal because the March 2005 judgment was final, the subsequent granting of the intervention by Coryell County and the other proceedings and rulings were improper and also constituted an abuse of discretion."

*Id.,* at 173-174. When a party moves to abate proceedings for the joinder of other necessary parties after that final judgment, direct appeal and mandate, "the trial court does not have the discretion to review and disregard the mandate of this Court." *Id.,* at 174. A trial court judgment becomes final with the issuance of an appellate mandate, in other words, and a trial court errs when it determines otherwise. *Id.,* at 175. As in the

---

[8] *In Re Robertson,* No. 10-09-00005-CV, 2009 Tex. App. LEXIS 2641 (Tex. App.— Waco April 15, 2009, orig. proceeding) (referred to as *Robertson I*).

March 2005 judgment discussed in *Robertson II*, the Booth divorce litigation had concluded, and Judge Rickhoff could not grant the Appellee here relief from that Two Hundred Thousand dollar ($200,000.00) attorneys fee award.

> Issue No. 2. Did the Probate Court's ignoring Kay's uncontroverted evidence of trial and appellate fees incurred to recover her $200,000.00 attorneys fee award, result in an improper judgment?

"If the instrument evidencing or supporting a claim provides for attorney's fees, the claimant may include as part of the claim the portion of attorney's fees the claimant has paid or contracted to pay an attorney to prepare, present and collect the claim." TEX. ESTATES CODE § 355.003. At the October 1, 2014, hearing, the Estate never disputed Kay's attorneys' evidence of reasonable and necessary trial and appellate fees required to recover Kay's $200,000.00 fee award. After Kay's trial counsel established his credentials and experience, he testified as follows without contravention:

> ".... I have spent about 15 hours total in the filing of the claim, the supplemental claim, the request, and today's [October 1, 2014] brief. In the event that an appeal must be taken of whatever rulings we get from this tribunal, I believe a customary and reasonable attorneys fee at the San Antonio Court of Appeals level would be 75 -- $25,000. To prepare a brief, and then at the Texas Supreme Court probably another $15,000."

17

RR 42, Appendix 12. Kay's brief that was filed that day appears at CR 108 – 112. The Trial Court repeated that attorneys fee amounts testimony: "... Okay. He says ... 4500; 25,000; 15,000 ..." *Id.*, RR 43. The Estate never challenged this testimony, never offered contrary evidence, or even cross-examined Kay's counsel, but the Probate Court still erroneously ignored that uncontroverted proof.

Kay invoked the statutory basis for recovering attorneys fees for William's breach of their divorce settlement contract—TEX. CIV. PRAC. & REM. CODE §38.001, that appellee Aircraft invoked in *Cessna Aircraft Company v. Aircraft Network, LLC*, 345 S.W.3d 139, 145-157 (Tex. App.—Dallas 2011, no pet.). The appellate court in *Cessna* rejected the assertion that Aircraft "may not properly recover the fees it incurred in proving its attorney's fees on remand..." because §38.001 "does not allow the recovery of fees for proving fees." In rejecting that argument, the court reasoned that "... a claim for attorney's fees is not an independent cause of action; it is part of a successful party's remedy." *Id.*, at 146 (citation omitted). Kay should thus recover the attorneys fees that the Estate forced her to incur in pursuit of her $200,000.00 attorney's fee claim in the probate proceeding below—or this matter should be remanded for determination below.

18

## CONCLUSION AND PRAYER

Under the undisputed record and settled Texas law, the trial court's refusal to comply with this Court's mandate resulted in an improper judgment, and should be reversed. Consequently, Relator KAY LYNN MAYNARD, formerly known as KAY LYNN MAYNARD BOOTH, respectfully requests that this Honorable Court of Appeals direct the lower court to:

1. vacate its October 2, 2014, Order and Judgment denying Kay's Fee Claims;

2. enter an order directing Michael McComas, Independent Executor of the Estate of William T. Booth, Deceased, to immediately pay Two Hundred Thousand Dollars ($200,000.00) in attorney's fees to Kay, and the interest thereon, as provided in the affirmed Final Divorce Judgment;

3. render an Order that the aforementioned Independent Executor should pay to Kay for Four Thousand Five Hundred dollars ($4,500.00) in attorneys fees for having pursued Kay's Fee Claims at the trial level; Twenty-five Thousand dollars ($25,000.00) in attorney's fees in the event such Appellee appeals to this Honorable Court of Appeals, and Fifteen Thousand dollars

19

($15,000.00) in attorney's fees in the event Appellee appeals to the Texas Supreme Court—or remand same for determination below; and

4. enter such other legal and equitable relief as Kay may show herself to be justly entitled.

Respectfully Submitted,

_____
Adán A. González, III
State Bar No. 08122350
THE LAW OFFICE OF
DONATO D. RAMOS, PLLC
6219 McPherson Road, Suite 350
Laredo, Texas 78041
Telephone 956-722-9909
Facsimile 956-727-5884
Trial and Appellate Counsel for
Appellant Kay Lynn Maynard

James K. Jones, Jr.
State Bar No. 10910200
THE LAW OFFICE OF
JAMES K. JONES, JR.
P.O. Box 560
Laredo, Texas 78042
Telephone 956-723-5575
Facsimile 956-723-2025
Trial Counsel for Appellant
Kay Lynn Maynard

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. CIV. P. 9.4(i)(2)(B) and 9.4(i)(3), the undersigned certifies that:

A.    The Appellant's Brief contains 4,599 words.

B.    The Appellant's Brief has been prepared in proportionally spaced typeface using Microsoft Office Word in Times New Roman 14 point.

_____
Adán A. González, III


## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October 2015, I have caused a true and correct copy of this foregoing instrument to be delivered to the following parties via the following methods.

Via email to chrish@heinrichslaw.com
A Chris Heinrichs
Heinrichs & De Gennaro, P.C.
100 N.E. Loop 410, Suit 1075
San Antonio, TX 78216
Attorneys for Real Parties in Interest

Via email to danpozza@yahoo.com
Dan Pozza
Law Office of Dan Pozza
239 East Commerce Street
San Antonio, Texas  78205

_____
Adán A. González, III

# APPENDIX

1. Claim of Kay Lynn Maynard

2. Fourth Court of Appeals Opinion and Judgment

3. Texas Supreme Court Denial of Petition

4. Fourth Court of Appeals Mandate

5. Response of Michael McComas, Independent Executor of the Estate of William Thomas Booth, to Kay Maynard's Request for Appellate Attorney's Fees

6. Kay Maynard's Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce

7. Kay Maynard's Supplemental Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce

8. Partial Allowance of Claims

9. Official Transcript – October 1, 2014, Hearing

10. Order Denying Kay Lynn Maynard's Requests for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce

11. Kay Lynn Maynard's Motion for New Trial

# APPENDIX 1

## *Claim of Kay Lynn Maynard*

FILED
IN MATTERS PROBATE

| | | |
|---|---|---|
| THE ESTATE OF | § | PROBATE COURT NO. 2 |
| | § | |
| WILLIAM THOMAS BOOTH | § | BEXAR COUNTY, TEXAS |

2013 MAY 23 P 12: 08

GERARD RICKHOFF
CLERK PROBATE COURTS
BEXAR COUNTY, TEXAS

BY_____ DEPUTY

## CLAIM OF KAY LYNN MAYNARD

Claimant KAY LYNN MAYNARD hereby makes and presents this her claim against the Estate of WILLIAM THOMAS BOOTH, deceased, viz: upon a *Final Judgment and Decree of Divorce* dated the 10th day of August, 2012, signed by the Honorable Monica L. Notzon (hereinafter referred to as "The Final Judgment"),

a. in the amount of One Hundred Fifty Thousand and No/100ths Dollars ($150,000.00), together with pre- and post-judgment interest thereon as provided on pages 5 and 26 of The Final Judgment;

b. in the amount of Forty Thousand and No/100th's Dollars ($40,000.00) for loss of deer hunting income, together with interest thereon as provided on page 26 of The Final Judgment;

c. in the amount of Eighteen Thousand and No/100ths Dollars ($18,000.00) for loss of hog hunting income, together with interest thereon as provided on page 26 of The Final Judgment;

d. in the amount of One Hundred Seven Thousand Seven Hundred Forty Three and No/100ths Dollars ($107,743.87) for special damages directly and consequentially resulting from WILLIAM THOMAS BOOTH's breach of contract, together with interest thereon thereon as provided on page 26 of The Final Judgment;

e. in damages of as-yet-to-be-determined amounts that are presently pending in appeal number 04-12-00585-CV, before the Court of Appeals for the Fourth Judicial District of Texas;

f. for the right to use water from all acreage awarded in The Final Judgment to WILLIAM THOMAS BOOTH for KAY LYNN MAYNARD's personal use, as well as to water her livestock by connecting to existing water wells and underground water lines, as provided on page 5 of The Final Judgment.

1

For collection of the above sums and to enforce such rights, claimant has contracted to pay an attorney to prepare and collect such claim, for which claimant also seeks payment. Upon the above debts and rights there are no payments, offsets or credits whatsoever; such debts and rights being the *Final Judgment and Decree of Divorce* upon which such Claimant is founded, and being hereto attached as Exhibit "A." The above sums have been secured by the filing of an Abstract of Judgment recorded as Document # 1143739 in Volume 3304, Page 713-715 of the Records of the County Clerk of Webb County, Texas, being hereto attached as Exhibit "B."

KAY LYNN MAYNARD

THE STATE OF TEXAS §

COUNTY OF WEBB §

Before me, the undersigned authority on this day personally appeared, KAY LYNN MAYNARD, known to me to be the person whose signature appears at the foot of the above claim, who being by me duly sworn, on her oath states that she is the owner of such claim, that the same is just, and that all legal offsets, payments and credits known to the affiant have been allowed.

KAY LYNN MAYNARD

Sworn to and subscribed before me by the said KAY LYNN MAYNARD this 20th day of May , 2013, to certify which witness my hand and seal of office.



CONNIE L. WALKER
Notary Public, State of Texas
My Commission Expires
April 23, 2016

Connie L. Walker
NOTARY PUBLIC,
STATE OF TEXAS

2

Respectfully Submitted,

_Adán A. González_

Adán A. González, III
State Bar No. 08122350
JONES & GONZALEZ,
An Association
5601 San Dario, Suite 5
Laredo, Texas 78041
Telephone 956-723-5575
Facsimile 956-723-2025

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served on the following counsel on May 20, 2013.

A. Chris Heinrichs                          cmrrr: 7011 0470 0003 4863 9634
HEINRICHS & De GENNARO, P.C.
One International Centre
100 N.E. Loop 410, Suite 1075
San Antonio, Texas  780216

_Adán A. González_

Adán A. González, III

3

Volume: 3303 Page: 590 - 674
Doc # 1142535
Doc Type: CERTIFIED COPIES OF DIVORCE DECREE
Record Date: 8/16/2012 3:00:50 PM Record By: VG
Fees $352.00
Margie Ibarra, Webb County Clerk

CAUSE NO. 2010-CVH-001376-D2

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | |
| WILLIAM BOOTH, and | § | 111th JUDICIAL DISTRICT |
| | § | [Transferred from 406th District Court] |
| | § | |
| KAY LYNN MAYNARD BOOTH | § | WEBB COUNTY, TEXAS |

FINAL JUDGMENT AND DECREE OF DIVORCE

On the 25th day of June 2012, came on to be heard the above-entitled and numbered cause.

*Appearances*

Petitioner, WILLIAM THOMAS BOOTH, appeared in person and through his attorneys of record, R. Michael Casseb and Martha Cigarroa de Llano and announced ready for trial. Respondent appeared in person and through her attorneys of record, James K. Jones, Jr., Cheryl Wilson, and Adán A. González, III and announced ready for trial.

*Record*

The record of testimony was duly reported by Cynthia Lenz and Vicente Mendoza in the 111th Judicial District Court of Webb County, Texas.

*Jurisdiction and Domicile*

The Court FINDS that the pleadings of Counter-Petitioner are in due form and contain all the allegations, information, and prerequisites required by law. The Court, after receiving evidence, finds that it has jurisdiction of this case and of all the parties and that at least sixty days have elapsed since the date the suit was filed and that the requirements of section 6.702 of the Texas Family Code have been met.

1

The Court further FINDS that, at the time this suit was filed, Counter-Petitioner had been a domiciliary of Texas for the preceding six-month period and a resident of the county in which this suit was filed for the preceding ninety-day period. All persons entitled to citation were properly cited.

*Jury*

A jury was empanelled and dismissed by the Court. Questions of fact and law pertaining to an alleged breach of contract and other matters were submitted to the Court.

*Agreement of Parties*

Although the parties did execute a Mediated Settlement Agreement, William Thomas Booth breached the agreement.

*Divorce*

IT IS ORDERED, ADJUDGED, AND DECREED that WILLIAM THOMAS BOOTH, Petitioner, and KAY LYNN MAYNARD BOOTH, Respondent, are divorced and that the marriage between them is dissolved on the grounds of insupportabililty.

*Children of the Marriage*

The Court finds that there is no child of the marriage of Petitioner and Respondent and that none is expected.

*The Contract Claim*

WILLIAM THOMAS BOOTH moved the Court for separate trial of KAY LYNN MAYNARD BOOTH's contract cause of action to enforce a mediated settlement agreement. By agreement of the parties, all issues incident to that cause of action were tried to the Court beginning on June 25, 2012. After presentation of evidence and argument of counsel, the Court FINDS and ORDERS in favor of KAY LYNN MAYNARD BOOTH and against WILLIAM THOMAS BOOTH:

1. KAY LYNN MAYNARD BOOTH is awarded as her sole and separate property, and WILLIAM THOMAS BOOTH is divested of all right, title, interest, and claim therein, Sixteen Hundred (1,600) acres described on the documents attached and incorporated herein by reference hereto as Exhibit "A."

2. Should KAY LYNN MAYNARD BOOTH wish to sell any of the 1,600 acres set forth above, WILLIAM THOMAS BOOTH shall have the right of first refusal, during his lifetime only, to purchase said acreage on all of the same terms and conditions as set forth in the offer received by Kay.

3. WILLIAM THOMAS BOOTH is awarded as his sole and separate property, and KAY LYNN MAYNARD BOOTH is divested of all right, title, interest, and claim therein, the following property save and except the Sixteen Hundred (1,600) acres described on the documents attached and incorporated herein by reference hereto as Exhibit "A":

| | |
|---|---|
| H-1 | That certain 380.39 acre tract, Tract B Webb County, Texas, according to plat thereof recorded in Plat Records of Webb County, Texas as shown in Exhibit "B" attached hereto and incorporated herein. |
| H-2 | That certain 222.26 acre tract, Tract A Webb County, Texas, according to plat thereof recorded in Plat Records of Webb County, Texas, as shown in Exhibit "C" attached hereto and incorporated herein. |
| H-3 | That certain 260.05 acre tract, Tract D Webb County, Texas, according to plat thereof recorded in Plat Records of Webb County, Texas, as shown in Exhibit "D" attached hereto and incorporated herein. |
| H-4 | That certain 66.55 acre tract, Tract E Webb County, Texas, according to plat thereof recorded in Plat Records of Webb |

3

County, Texas, as shown in Exhibit "E" attached hereto and incorporated herein.

H-5    That certain 870.91 acre tract, recorded in Volume 2515, Page 140 of the Real Property Records of Webb County, Texas, as shown in Exhibit "F" attached hereto and incorporated herein.

H-6    That certain 0.85 acre tract, Webb County, Texas, out of Survey No. 2292, Abstract No. 3226, including, but not limited to, the residence located thereon, as shown in Exhibit "G" attached hereto and incorporated herein.

H-7    That certain 948.21 acre tract, Webb County, Texas, according to plat thereof recorded in Plat Records of Webb County, Texas, as shown in Exhibit "H" attached hereto and incorporated herein.

H-8    That certain 1,773.33 acre tract, Tract C Webb County, Texas, according to plat thereof recorded in Plat Records of Webb County, as shown in Exhibit "I" attached hereto and incorporated herein; and

H-9    That certain 19.956 acre tract in Webb County, Texas, according to plat thereof recorded in Plat Records of Webb County, as shown in Exhibit "J" attached hereto and incorporated herein.

4. Should WILLIAM THOMAS BOOTH wish to sell any of the acreage set forth above, KAY LYNN MAYNARD BOOTH shall have the right of first refusal during her lifetime only to purchase said acreage on all of the same terms and conditions as set forth in the offer received by WILLIAM THOMAS BOOTH.

5. So long as KAY LYNN MAYNARD BOOTH owns an interest in the property awarded to her above, she and William Thomas Booth shall each receive fifty percent (50%) of any and all benefits arising from the Surface Use Agreement, a copy of which is attached to and

4

incorporated into this Final Judgment and Decree of Divorce as Exhibit "K".

6. KAY LYNN MAYNARD BOOTH shall have the right to use water from all acreage awarded to WILLIAM THOMAS BOOTH for her personal use, as well as to water her livestock by connecting to existing water wells and underground water lines, at her sole cost and expense, on WILLIAM THOMAS BOOTH's property. This right shall terminate upon the death of KAY LYNN MAYNARD BOOTH, or upon the sale of the acreage awarded to her herein.

7. KAY LYNN MAYNARD BOOTH is awarded all her personal belongings, jewelry and clothing.

8. WILLIAM THOMAS BOOTH is awarded all his personal belongings, jewelry and clothing.

9. KAY LYNN MAYNARD BOOTH shall have judgment against WILLIAM THOMAS BOOTH in the amount of One Hundred Fifty Thousand dollars ($150,000.00), with interest thereon from November 18, 2011, at the rate of five per cent, until the date of signing of this judgment.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that on or before August 18, 2012, Kay Lynn Maynard Booth and her designees shall begin to physically separate the livestock belonging to the parties equally (not including five (5) cows belonging to Jerry Maynard). The roundup shall conclude on or before August 27, 2012, WILLIAM THOMAS BOOTH may be present, and the cost of the roundup and separation shall be borne by both parties equally.

5

IT IS FURTHERED ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH shall have and receive furniture described on the instrument attached hereto as Exhibit "L," and WILLIAM THOMAS BOOTH shall have and receive furniture described on the instrument attached hereto as Exhibit "M."

IT IS FURTHER ORDERED that WILLIAM THOMAS BOOTH is awarded as his sole and separate property the following vehicles:

| | | |
|---|---|---|
| H-1 | Escalade Sport Utility 4-Door | VIN# 16YEC6388R309488 |
| H-2 | 1997 Chevrolet Suburban | VIN #1GNFK116ROVJ356649 |
| H-3 | 16ft. Flatbed Trailer | VIN #Unknown |
| H-4 | John Deere Tractor | VIN #3029DLV51JDS21 |
| H-5 | 28ft. Gooseneck Trailer | VIN #16G5628276B059273 |
| H-6 | 2007 Yamaha 250 motorcycle | VIN #Unknown |
| H-7 | 2007 Honda 250 motorcycle | VIN #Unknown |
| H-8 | 2007 Honda 150 motorcycle | VIN #Unknown |
| H-9 | 2006 Yamaha Cub Cadet golf cart | VIN #Unknown |
| H-10 | 1995 Chevrolet pickup truck | VIN #1GCEC19KXSE149321 |

IT IS FURTHER ORDERED that KAY LYNN MAYNARD BOOTH is awarded as her sole and separate property:

| | | |
|---|---|---|
| W-1 | 2003 Hummer | VIN# 5GRC23U83H134902, |
| W-2 | 2001 Chevrolet 2500 HD | VIN# GCHC23U61F165411. |

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the following items are awarded to William Thomas Booth if located in good faith by, KAY LYNN MAYNARD BOOTH:

6

H-1 Bill Coster's shotgun;

H-2 Arrowhead collection;

H-3 Paneré watches;

H-4 Deer heads.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that WILLIAM THOMAS BOOTH is awarded all other vehicles and farm equipment belonging to the parties.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH is awarded as her sole and separate property, and WILLIAM THOMAS BOOTH is divested of all right, title, interest, and claim therein, the following royalty and non-participating royalty interests:

W-1 A ½ of 1% (.005) overriding royalty interest as described in the Assignment of Overriding Royalty Interests recorded in Volume 1886, Page 496-501, Real Property Records, Webb County, Texas.

W-2 A non-participating royalty interest equal to ½ of 1% (.005) in oil, gas and other minerals in 892.09 acres of land, in depths below the top of the Anacacho Formation (as described in the Perpetual Royalty Deed recorded in Volume 444, Page 224, and Volume 444 page 227 Real Property Records, Webb County, Texas).

W-3 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests, dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 795, Official Public Records of Webb County, Texas, covering 642.29 acres of land, more or less, out of the Joaquin Galan Grant, as more fully described therein.

W-4 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests, dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 792, Official Public Records of Webb County, Texas.

7

W-5 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests, dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 786, Official Public Records of Webb County, Texas.

W-6 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests, dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 789, Official Public Records of Webb County, Texas.

W-7 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Topp Petroleum Corporation, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 190, of the Official Public Records of Webb County, Texas.

W-8 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Thomason Investment Co., Assignor, to William Booth, Assignee, recorded at Volume 289, Page 150, of the Deed Records of Webb County, Texas.

W-9 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from R. W. Dirks Petroleum Engineer, Inc., Assignor, to William Booth, Assignee, recorded at Volume 289, Page 156, of the Deed Records of Webb County, Texas.

W-10 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Gary D. Lewis, Trustee of the Pamela Lewis Trust, Assignor, to William Booth, Assignee, recorded in Volume 284, Page 729, of the Official Public Records of Webb County, Texas.

W-11 One-half (½) of William Booth's right, title and interest under and pursuant to Correction Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Gary D. Lewis, Trustee of the Pamela Lewis Trust, Assignor, to William Booth, Assignee, recorded in Volume 343, Page 96, of the Official Public Records of Webb County, Texas.

W-12 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee,

recorded in Volume 289, Page 202, of the Official Public Records of Webb County, Texas.

W-13 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee, recorded in Volume 289, Page 206, of the Official Public Records of Webb County, Texas.

W-14 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee, recorded in Volume 289, Page 208, of the Official Public Records of Webb County, Texas.

W-15 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee, recorded in Volume 289, Page 211, of the Official Public Records of Webb County, Texas.

W-16 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, R. D. Burnside, Jr., Assignor, to William Booth, Assignee, recorded in Volume 289, Page 152 of the Official Records of Webb County, Texas.

W-17 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Thomason Investment Co.-Bryant, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 154 of the Official Records of Webb County, Texas.

W-18 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Barbara B. Matheney, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 158 of the Official Records of Webb County, Texas.

W-19 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joseph H. and Malinda L. Cowen, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 160 of the Official Records of Webb County, Texas.

W-20 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Tom Sneva, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 162, of the Official Records of Webb County, Texas.

W-21 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Julie Streitman Martisek, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 164 of the Official Records of Webb County, Texas.

W-22 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 47, of the Official Records of Webb County, Texas.

W-23 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 50, of the Official Records of Webb County, Texas.

W-24 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 53, of the Official Records of Webb County, Texas.

W-25 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 56, of the Official Records of Webb County, Texas.

W-26 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 284, Page 726, of the Official Records of Webb County, Texas.

W-27 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. A. Paul Compton, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 166, of the Official Records of Webb County, Texas.

W-28   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jon R. Fischer, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 168, of the Official Records of Webb County, Texas.

W-29   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, 1982 Beasley Trust, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 170, of the Official Records of Webb County, Texas

W-30   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. William Streitman, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 172, of the Official Records of Webb County, Texas.

W-31   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, John W. Beasley, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 174, of the Official Records of Webb County, Texas.

W-32   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Grady Hogue, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 176, of the Official Records of Webb County, Texas.

W-33   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, James W. Matheney, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 178, of the Official Records of Webb County, Texas.

W-34   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. J.H. & Mary Bearden, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 180, of the Official Records of Webb County, Texas.

W-35   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. Frank R. Dehnisch, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 182, of the Official Records of Webb County, Texas.

W-36   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jack E. Bearden, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 184, of the Official Records of Webb County, Texas.

W-37   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Pamela Lewis Trust, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 186, of the Official Records of Webb County, Texas.

W-38   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joe H. Schmid, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 188, of the Official Records of Webb County, Texas.

W-39   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Thomason Investment Co., Assignor, to William Booth, Assignee, recorded in Volume 315, Page 8, of the Official Records of Webb County, Texas.

W-40   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, R. D. Burnside, Jr., Assignor, to William Booth, Assignee, recorded in Volume 315, Page 11, of the Official Records of Webb County, Texas.

W-41   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Thomason Investment Co. - Bryant, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 14, of the Official Records of Webb County, Texas.

W-42   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, R. W. Dirks Petroleum Engineer, Inc., Assignor, to William Booth, Assignee, recorded in Volume 315, Page 17, of the Official Records of Webb County, Texas.

W-43   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Barbara B. Matheney, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 20, of the Official Records of Webb County, Texas.

W-44   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joseph H. and Malinda L. Cowen, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 23, of the Official Records of Webb County, Texas.

W-45   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Tom Sneva, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 26, of the Official Records of Webb County, Texas.

W-46   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Julie Streitman Martisek, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 29, of the Official Records of Webb County, Texas.

W-47   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. A. Paul Compton, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 32, of the Official Records of Webb County, Texas.

W-48   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jon R. Fischer, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 35, of the Official Records of Webb County, Texas.

W-49   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, 1982 Beasley Trust, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 38, of the Official Records of Webb County, Texas.

W-50   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. William Streitman, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 41, of the Official Records of Webb County, Texas.

W-51   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, John W. Beasley, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 44, of the Official Records of Webb County, Texas.

W-52 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Grady Hogue, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 47, of the Official Records of Webb County, Texas.

W-53 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, James W. Matheney, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 50, of the Official Records of Webb County, Texas.

W-54 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. J.H. & Mary Bearden, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 53, of the Official Records of Webb County, Texas.

W-55 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. Frank R. Dehnisch, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 56, of the Official Records of Webb County, Texas.

W-56 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jack E. Bearden, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 59, of the Official Records of Webb County, Texas.

W-57 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Pamela Lewis Trust, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 62, of the Official Records of Webb County, Texas.

W-58 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joe H. Schmid, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 65, of the Official Records of Webb County, Texas.

W-59 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated February 1, 1996, Navarro Gas Company, Assignor, to William Booth, Assignee, recorded in Volume 382, Page 112, of the Official Records of Webb County, Texas.

W-60 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated September 29, 1997, Union Pacific Resources Company, Assignor, to William Booth, Assignee, recorded in Volume 562, Page 626, of the Official Records of Webb County, Texas.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that WILLIAM THOMAS BOOTH is awarded as his sole and separate property, and KAY LYNN MAYNARD BOOTH is divested of all right, title, interest, and claim therein, the following royalty and non-participating royalty interests:

H-1 A ½ of 1% (.005) overriding royalty interest as described in the Assignment of Overriding Royalty Interests recorded in Volume 1886, Page 496-501, Real Property Records, Webb County, Texas.

H-2 A non-participating royalty interest equal to ½ of 1% (.005) in oil, gas and other minerals in 892.09 acres of land, in depths below the top of the Anacacho Formation (as described in the Perpetual Royalty Deed recorded in Volume 444, Page 224, and Volume 444, page 227 , Real Property Records, Webb County, Texas).

H-3 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests, dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 795, Official Public Records of Webb County, Texas, covering 642.29 acres of land, more or less, out of the Joaquin Galan Grant, as more fully described therein.

H-4 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests, dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 792, Official Public Records of Webb County, Texas.

H-5 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests, dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 786, Official Public Records of Webb County, Texas.

H-6 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral interests,

15

dated December 6, 1994, from Richard L. Fuqua, P.C., Grantor, to William Booth, Assignee, recorded in Volume 291, Page 789, Official Public Records of Webb County, Texas.

H-7 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Topp Petroleum Corporation, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 190, of the Official Public Records of Webb County, Texas.

H-8 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Thomason Investment Co., Assignor, to William Booth, Assignee, recorded at Volume 289, Page 150, of the Deed Records of Webb County, Texas.

H-9 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from R. W. Dirks Petroleum Engineer, Inc., Assignor, to William Booth, Assignee, recorded at Volume 289, Page 156, of the Deed Records of Webb County, Texas.

H-10 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Gary D. Lewis, Trustee of the Pamela Lewis Trust, Assignor, to William Booth, Assignee, recorded in Volume 284, Page 729, of the Official Public Records of Webb County, Texas.

H-11 One-half (½) of William Booth's right, title and interest under and pursuant to Correction Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, from Gary D. Lewis, Trustee of the Pamela Lewis Trust, Assignor, to William Booth, Assignee, recorded in Volume 343, Page 96, of the Official Public Records of Webb County, Texas.

H-12 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee, recorded in Volume 289, Page 202, of the Official Public Records of Webb County, Texas.

H-13 One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee,

16

recorded in Volume 289, Page 206, of the Official Public Records of Webb County, Texas.

H-14   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee, recorded in Volume 289, Page 208, of the Official Public Records of Webb County, Texas.

H-15   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil and Gas Interests dated November 22, 1994, by Gary D. Lewis, Trustee of the Pamela Lewis Trust, et al, Assignors, to William Booth, Assignee, recorded in Volume 289, Page 211, of the Official Public Records of Webb County, Texas.

H-16   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, R. D. Burnside, Jr., Assignor, to William Booth, Assignee, recorded in Volume 289, Page 152 of the Official Records of Webb County, Texas.

H-17   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Thomason Investment Co.-Bryant, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 154 of the Official Records of Webb County, Texas.

H-18   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Barbara B. Matheney, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 158 of the Official Records of Webb County, Texas.

H-19   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joseph H. and Malinda L. Cowen, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 160 of the Official Records of Webb County, Texas.

H-20   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Tom Sneva, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 162, of the Official Records of Webb County, Texas.

H-21   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases

17

dated October 1, 1994, Julie Streitman Martisek, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 164 of the Official Records of Webb County, Texas.

H-22   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 47, of the Official Records of Webb County, Texas.

H-23   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 50, of the Official Records of Webb County, Texas.

H-24   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 53, of the Official Records of Webb County, Texas.

H-25   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 274, Page 56, of the Official Records of Webb County, Texas.

H-26   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated November 21, 1994, T. S. McDaniel, et al, Assignor, to William Booth, Assignee, recorded in Volume 284, Page 726, of the Official Records of Webb County, Texas.

H-27   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. A. Paul Compton, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 166, of the Official Records of Webb County, Texas.

H-28   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jon R. Fischer, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 168, of the Official Records of Webb County, Texas.

H-29   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, 1982 Beasley Trust, Assignor, to William

18

Booth, Assignee, recorded in Volume 289, Page 170, of the Official Records of Webb County, Texas

H-30  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. William Streitman, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 172, of the Official Records of Webb County, Texas.

H-31  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, John W. Beasley, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 174, of the Official Records of Webb County, Texas.

H-32  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Grady Hogue, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 176, of the Official Records of Webb County, Texas.

H-33  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, James W. Matheney, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 178, of the Official Records of Webb County, Texas.

H-34  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. J.H. & Mary Bearden, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 180, of the Official Records of Webb County, Texas.

H-35  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. Frank R. Dehnisch, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 182, of the Official Records of Webb County, Texas.

H-36  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jack E. Bearden, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 184, of the Official Records of Webb County, Texas.

H-37  One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Pamela Lewis Trust, Assignor, to William

19

Booth, Assignee, recorded in Volume 289, Page 186, of the Official Records of Webb County, Texas.

H-38   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joe H. Schmid, Assignor, to William Booth, Assignee, recorded in Volume 289, Page 188, of the Official Records of Webb County, Texas.

H-39   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Thomason Investment Co., Assignor, to William Booth, Assignee, recorded in Volume 315, Page 8, of the Official Records of Webb County, Texas.

H-40   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, R. D. Burnside, Jr., Assignor, to William Booth, Assignee, recorded in Volume 315, Page 11, of the Official Records of Webb County, Texas.

H-41   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Thomason Investment Co. - Bryant, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 14, of the Official Records of Webb County, Texas.

H-42   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, R. W. Dirks Petroleum Engineer, Inc., Assignor, to William Booth, Assignee, recorded in Volume 315, Page 17, of the Official Records of Webb County, Texas.

H-43   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Barbara B. Matheney, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 20, of the Official Records of Webb County, Texas.

H-44   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joseph H. and Malinda L. Cowen, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 23, of the Official Records of Webb County, Texas.

H-45   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Tom Sneva, Assignor, to William Booth,

Assignee, recorded in Volume 315, Page 26, of the Official Records of Webb County, Texas.

H-46   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Julie Streitman Martisek, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 29, of the Official Records of Webb County, Texas.

H-47   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. A. Paul Compton, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 32, of the Official Records of Webb County, Texas.

H-48   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jon R. Fischer, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 35, of the Official Records of Webb County, Texas.

H-49   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, 1982 Beasley Trust, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 38, of the Official Records of Webb County, Texas.

H-50   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. William Streitman, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 41, of the Official Records of Webb County, Texas.

H-51   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, John W. Beasley, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 44, of the Official Records of Webb County, Texas.

H-52   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Grady Hogue, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 47, of the Official Records of Webb County, Texas.

H-53   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, James W. Matheney, Assignor, to William

Booth, Assignee, recorded in Volume 315, Page 50, of the Official Records of Webb County, Texas.

H-54   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. J.H. & Mary Bearden, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 53, of the Official Records of Webb County, Texas.

H-55   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Dr. Frank R. Dehnisch, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 56, of the Official Records of Webb County, Texas.

H-56   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Jack E. Bearden, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 59, of the Official Records of Webb County, Texas.

H-57   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Pamela Lewis Trust, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 62, of the Official Records of Webb County, Texas.

H-58   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated October 1, 1994, Joe H. Schmid, Assignor, to William Booth, Assignee, recorded in Volume 315, Page 65, of the Official Records of Webb County, Texas.

H-59   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated February 1, 1996, Navarro Gas Company, Assignor, to William Booth, Assignee, recorded in Volume 382, Page 112, of the Official Records of Webb County, Texas.

H-60   One-half (½) of William Booth's right, title and interest under and pursuant to Assignment of Oil, Gas and Mineral Leases dated September 29, 1997, Union Pacific Resources Company, Assignor, to William Booth, Assignee, recorded in Volume 562, Page 626, of the Official Records of Webb County, Texas.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that WILLIAM THOMAS BOOTH shall retain his Twenty-Four and a half percent (24.5%) interest in the W.V. Booth Family Limited Partnership.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH is awarded her Roth and Individual Retirement Accounts and her Catholic Mutual Insurance policy, and that WILLIAM THOMAS BOOTH is awarded his life insurance policy, the Briggs Country Club golf membership, and Southwest Securities account.

*Income Taxes*

IT IS FURTHER ORDERED, ADJUDGED and DECREED that WILLIAM THOMAS BOOTH shall pay income taxes owed by the parties for the taxable period 2010 and through August 10, 2012, and that WILLIAM THOMAS BOOTH and KAY LYNN MAYNARD BOOTH shall share the tax refund and carryover for the year 2011, if any.

IT IS ORDERED AND DECREED that, for the calendar year 2012, WILLIAM THOMAS BOOTH shall timely pay and hold KAY LYNN MAYNARD BOOTH and her property harmless from any federal income tax liability attributable to the income of the parties or either of them from January 1 of that year through the date of divorce, unless such additional tax, penalty and/or interest resulted from KAY LYNN MAYNARD BOOTH's omission of income she earned or recognized in 2012 or from erroneous deductions proffered by KAY LYNN MAYNARD BOOTH, in which case KAY LYNN MAYNARD BOOTH shall pay such resulting tax, penalties and/or interest thereon, and she shall indemnify and hold WILLIAM THOMAS BOOTH harmless therefrom.

23

IT IS ORDERED AND DECREED that WILLIAM THOMAS BOOTH shall be entitled to use as a credit against his tax liability for calendar year 2012 all prepayments and withholdings made by either party before the date of divorce and all deductions, exemptions, and adjustments attributable to either party's income and expenses before the date of divorce.

IT IS ORDERED AND DECREED that WILLIAM THOMAS BOOTH shall timely pay and hold KAY LYNN MAYNARD BOOTH and her property harmless from any tax liability attributable to WILLIAM THOMAS BOOTH's income from the date of the divorce until December 31 of that year.

IT IS ORDERED AND DECREED that KAY LYNN MAYNARD BOOTH shall timely pay and hold WILLIAM THOMAS BOOTH and his property harmless from any tax liability attributable to KAY LYNN MAYNARD BOOTH's income from the date of divorce until December 31 of that year.

IT IS ORDERED AND DECREED that each party shall be solely entitled to use as a credit against his or her own tax liability for calendar year 2012 all prepayments and withholding made by him or her after the date of divorce and all deductions, exemptions and adjustments attributable to his or her income and expenses after the date of divorce. In this regard, IT IS ORDERED AND DECREED that KAY LYNN MAYNARD BOOTH'S tax liability shall be that amount arrived at by independent calculation that KAY LYNN MAYNARD BOOTH would owe if she were filing a separate return for the entire year and reporting only the income earned or received by her from the date of the divorce to December 31 of that year, and with only those deductions attributable to expenditures made by her from the date of divorce to December 31 of that year, with

100% of any statutory deduction available to her in lieu of itemizing her deductions and 100% of one full dependency exemption.

IT IS ORDERED AND DECREED that any portion of the income tax on KAY LYNN MAYNARD BOOTH's return for the year of the divorce paid by WILLIAM THOMAS BOOTH shall be deemed part of KAY LYNN MAYNARD BOOTH's share of the marital estate of the parties.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that WILLIAM THOMAS BOOTH shall pay his debts incurred prior to September 22, 2011, and that KAY LYNN MAYNARD BOOTH shall pay her debts incurred prior to September 22, 2011, and it is further ORDERED, ADJUDGED and DECREED that each party shall indemnify the other, and hold the other harmless, for all debts and claims that they have assumed and been ordered to pay by virtue of the Final Judgment and Decree of Divorce entered in this action.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that WILLIAM THOMAS BOOTH will pay the debts as provided above, including but not limited to, the debts owed to Neiman Marcus; owed on Citiworld Master card account ending in 3986 and Visa Signature card account ending in 8261; and owed to Stockmen's National Bank..

IT IS FURTHER ORDERED, ADJUDGED and DECREED that WILLIAM THOMAS BOOTH and KAY LYNN MAYNARD BOOTH each keeps the cash in their respective possession on and before September 22, 2011.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH shall have and receive Judgment against WILLIAM THOMAS BOOTH for:

25

1. loss of deer hunting income in the amount of Forty Thousand and No/100 Dollars ($40,000.00); and

2. loss of hog hunting income in the amount of Eighteen Thousand and No/100 Dollars ($18,000.00).

IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH shall have and recover special damages directly and consequentially resulting from WILLIAM THOMAS BOOTH'S breach of the contract for expenses that KAY LYNN MAYNARD BOOTH incurred from October 12, 2011, in the amount of ONE HUNDRED SEVEN THOUSAND SEVEN HUNDRED FORTY THREE AND 87/100 DOLLARS ($107,743.87).

IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH recover attorney's fees reasonably and necessarily incurred after October 12, 2011, for services rendered in the trial through June 28, 2012, in the amount of Two Hundred Thousand Dollars ($200,000); provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted.

All amounts due and unpaid hereunder shall bear interest at the rate of five percent (5%) per annum compounded annually from the date of signing of this Final Judgment and Decree of Divorce.

*Division of Marital Estate*

After the Court disposed of the contract claim, it heard further evidence of what property had not been partitioned by the parties by enforcement of their settlement

26

agreement under the contract action as stated above. It is therefore ORDERED, ADJUDGED, and DECREED and the court FINDS:

The Court finds that the parties entered into a mediated settlement agreement disposing and dividing most of their assets. In regard to the assets not divided between the parties, the Court finds that the mediated settlement agreement is a just and right division of the parties' marital estate, having due regard for the rights of each party. Those assets not divided by the parties are divided by the court and awarded to WILLIAM THOMAS BOOTH and KAY LYNN BOOTH in a just and right manner as reflected herein:

IT IS ORDERED AND DECREED that the husband, WILLIAM THOMAS BOOTH, is awarded the following as his sole and separate property, and the wife is divested of all right, title, interest, and claim in and to that property:

H-1    All property reflected on Exhibit "M" which is attached hereto and incorporated herein by reference.

H-2    William Thomas Booth shall retain the Dominion Country Club Membership.

H-3    William Thomas Booth shall be entitled to one-half (1/2) of all funds in the Registry of the 111th Judicial District Court of Webb County, Texas, to be paid to him on the date of entry of this Decree of Divorce.

IT IS ORDERED AND DECREED that the wife, KAY LYNN MAYNARD BOOTH, is awarded the following as her sole and separate property, and the husband is divested of all right, title, interest, and claim in and to that property:

W-1    All property reflected on Exhibit "L" which is attached hereto and incorporated herein by reference.

W-2   Kay shall be entitled to one-half (1/2) of all funds in the Registry of the 111th Judicial District Court of Webb County, Texas, to be paid to her on the date of entry of this Decree of Divorce.

*Property To Be Fenced*

The boundary between the acreage belonging to KAY LYNN MAYNARD BOOTH and WILLIAM THOMAS BOOTH may be fenced by either party.

*Debts Payable by William Thomas Booth*

IT IS ORDERED AND DECREED that the husband, WILLIAM THOMAS BOOTH, shall pay, as part of the division of the estate of the parties, and shall indemnify and hold the wife and her property harmless from any failure to so discharge, these items:

H-1   The balance due, including principal, interest, and all other charges, on the promissory note payable to Security Service Federal Credit Union, and given as part of the purchase price of and secured by a lien on the 2007 Cadillac Escalade Sport Utility 4D motor vehicle William Thomas Booth is to receive.

The following debts, charges, liabilities, and obligations:

H-2   All debts incurred by William since leaving the parties' home on June 23, 2010

H-3.   Balance due to CitiWorld MasterCard, account ending in 3986

H-4.   Visa Signature, account ending in 8261

H-5.   Loan at Stockman's National Bank

H-6.   All debts, charges, liabilities, and other obligations incurred solely by William from and after June 23, 2010.

H-7.   All encumbrances, ad valorem taxes, liens, assessments, or other charges due or to become due on the real and personal property awarded to William Thomas Booth.

*Debts Payable by Kay Lynn Maynard Booth*

IT IS ORDERED AND DECREED that the wife, KAY LYNN MAYNARD BOOTH, shall pay, as part of the division of the estate of the parties, and shall indemnify

28

and hold the husband and his property harmless from any failure to so discharge, these items:

W-1.   All credit card debts incurred since June 10, 2010.

W-2.   All debts, charges, liabilities, and other obligations incurred solely by Kay Lynn Maynard Booth from and after June 10, 2010.

W-3.   All encumbrances, ad valorem taxes, liens, assessments, or other charges due or to become due on the real and personal property awarded to Kay Lynn Maynard Booth.

*Notice*

IT IS ORDERED AND DECREED that each party shall send to the other party, within three (3) days of its receipt, a copy of any correspondence from a creditor or taxing authority concerning any potential liability of the other party.

*Future Use and Disposition of Credit Cards*

IT IS ORDERED AND DECREED that William Booth is granted exclusive use of the following credit cards and Kay Lynn Maynard Booth is enjoined and prohibited from using or incurring any indebtedness on those cards:

H-1.   Neiman Marcus, account ending in 5656

H-2.   CitiAadvantage World MasterCard, accounting ending in 3986

H-3.   Visa Signature Card, account ending in 8261

IT IS ORDERED AND DECREED that Kay Lynn Maynard Booth is granted exclusive use of the following credit cards and William Booth is enjoined and prohibited from using or incurring any indebtedness on those cards:

W-1.   CitiBusiness Aadvantage Card, account ending in 5156

W-2.   CitiBusiness Aadvantage Card, account ending in 3410

W-3.   CitiAadvantage Visa Signature Card, account ending in 6003

W-4.   CitiBusiness Aadvantage Card, account ending in 6912

29

W-5.   CitiBusiness Aadvantage Card, accounting ending in 1552

W-6.   MBNA, account ending in 8842

W-7.   CitiAadvantage Visa Signature, account ending in 3180

*Transfer and Delivery of Property*

Kay Lynn Maynard Booth is ORDERED to appear in the law offices of Jones & Gonzalez, 5601 San Dario, Suite 5, Laredo, Webb County, Texas 78041 at 1:30 p.m. on August 28, 2012, to execute, have acknowledged, and deliver to William Thomas Booth these instruments:

1.   Special Warranty Deed conveying all the property described elsewhere in this Final Decree of Divorce to William Booth;

2.   Certificates of Title for all motor vehicle in her possession; and

3.   Power of attorney to transfer title of all motor vehicles in her possession.

4.   Any keys, insurance policies, registration papers and title documents for any other motor vehicle awarded to William Booth hereunder.

William Thomas Booth is ORDERED to appear in the law offices of Person, Whitworth, Borchers & Morales, LLP, 602 E. Calton Road, Laredo, Webb County, Texas 78041 at 1:30 p.m. on August 28, 2012, to execute, have acknowledged, and deliver to Kay Lynn Maynard Booth these instruments:

1.   Special Warranty Deed in favor of Kay for the One Thousand Six Hundred (1,600) acres referred to elsewhere in this Final Decree of Divorce;

2.   Certificate of title for all motor vehicles in his possession, if any;

3.   Power of attorney to transfer motor vehicle for the 2003 Hummer and the 2001 Chevrolet pickup truck; and

This decree shall serve as a muniment of title to transfer ownership of all property awarded to any party in this Final Decree of Divorce.

*Direction to Delivery Property*

If they are in her possession, Kay Lynn Maynard Booth is ORDERED to deliver to William Thomas Booth on August 28, 2012 at the offices of Person, Whitworth, Borchers & Morales, LLP, 602 E. Calton Road, Laredo, Webb County, Texas 78041 the following items:

1. All title documents, tax statements, insurance policies, house plans, warranties and service contracts, title and closing documents, and entry codes and keys for the house located on .085 acres of the Booth Ranch, as shown on the Special Warranty Deed from Kay Lynn Maynard Booth to William Thomas Booth.

Although the former residence of the parties is the property of William Thomas Booth, Kay Lynn Maynard Booth may remain in that residence, rent-free, until August 31, 2012.

IT IS ORDERED AND DECREED that each party shall pay for the preparation of his or her return for 2012.

IT IS ORDERED AND DECREED that each party shall preserve for a period of seven (7) years from the date of divorce all financial records relating to the community estate. Each party is ORDERED to allow the other party access to these records to determine acquisition dates or tax basis or to respond to an IRS examination within five (5) days of receipt of written notice from the other party. Access shall include the right to copy the records.

IT IS ORDERED AND DECREED that all payments made to the other party in accordance with the allocation provisions for payment of federal income taxes contained in this Final Decree of Divorce are not deemed income to the party receiving those payments but are part of the property division and necessary for a just and right division of the parties' estate.

*Resolution of Temporary Orders*

IT IS ORDERED AND DECREED that Petitioner and Respondent are discharged from all further liabilities and obligations imposed by the temporary order of this Court rendered on December 15, 2010.

*Discovery Retention Requirement*

IT IS ORDERED AND DECREED that any persons required to serve discovery materials shall maintain, for a period of eighteen (18) months after this judgment is signed, the originals or exact copies of all discovery materials produced during the pendency of this matter and not filed with the Court. If an appeal is begun within that eighteen (18)-month period, IT IS FURTHER ORDERED AND DECREED that the discovery materials shall be maintained while the appeal is pending.

*Change of Name*

IT IS ORDERED, ADJUDGED, AND DECREED that Respondent's name is changed to KAY LYNN MAYNARD.

*Court Costs*

All costs of court in this case are adjudged against WILLIAM THOMAS BOOTH, for which let execution issue.

*Clarifying Orders*

Without affecting the finality of this Final Decree of Divorce, this Court expressly reserves the right to make orders necessary to clarify and enforce this Decree.

*Relief Not Granted*

IT IS ORDERED AND DECREED that all relief requested in this case and not expressly granted is denied. This is a final judgment, for which let execution and all writs

and processes necessary to enforce this judgment issue. This judgment finally disposes of all claims and all parties and is appealable.

SIGNED on ___August 10___, 2012.

_____
THE HONORABLE MONICA Z. NOTZON
PRESIDING JUDGE

A True Copy of the original, I certify
the ___10th___ day of ___August___ 20 _12_
ESTHER DEGOLLADO
Clerk of the District Courts and
County Court at Law Webb County, Texas
By _____ Deputy

33

1600.00 Acres of Land out of the Juaquin Galan 15 League Grant, Survey 2292, Abstract 3226, Webb County, Texas and being out of a 5393.08 Acre Tract described in Volume 681 on page 586 of the Deed Records of Webb County, Texas, being more particularly described as follows:

BEGINNING at a steel deer-proof fence corner post, the east corner of this tract, the east corner of a 948.21 acre parcel of the 5393.08 acre tract and the south corner of Share no. 3 as described in Cause No. 5185 of the District Court Records of Webb County, Texas, on the north line of a 10046.63 acre tract described in Volume 1319 on page 380 of the Deed Records of Webb County, Texas at a State Plane Coordinate of N:17243964.55, E:630126.52, Texas South Zone, North American Datum, 1983;

THENCE S69°34'17"W 3724.89 feet (out of a record: S69°34'17"W 4513.09 feet) with the south line of the 948.21 acre parcel and generally following a deer-proof fence to a set #4 rebar, the south corner of this tract, 70.2 feet southwest of a three-way fence corner post and bearing N69°34'17"E 787.01 feet from a found #4 rebar, the south corner of the 948.21 acre parcel;

THENCE N20°16'46"W 18486.57 feet through the 948.21 acre parcel and converging with and crossing a wire fence at about 420 feet, passing another wire fence at a distance of 9264 feet, passing 39.8 feet east of a low steel fence corner post at a distance of 17420 feet and continuing to a set #4 rebar on the north line of a 1773.33 acre parcel of the 5393.08 acre tract, south margin of Galvan Road, at the base of a deer-proof fence, the west corner of this tract;

THENCE N63°21'34"E 456.99 feet (out of a record: N63°29'04"E 10534.05 feet) with the south margin of Galvan Road and generally following the deer-proof fence, to a steel fence corner post on the east side of an electric gate, a deflection point;

THENCE N62°58'12"E 3292.40 feet (out of the same record: N63°29'04"E 10534.05 feet) with the south margin of Galvan Road and generally following the deer-proof fence, passing a three-way fence corner post at a distance of 2097.5 feet and continuing with a low wire fence to the north corner of this tract, the north corner of the 1773.33 acre tract and the west corner of a 2048.74 acre tract described in Volume 622 on page 23 of the Deed Records of Webb County, Texas, on the east line of the 7093.32 acre tract from which the 5393.08 acres was derived and as described in Volume 193 on page 431 of the Deed Records of Webb County, Texas and bearing S10°29'26"E 4.08 feet from an eight-inch creosote fence post in the severed east fence-line of the 7093.32 acre tract;

THENCE S20°17'19"E 8989.60 feet (record: S20°17'19"E 8916.51 feet) with the east line of the 5393.08 acre tract, the west line of the 2048.74 acre tract and generally following a low wire fence and passing a steel deer-proof fence corner post at a distance of 1877 feet and continuing on the same course and generally following a deer-proof fence, to a three-way fence intersection half way between two eight inch steel pipe posts, the south corner of the 2048.74 acre tract and the west corner of "Share no. 3," a deflection point on the east line of this tract;

THENCE S20°16'17"E 9939.71 feet (record: S20°16'17"E 1217.26 feet and S20°16'17"E 8722.45 feet) with the west line of "Share no. 3" and generally following the deer-proof fence, to the POINT OF BEGINNING, containing 1600.00 acres of land.

Bearings and Coordinates are based on Grid North according to the Texas Coordinate System, South Central Zone, North American Datum 1983, relative to the National Geodetic Survey Continuously Operating Reference System station TXLR.
"Set" corners are #4 rebar capped with a red plastic cap stamped "CAREY 4454."
Record courses refer to Volume 681, page 586, Webb County Deed Records.
A survey plat accompanies this description.

PAUL T CAREY RPLS 4454


EXHIBIT



House

38.8'

S20°17'19"E 8969.60'

S20°17'19"E 6916.51'

Gayle M. Rettig
2048.74 Acres
(V. 622, p. 23)

Grid North

0          4000

1 " = 2000   U. S. Survey Feet

Remaining Portion
of 1773.33 Acres
(V. 681, p. 586)

*Joaquin Galan Survey 2292, Abstract 3226*

1600.00 ACRES

N20°16'46"W 18486.57'

S20°16'17"E 1817.26'

1198 Acres
(V. 681, p. 586)

Triphene Middleton
Share No. 3
(Cause No. 5185)

Remaining Portion
of 948.21 Acres
(V. 681, p. 586)

S20°16'17"E 9939.71'

S20°16'17"E 8722.49'

1473.54 Acres
(V. 681, p. 586)

Point of Beginning

*Land Boundary Survey of*
1600.00 Acres of Land out of the Juaquin Galan 15 League Grant,
Survey 2292, Abstract 3226, Webb County, Texas and being out of
a 5393.08 Acre Tract described in Volume 681 on page 586 of the
Deed Records of Webb County, Texas.

steel deer-proof fence post
N 1724396453
E 63012652

S69°34'17"W 4513.09' (overall)

S69°34'17"W 3724.89'

N69°34'17"E
787.01'

set #4 rebar 70.2' SW of 3-way fence corner

Triphene Middleton
10046.63 Acres
(V. 1319, p. 380)

found #4 rebar
SW corner of
948.21 Acres

Referenced Documents:
V. 13 , P. 247 ;
V. 184 , P. 513 ;
V. 193 , P. 431 ;
V. 194 , P. 464 ;
V. 283 , P. 289 ;
V. 391 , P. 826 ;
V. 391 , P. 833 ;
V. 582 , P. 539 ;
V. 622 , P. 23 ;
V. 681 , P. 586 ;
V. 1036 , P. 312 ;
V. 1319 , P. 380 ;
V. 1791 , P. 518 ;
V. 3083 , P. 704 ,
Deed Records, Webb County, Texas.

Legend
▓▓▓ graded road
—✕— wire fence

COMPLAINTS IN REGARD TO VIOLATIONS OF GENERAL
RULES OF SURVEYING PROCEDURES AND PRACTICES
SHOULD BE DIRECTED TO:

TEXAS BOARD OF PROFESSIONAL LAND SURVEYING
12100 PARK 35 CIRCLE, BLDG. A, STE. 156, MC-230
AUSTIN, TEXAS 78753

*Medina Valley Surveys, Inc.*
P. O. Box 1189, Castroville, Texas 78009
830.931.9783   medinavalleysurveys.com

Texas
Society of
Professional
Surveyors
MEMBER

All "SET" corners are marked with a red plastic cap stamped "CAREY 4454."
Record Courses, shown in RED, refer to Volume 681, page 586.

Bearings are based on Grid North according to the Texas Coordinate System, South Central Zone, North American Datum, 1983, relative to NGS CORS "TXLR.".



GPS & Conventional

Smyth & Co.

1022 Garner Field Road, Suite D
Uvalde, TX 78801

(830) 591-0858
(830) 591-0863 Fax

## FIELD NOTES FOR A BOUNDARY SURVEY
## COMPLETED NOVEMBER 21, 2004
## TRACT "B" (380.39 ACRES)

Being 380.39 grid acres of land lying in Webb County, Texas being a portion out of that same 1473.54 acre tract description in Partition recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas and being within the Joaquin Galan Grant, Survey 2292, Abstract 3226 and being more particularly described by metes and bounds as follows: (The bearings and distances shown herein conform to the Texas Coordinate System, North American Datum 1927, Texas South Zone.) (All corners called for as being set are marked on ground with ½" diameter steel stakes with identification markers stamped "SMYTH/2046" attached unless otherwise noted or shown.)

BEGINNING at a steel stake set for the southwest corner of a 30 ft. width easement, simultaneously surveyed out of and part of the said 1473.54 acre tract, set for the south corner of a certain Tract "A" (222.26 acres) simultaneously surveyed out of and part of the said 1473.54 acre tract and set for the west corner of this Tract "B" (380.39 acres), from which a 2" iron pipe found for the south corner of said 1473.54 acre tract bears S 18° 36' 38" W at a distance of 6562.68 feet;

THENCE: N 47° 53' 23" E, with the common line of said Tract "A" and this Tract "B" at 30.53 feet pass steel stake, set for the southeast corner of said 30 ft. Easement, continuing for a total distance of 3154.14 feet to a steel stake, set for the east corner of said Tract "A" and the north corner of this tract;

THENCE: S 26° 30' 33" E, with the common line of said 1473.54 acre tract and that same certain 948.21 acre tract description in Partition recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas, a distance of 6298.95 feet to a steel stake, set near game barrier fence, for the common south corner of said 1473.54 acre tract and said 948.21 acre tract and being the east corner of this tract;

Volume 1791 Page 523

## EXHIBIT B

THENCE: S 69° 33' 18" W, with the southeast line of said 1473.54 acre tract, with the northwest line of a certain 10,046.63 acre tract conveyed to Triphene S. Middleton, as recorded in Volume 1319, Pages 380-83, Deed Records of Webb County, Texas and generally along existing game barrier fence, at 1740.58 feet pass remnants of damaged monument, (called 3" disc) found under fence, continuing for a total distance of 2745.94 feet to a steel stake, set near fence, for the south corner of this tract;

THENCE: N 29° 55' 03" W, with the southwest line of this tract, a distance of 5169.73 feet to the Place of Beginning and containing 380.39 grid acres of land within the herein described tract as surveyed by D. G. Smyth & Co. on November 21, 2004.

THE STATE OF TEXAS:
COUNTY OF UVALDE:

It is hereby certified that the foregoing field note description and Attached plat were prepared from and actual on the ground survey Made by personnel working under my direct supervision and that Same are true and correct according to acres said survey.

D. G. Smyth-Registered Professional Land Surveyor/
Licensed State Land Surveyor-No. 2046

#04-2692 TB

2

# FIELD NOTES FOR A BOUNDARY SURVEY
## COMPLETED NOVEMBER 21, 2004
### TRACT "A" (222.26 ACRES)

Being 222.26 grid acres of land lying in Webb County, Texas being a portion out of that same 1473.54 acre tract description in Partition recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas and being within the Joaquin Galan Grant, Survey 2292, Abstract 3226 and being more particularly described by metes and bounds as follows: (The bearings and distances shown herein conform to the Texas Coordinate System, North American Datum 1927, Texas South Zone.) (All corners called for as being set are marked on ground with ½" diameter steel stakes with identification markers stamped "SMYTH/2046" attached unless otherwise noted or shown.)

BEGINNING at a steel stake set for the southwest corner of a 30 ft. width easement, simultaneously surveyed out of and part of the said 1473.54 acre tract, set for the west corner of a certain Tract "B" (380.39 acres), simultaneously surveyed out of and part of the said 1473.54 acre tract and set for the south corner of this Tract "A" (222.26 acres), from which a 2" iron pipe found for the south corner of said 1473.54 acre tract bears S 18° 36' 38" W at a distance of 6562.68 feet;

THENCE: N 31° 14' 50" W, with the lower southwest line of said 30 ft. Easement and the southwest line of this tract, a distance of 3353.36 feet to a steel stake, set near fence, for a re-entrant corner of said 30 ft Easement and west corner of this tract;

THENCE: N 59° 45' 53" E, with the northeast line of this tract and the southeast line of that same certain 1198.00 acre tract description in said Partition recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas and generally along existing fence, at 30.53 feet cross the lower northeast line of said 30 ft. Easement, continuing for a total distance of 3320.00 feet to a ¼" steel stake, found under fence, for the north corner of this tract and being the common north corner of said 1473.54 acre tract and that same certain 948.21 acre tract description in said Partition recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas;

1

EXHIBIT C

THENCE: S 47° 53' 23" W, with the common line of said Tract "A" and Tract "B", at 3123.59 feet pass steel stake, set for the southeast corner of said 30 ft. width Easement, continuing for a total distance of 3154.14 feet to the Place of Beginning and containing 222.26 grid acres of land within the herein described tract as surveyed by D. G. Smyth & Co. on November 21, 2004.

THE STATE OF TEXAS:
COUNTY OF UVALDE:

It is hereby certified that the foregoing field note description and Attached plat were prepared from and actual on the ground survey Made by personnel working under my direct supervision and that Same are true and correct according to same said survey.

D. G. Smyth-Registered Professional Land Surveyor/
Licensed State Land Surveyor-No. 2046

#04-2692 TA

2

Being 260.05 acres of land lying in Webb County, Texas being a portion out of that same 1198.00 acre tract description in Partition Deed recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas and being within the Joaquin Galan Grant, Survey 2292, Abstract 3226 and being more particularly described by metes and bounds as follows: (The bearings and distances shown herein conform to the Texas Coordinate System, North American Datum 1927, Texas South Zone.) (All corners called for as being set are marked on ground with ½" diameter steel stakes with identification markers stamped "SMYTH/2046" attached unless otherwise noted or shown.)

BEGINNING at a ½" steel stake, found under fence, for the south corner of this tract, for the north corner of a certain Tract "C" (870.91 acres), simultaneously surveyed this day and also being the west corner of a certain unrecorded Tract "A" (22.26 acres) surveyed November 21, 2004, from which a 2" pipe found for the south corner of said 1473.54 acre parent tract bears S 02° 14' 49" W at a distance of 9094.43 feet;

THENCE: N 18° 03' 22" W, with the southwest line of this tract for a distance of 6148.79 feet to a ½" steel stake, set under fence, for the north corner of this tract, at a point on the northeast line of said 1198.00 acre parent tract and being on the southwest line of a 30 ft. access easement, simultaneously surveyed this day;

THENCE: S 52° 40' 35" E, with the northeast line of this tract, with the common line of said 1198.00 acre parent tract and a certain 1773.33 acre tract described in partition deed recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas and generally with existing fence, at 145.24 feet pass ½" steel stake, set under fence, for the south corner of said 30 ft. access easement, continuing for a total distance of 6088.73 feet to a ½" steel stake, set near 2-way fence corner, for the east corner of this tract;

1

EXHIBIT D

found under fence, continuing for a total distance of ... ...
Beginning and containing 260.05 acres of land within the herein described tract as
surveyed by D. G. Smyth & Co. Inc. on March 20, 2006.



THE STATE OF TEXAS:
COUNTY OF UVALDE:

It is hereby certified that the foregoing field note description and
Attached plat were prepared from and actual on the ground survey
Made by personnel working under my direct supervision and that
Same are true and correct according to same said survey.

D. G. Smyth-Registered Professional Land Surveyor/
Licensed State Land Surveyor-No. 2046

#06-2873D

2

Being 66.55 acres of land lying in Webb County, Texas being a portion out of that same 1198.00 acre tract description in Partition Deed recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas and being within the Joaquin Galan Grant, Survey 2292, Abstract 3226 and being more particularly described by metes and bounds as follows: (The bearings and distances shown herein conform to the Texas Coordinate System, North American Datum 1927, Texas South Zone.) (All corners called for as being set are marked on ground with ½" diameter steel stakes with identification markers stamped "SMYTH/2046" attached unless otherwise noted or shown.)

BEGINNING at a ½" steel stake, found under fence, for the northeast corner of this tract and being the northmost corner of a certain Tract "D" (260.05 acres), surveyed March 3, 2006, from which a ½" steel stake found near 3-way fence corner for the north corner of said 1198.00 acre parent tract bears N 52° 43' 23" W at a distance of 3186.20 feet;

THENCE: S 18° 03' 22" E, with the common line of this tract and said Tract "D" (260.05 acres) for a distance of 1117.11 feet to a ½" steel stake set for the south east corner of this tract;

THENCE: N 56° 24' 47" W, with the southwest line of this tract for a distance of 4225.84 feet to a ½" steel stake, set near fence, for the west corner of this tract, at a point on the southeast margin of Galvan Road (fenced roadway open to public);

THENCE: N 44° 19' 08" E, with the southeast margin of said Galvan Road with the northwest line of this tract and generally with occupied fence for a distance of 914.29 feet to a ½" steel stake found near 3-way fence corner for the north corner of this tract and being the northwest corner of a certain 30 ft. easement surveyed March 20, 2006;

1

# EXHIBIT E

THENCE: S 52° 51' 05" E, continuing now with the northeast line of this tract and generally with fence for a distance of 3132.50 feet to the Place of Beginning and containing 66.55 acres of land within the herein described tract as surveyed by D. G. Smyth & Co. Inc. on May 7, 2006.

THE STATE OF TEXAS:
COUNTY OF UVALDE:

It is hereby certified that the foregoing field note description and Attached plat were prepared from and actual on the ground survey Made by personnel working under my direct supervision and that Same are true and correct according to same said survey.



D. G. Smyth-Registered Professional Land Surveyor/
Licensed State Land Surveyor-No. 2046

#06-2923E

## FIELD NOTES FOR A SEVERANCE SURVEY
## COMPLETED MARCH 20, 2006
## TRACT "C" (870.91 ACRES)

Being 870.91 grid acres of land lying in Webb County, Texas being a portion out of that same 1473.54 acre tract description in Partition Deed recorded in Volume 681, Pages 586-593 of the Deed Records of Webb County, Texas and being within the Joaquin Galan Grant, Survey 2292, Abstract 3226 and being more particularly described by metes and bounds as follows: (The bearings and distances shown herein conform to the Texas Coordinate System, North American Datum 1927, Texas South Zone.) (All corners called for as being set are marked on ground with ½" diameter steel stakes with identification markers stamped "SMYTH/2046" attached unless otherwise noted or shown.)

BEGINNING at a ½" steel stake, found under fence, for the north corner of this tract, for the south corner of a certain Tract "D" (260.05 acres), simultaneously surveyed this day and also being the west corner of a certain unrecorded Tract "A" (222.26 acres) surveyed November 21, 2004, from which a 2" pipe found for the south corner of said 1473.54 acre parent tract bears S 02° 14' 49" W at a distance of 9094.43 feet;

THENCE: S 31° 12' 50" E, with the common line of this tract and said Tract "A" (222.26 acres) for a distance of 3353.36 feet to a ½" steel stake found for a deflection point and being the east common corner of said Tract "A" and a certain unrecorded Tract "B" (380.39 acres) surveyed November 21, 2004;

THENCE: S 29° 55' 03" E, with the common line of this tract and said Tract "B" (380.39 acres) for a distance of 5169.73 feet to a ½" steel stake, found under fence, for the east corner of this tract and the south corner of Tract "B";

THENCE: S 69° 35' 25" W, with the common line of this tract and a certain 10,046.63 acre tract conveyed to Triphene S Middleton and recorded in Volume 1319, Pages 380-383 of the Deed Records of Webb County, Texas and generally with occupied fence for a distance of 4985.77 feet to said 2" pipe for the south corner of this tract and also being the south corner of said 1473.54 acre parent tract;

1

EXHIBIT "A"

# EXHIBIT F

THENCE: N 59° 45' 53" E, with the northwest line of this tract, with the south terminus of said access easement and generally with occupied fence, at 30.00 feet pass a 4" pipe fence post for the east corner of said 30 ft. access easement, continuing for a total distance of 4384.61 feet to the Place of Beginning and containing 870.91 acres of land within the herein described tract as surveyed by D. G. Smyth & Co. Inc. on March 20, 2006.



THE STATE OF TEXAS:
COUNTY OF UVALDE:

It is hereby certified that the foregoing field note description and Attached plat were prepared from and actual on the ground survey Made by personnel working under my direct supervision and that Same are true and correct according to same said survey.

D. G. Smyth-Registered Professional Land Surveyor/
Licensed State Land Surveyor-No. 2046

#06-2873C

2

EXHIBIT "A"

Being a tract of land that is calculated to contain 0.85 acre, more or less, being a part of Survey 2292, Abstract 3226, Joaquin Galan Original Grantee in Webb County, Texas, this 0.85 acre tract is a part of that certain tract of land that is called to contain 1,773.33 acres, more or less, as per the description in Exhibit "C" of that certain Partition Deed that was executed by and between William T. Booth and John V. Booth that is dated September 21, 1998 and that is recorded in Volume 681, Pages 586-593 of the Official Public Records of Webb County, Texas, this 0.85 acre tract is more particularly described by metes and bounds as follows, to-wit:

COMMENCING for a tie at the calculated position of the southeast corner of the aforementioned tract of land that is called to contain 1,773.33 acres (Tract "C"), more or less, being the northeast corner of a tract of land that is called to contain 948.21 acres, more or less, as per the description in Exhibit "D" of the aforementioned Partition Deed that is recorded in Volume 681, Pages 586-593 of the Official Public Records of Webb County, Texas, this point is called to be on the west line of a tract of land that is called to contain 3628.88 acres, more or less, and was conveyed to R.M. Middleton by Bert Mars et ux by that certain instrument that is dated September 1, 1960 and that is recorded in Volume 283, Page 289 of the Deed Records of Webb County, Texas;

THENCE North 47°02'16" West 9338.54 Feet to a 60D nail that was set for the southeast corner of this 0.85 acre tract and the PLACE OF BEGINNING of this survey;

THENCE South 75°04'49" West 183.50 Feet along the southeasterly line hereof to a 60D nail that was set for the southwest corner of this tract;

THENCE North 20°32'46" West along the southwesterly line hereof, passing at 59.24 Feet the most southerly point of a thirty (30') foot wide access road easement that is calculated to contain 1.13 acres, more or less, that was also surveyed on this date, passing at 131.84 Feet a most easterly northeast corner of said thirty (30') foot wide access road easement, and 202.43 Feet in all to a 60D nail that was set for the northwest corner of this tract;

THENCE North 84°17'29" East 223.06 Feet along the northwesterly line hereof to a 60D nail that was set for the northeast corner of this tract;

THENCE South 09°07'08" East 166.60 Feet along the northeasterly line hereof to the PLACE OF BEGINNING and containing 0.85 acre of land, more or less.

State of Texas §
County of Webb §

I, A.J. Medina, Jr., Registered Professional Land Surveyor, do hereby certify that the foregoing field notes and the map that I prepared on this day are based on a survey conducted on the ground under my supervision and that said map and these field notes reflect facts found at the time that said survey was made. The source for the bearings shown on these field notes and on the attached map is based on GPS readings on Datum NAD 83, Texas South Zone. Refer to the attached map for additional information. This the 30th day of July, 2002.

A.J. Medina, Jr.
Registered Professional Land Surveyor No. 5104, Texas

# EXHIBIT G

THENCE    83.91 Feet with a curve to the right that has the following attributes:

| Radius | Central Angle | Length | Tangent | Chord Bearing | Distance |
|---|---|---|---|---|---|
| 415.00 Feet | 011°35'04" | 83.91 Feet | 42.10 Feet | North 06°45'28" East | 83.76 Feet |

to the calculated position of the tangent point of said curve;

THENCE    North 12°33'00" East    148.19 Feet to the point of curvature of curve to the left;

THENCE    38.46 Feet with a curve to the left that has the following attributes:

| Radius | Central Angle | Length | Tangent | Chord Bearing | Distance |
|---|---|---|---|---|---|
| 54.00 Feet | 040°48'16" | 38.46 Feet | 20.08 Feet | North 07°51'08" West | 37.65 Feet |

to the calculated position of the tangent point of said curve at a point near a gate at an existing pasture fence;

THENCE    North 28°15'16" West    309.72 Feet to a point at an existing gate at a fence on the southeasterly line of a laned road that is maintained by the Road and Bridge Department of Webb County, being a county road that is locally known as the "Galvan" Road, this point is a point on tangent in the westerly line hereof;

THENCE    North 28°15'16" West    73.13 Feet continuing along the westerly line hereof and within the aforementioned Middleton 1,773.33 acre tract, and also within the lane defining the limits of the "Galvan" Road to a point in the center of a paved section of said "Galvan" Road for the northwest corner of this tract;

THENCE    North 63°23'21" East    30.01 Feet with the center of the paved section of said "Galvan" Road and the most northerly northwest line hereof to a point for the most northerly northeast corner of this tract;

THENCE    South 28°15'16" East    72.91 Feet along an easterly line hereof and within the aforementioned Middleton 1,773.33 acre tract and also within the lane defining the limits of the "Galvan" Road to a point on tangent at an existing gate at a fence on the southeasterly line of said "Galvan" Road;

THENCE    South 28°15'16" East    309.08 Feet continuing along an easterly line hereof to the point of curvature of a curve to the right, said point being near a gate at an existing pasture fence;

THENCE    59.82 Feet with a curve to the right that has the following attributes:

| Radius | Central Angle | Length | Tangent | Chord Bearing | Distance |
|---|---|---|---|---|---|
| 84.00 Feet | 040°48'16" | 59.82 Feet | 31.24 Feet | South 07°51'08" East | 58.57 Feet |

to the calculated position of the tangent point of said curve;

THENCE    South 12°33'00" West    148.19 Feet to the point of curvature of a curve to the left;

THENCE    77.84 Feet with a curve to the left that has the following attributes:

| Radius | Central Angle | Length | Tangent | Chord Bearing | Distance |
|---|---|---|---|---|---|
| 385.00 Feet | 011°35'04" | 77.84 Feet | 39.05 Feet | South 06°45'28" West | 77.71 Feet |

to the calculated position of the tangent point of said curve;

THENCE    South 00°57'56" West    134.81 Feet to a point of deflection to the left;

THENCE    South 38°15'31" East    25.29 Feet to a point of deflection to the left;

THENCE    South 77°28'58" East    629.15 Feet to the point of curvature of a curve to the right;

Field Notes of a 1.13 Acre Tract
Continued on Page 3 of 3 Pages

that was also surveyed on this date, this point is the most easterly northeast corner of this tract;

THENCE   South 20°32'46" East   72.60 Feet with the southwesterly line of the aforementioned 0.85 acre tract that was also surveyed on this date and the most northeasterly line hereof to the PLACE OF BEGINNING and containing 1.13 acres of land, more or less.

State of Texas      §
County of Webb   §

I, A.J. Medina, Jr., Registered Professional Land Surveyor, do hereby certify that the foregoing field notes and the map that I prepared on this day are based on a survey conducted on the ground under my supervision and that said map and these field notes reflect facts found at the time that said survey was made. The source for the bearings shown on these field notes and on the attached map is based on GPS readings on Datum NAD 83, Texas South Zone. Refer to the attached map for additional information. This the 30th day of July, 2002.

A.J. Medina, Jr.
Registered Professional Land Surveyor No. 5104, Texas

WHICH WAS PARTITIONED FROM A 7093.32 ACRE TRACT AS PER DEED RECORDED IN VOLUME 193, PAGE 431 OF THE WEBB COUNTY DEED RECORDS, TEXAS. THIS 948.21 ACRE TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A SET ½" IRON ROD BEING THE SOUTH CORNER OF THIS TRACT WHICH BEARS N 69°35'33" E A DISTANCE OF 5990.99 FEET FROM THE SOUTHWEST CORNER OF SAID 7093.32 ACRE TRACT ALSO BEING THE SOUTHWEST CORNER OF SAID 2421.75 ACRE TRACT TO A FOUND 3" BRASS DISK, THENCE N 69°34'17" E A DISTANCE OF 1740.73 FEET TO THE SOUTH CORNER OF THIS TRACT, FOR THE TRUE POINT OF BEGINNING;

THENCE, N 26°30'28" W, A DISTANCE OF 9009.88 FEET TO A SET ½" IRON ROD BEING ON THE NORTHWEST BOUNDARY LINE OF SAID 2421.75 ACRE TRACT, FOR THE NORTHWEST CORNER OF THIS TRACT;

THENCE, N 59°45'45" E, ALONG SAID NORTHWEST BOUNDARY LINE OF SAID 2421.75 ACRE TRACT, A DISTANCE OF 299.90 FEET TO A FOUND FENCE CORNER POST BEING AN EXTERIOR CORNER OF SAID 2421.75 ACRE TRACT, FOR AN EXTERIOR CORNER OF THIS TRACT;

THENCE, S 30°01'56" E, CONTINUING ALONG SAID 2421.75 ACRE BOUNDARY LINE, A DISTANCE OF 1197.73 FEET TO A FOUND ½" IRON ROD BEING AN INTERIOR CORNER OF SAID 2421.75 ACRE TRACT, FOR AN INTERIOR CORNER OF THIS TRACT;

THENCE, N 59°26'10" E, CONTINUING ALONG SAME BOUNDARY LINE, A DISTANCE OF 5075.04 FEET TO A FOUND ½" IRON ROD BEING THE MOST NORTH CORNER OF SAID 2421.75 ACRE TRACT, FOR THE MOST NORTH CORNER OF THIS TRACT;

THENCE, S 20°16'17" E, CONTINUING ALONG SAME, A DISTANCE OF 8722.45 FEET TO A FOUND FENCE CORNER POST BEING THE EAST CORNER OF SAID 2421.75 ACRE TRACT, FOR THE EAST CORNER OF THIS TRACT;

THENCE, S 69°34'17" W, ALONG SAME, A DISTANCE OF 4513.09 FEET TO THE POINT OF BEGINNING OF THIS 948.21 ACRE TRACT OF LAND, MORE OR LESS.

HENRY FLORES
COUNTY CLERK
FILED

SEP 21 PM 4:08

WEBB COUNTY, TEXAS

BY _____ DEPUTY

681 593

EXHIBIT H

Abstract 3226, Webb County, Texas and being out of a 5393.08 Acre Tract described in Volume 681 on page 586 of the Deed Records of Webb County, Texas, being more particularly described as follows:

BEGINNING at a steel deer-proof fence corner post, the east corner of this tract, the east corner of a 948.21 acre parcel of the 5393.08 acre tract and the south corner of Share no. 3 as described in Cause No. 5185 of the District Court Records of Webb County, Texas, on the north line of a 10046.63 acre tract described in Volume 1319 on page 380 of the Deed Records of Webb County, Texas at a State Plane Coordinate of N:17243964.55, E:630126.52, Texas South Zone, North American Datum, 1983;

THENCE S69°34'17"W 3724.89 feet (out of a record: S69°34'17"W 4513.09 feet) with the south line of the 948.21 acre parcel and generally following a deer-proof fence to a set #4 rebar, the south corner of this tract, 70.2 feet southwest of a three-way fence corner post and bearing N69°34'17"E 787.01 feet from a found #4 rebar, the south corner of the 948.21 acre parcel;

THENCE N20°16'46"W 18486.57 feet through the 948.21 acre parcel and converging with and crossing a wire fence at about 420 feet, passing another wire fence at a distance of 9264 feet, passing 39.8 feet east of a low steel fence corner post at a distance of 17420 feet and continuing to a set #4 rebar on the north line of a 1773.33 acre parcel of the 5393.08 acre tract, south margin of Galvan Road, at the base of a deer-proof fence, the west corner of this tract;

THENCE N63°21'34"E 456.99 feet (out of a record: N63°29'04"E 10534.05 feet) with the south margin of Galvan Road and generally following the deer-proof fence, to a steel fence corner post on the east side of an electric gate, a deflection point;

THENCE N62°58'12"E 3292.40 feet (out of the same record: N63°29'04"E 10534.05 feet) with the south margin of Galvan Road and generally following the deer-proof fence, passing a three-way fence corner post at a distance of 2097.5 feet and continuing with a low wire fence to the north corner of this tract, the north corner of the 1773.33 acre tract and the west corner of a 2048.74 acre tract described in Volume 622 on page 23 of the Deed Records of Webb County, Texas, on the east line of the 7093.32 acre tract from which the 5393.08 acres was derived and as described in Volume 193 on page 431 of the Deed Records of Webb County, Texas and bearing S10°29'26"E 4.08 feet from an eight-inch creosote fence post in the severed east fence-line of the 7093.32 acre tract;

THENCE S20°17'19"E 8989.60 feet (record: S20°17'19"E 8916.51 feet) with the east line of the 5393.08 acre tract, the west line of the 2048.74 acre tract and generally following a low wire fence and passing a steel deer-proof fence corner post at a distance of 1877 feet and continuing on the same course and generally following a deer-proof fence, to a three-way fence intersection half way between two eight inch steel pipe posts, the south corner of the 2048.74 acre tract and the west corner of "Share no. 3," a deflection point on the east line of this tract;

THENCE S20°16'17"E 9939.71 feet (record: S20°16'17"E 1217.26 feet and S20°16'17"E 8722.45 feet) with the west line of "Share no. 3" and generally following the deer-proof fence, to the POINT OF BEGINNING, containing 1600.00 acres of land.

Bearings and Coordinates are based on Grid North according to the Texas Coordinate System, South Central Zone, North American Datum 1983, relative to the National Geodetic Survey Continuously Operating Reference System station TXLR.
"Set" corners are #4 rebar capped with a red plastic cap stamped "CAREY 4454."
Record courses refer to Volume 681, page 586, Webb County Deed Records.
A survey plat accompanies this description.

PAUL T. CAREY, RPLS 4454
Surveyed: October 26, 2011
Released: July 19, 2012
Job Number 10973

"1"

10973mh.doc



House

Grid North

 Usyd W. Keing
2040.74 Acres
(V. 622, p. 23)

S20°17'19"E 9989.69'

0 ─────── 4000
1" = 2000 U. S. Survey Feet

Remaining Portion
of 1775.35 Acres
(V. 681, p. 586)

*Joaquin Galan Survey 2292, Abstract 3226*

**1600.00 ACRES**

N20°16'46"W 14486.57'

1196 Acres
(V. 681, p. 586)

Triphone Middleton
Share No. 3
(Cause No. 5185)

S20°16'17"E 9999.71'

Remaining Portion
of 948.21 Acres
(V. 681, p. 586)

1473.54 Acres
(V. 681, p. 586)

Point of Beginning

*Land Boundary Survey of*
1600.00 Acres of Land out of the Juaquin Galan 15 League Grant,
Survey 2292, Abstract 3226, Webb County, Texas and being out of
a 5393.06 Acre Tract described in Volume 681 on page 586 of the
Deed Records of Webb County, Texas.

Steel deer-proof fence post
N 17847945.53
E 63018452

Triphone Middleton
10046.63 Acres
(V. 1319, p. 360)

S69°34'17"W 453.09' covered ID
S69°34'17"W 372489'

set #4 rebar 70.2' SW of 3-way fence corner

found #4 rebar
SW corner of
948.21 Acres

**Referenced Documents:**
V. 13 , P. 247 ;
V. 184 , P. 513 ;
V. 193 , P. 431 ;
V. 194 , P. 464 ;
V. 283 , P. 289 ;
V. 391 , P. 828 ;
V. 391 , P. 833 ;
V. 582 , P. 539 ;
V. 622 , P. 23 ;
V. 681 , P. 586 ;
V. 1036 , P. 312 ;
V. 1319 , P. 380 ;
V. 1791 , P. 518 ;
V. 3083 , P. 704 ;
Deed Records, Webb County, Texas.

**Legend**
graded road
wire fence

COMPLAINTS IN REGARD TO VIOLATIONS OF GENERAL
RULES OF SURVEYING PROCEDURES AND PRACTICES
SHOULD BE DIRECTED TO:

TEXAS BOARD OF PROFESSIONAL LAND SURVEYING
12100 PARK 35 CIRCLE, BLDG. A, STE. 156, MC-230
AUSTIN, TEXAS 78753

*Medina Valley Surveys, Inc.*
P. O. Box 1189, Castroville, Texas 78009
830.931.8783    medinavalleysurveys.com

All "SET" corners are marked with a red plastic cap stamped "CAREY 4454."
Record Courses, shown in RED, refer to Volume 681, page 586.

Bearings are based on Grid North according to the Texas Coordinate System, South Central Zone, North American Datum, 1983, relative to NGS CORS "TXLR.".

Surveyed:        October 26, 2011
Released:        October 28, 2011
Requested by:        James K. Jones
Company:    Jones and Gonzales, P.C.
Deliver to:    Jones and Gonzales, P.C.
Reference #:

File Number:        10973

THIS PLAT IS THE PROPERTY OF MEDINA VALLEY SURVEYS, INC. AND
SHALL NOT BE ALTERED, DUPLICATED, OR ELECTRONICALLY REPRODUCED
WITHOUT THE WRITTEN AUTHORIZATION OF MEDINA VALLEY SURVEYS, INC.
THIS PLAT, AS PREPARED, HAS MY SIGNATURE, IN RED, AND IS EMBOSSED
WITH MY IMPRESSION SEAL. IF THIS PLAT DOES NOT DISPLAY THESE TWO
ITEMS IT IS A COPY AND IT MAY HAVE BEEN ALTERED. I ASSUME NO
RESPONSIBILITY FOR INFORMATION CONVEYED ON SUCH COPIES.
MEDINA VALLEY SURVEYS, INC. ACCEPTS NO RESPONSIBILITY FOR THE
USE OF THIS PLAT FOR ANY PURPOSE AFTER SIX MONTHS FROM THE
LAST DATE INDICATED HEREON.
ALL RIGHTS RESERVED. COPYRIGHT 2011, MEDINA VALLEY SURVEYS, INC. ©
WARNING: ALTERATION OF CERTIFIED MATERIAL IS FORGERY.

STATE OF TEXAS
COUNTY OF MEDINA

I HEREBY CERTIFY THAT THIS ORIGINAL PLAT IS TRUE AND CORRECT AND
WAS PREPARED FROM AN ACTUAL SURVEY MADE ON THE GROUND UNDER
MY SUPERVISION AND THAT THERE ARE NO VISIBLE ENCROACHMENTS OR
EASEMENTS EXCEPT AS SHOWN.

Paul T. Carey, RPLS, LSLS
Licensed State Land Surveyor, Registered Professional Land Surveyor 4454

All of that certain tract or parcel of land situated in the Joaquin Galan Grant, A-3226, Webb County, Texas and being 1,773.33 acres out of a called 7,093.32 acre tract as described in deed dated January 20, 1947 from George W. Lyles to W. V. Booth, recorded in Volume 193, Page 431, Deed Records of Webb County, Texas and being more particularly described as follows:

Beginning at the Southwest corner of a called 1,773.33 acre tract as described in deed to Verner Wayne Middleton and Martin Michael Middleton filed for record July 31, 1992 in Volume 47, Page 51, Official Public Records of Webb County, Texas and being on the East line of a tract as described in deed to Norbert J. Dickman and Robert Dickson, Trustees, recorded in Volume 364, Page 722, Official Public Records of Webb County, Texas. A 1/2 inch iron rod, found, bears N 45 deg 32 min 12 sec W, 63.29 feet.

Thence S 45 deg 32 min 12 sec E along the most Eastern West line of the said called 7,093.32 acres, 562.05 feet to a fence corner at the inside Ell corner in the West line of the said called 7,093.32 acres and the Southeast corner of the said Norbert J. Dickman et al tract, same being the Northeast corner of a 1,198.00 acre tract as described in deed of even date.

Thence S 53 deg 12 min 01 sec E along the East line of the said 1,198.00 acres, 9,215.22 feet to a fence post at a deflection in said line, continuing S 23 deg 44 min 16 sec E, 472.35 feet to a fence corner at the Southeast corner of the said 1,198.00 acres and at the outside Ell corner in the North line of a 2,421.75 acre tract as described in deed of even date.

Thence S 30 deg 01 min 56 sec E a distance of 1,197.73 feet to a 1/2 inch iron rod set the inside Ell corner in the North line of the said 2,421.75 acres.

Thence N 59 deg 26 min 10 sec E along the North line of the said 2,421.75 acres, 5,075.04 feet to a 1/2 inch iron rod set at the Northeast corner of same on the West line of a called 3,628.88 acre tract as described in deed from Bert Mars et ux to R. M. Middleton, filed for record on September 1, 1960 in Volume 283, Page 289, Deed Records of Webb County, Texas.

Thence N 20 deg 16 min 17 sec W along said West line, 1,217.26 feet to a fence corner at the Southwest corner of a called 2,048.74 acre tract as described in deed to Gayle M. Rettig, filed for record July 14, 1980 in Volume 622, Page 23, Deed Records of Webb County, Texas.

# EXHIBIT I

Abstract 3226, Webb County, Texas and being out of a 5393.08 Acre Tract described in Volume 681 on page 586 of the Deed Records of Webb County, Texas, being more particularly described as follows:

BEGINNING at a steel deer-proof fence corner post, the east corner of this tract, the east corner of a 948.21 acre parcel of the 5393.08 acre tract and the south corner of Share no. 3 as described in Cause No. 5185 of the District Court Records of Webb County, Texas, on the north line of a 10046.63 acre tract described in Volume 1319 on page 380 of the Deed Records of Webb County, Texas at a State Plane Coordinate of N:17243964.55, E:630126.52, Texas South Zone, North American Datum, 1983;

THENCE S69°34'17"W 3724.89 feet (out of a record: S69°34'17"W 4513.09 feet) with the south line of the 948.21 acre parcel and generally following a deer-proof fence to a set #4 rebar, the south corner of this tract, 70.2 feet southwest of a three-way fence corner post and bearing N69°34'17"E 787.01 feet from a found #4 rebar, the south corner of the 948.21 acre parcel;

THENCE N20°16'46"W 18486.57 feet through the 948.21 acre parcel and converging with and crossing a wire fence at about 420 feet, passing another wire fence at a distance of 9264 feet, passing 39.8 feet east of a low steel fence corner post at a distance of 17420 feet and continuing to a set #4 rebar on the north line of a 1773.33 acre parcel of the 5393.08 acre tract, south margin of Galvan Road, at the base of a deer-proof fence, the west corner of this tract;

THENCE N63°21'34"E 456.99 feet (out of a record: N63°29'04"E 10534.05 feet) with the south margin of Galvan Road and generally following the deer-proof fence, to a steel fence corner post on the east side of an electric gate, a deflection point;

THENCE N62°58'12"E 3292.40 feet (out of the same record: N63°29'04"E 10534.05 feet) with the south margin of Galvan Road and generally following the deer-proof fence, passing a three-way fence corner post at a distance of 2097.5 feet and continuing with a low wire fence to the north corner of this tract, the north corner of the 1773.33 acre tract and the west corner of a 2048.74 acre tract described in Volume 622 on page 23 of the Deed Records of Webb County, Texas, on the east line of the 7093.32 acre tract from which the 5393.08 acres was derived and as described in Volume 193 on page 431 of the Deed Records of Webb County, Texas and bearing S10°29'26"E 4.08 feet from an eight-inch creosote fence post in the severed east fence-line of the 7093.32 acre tract;

THENCE S20°17'19"E 8989.60 feet (record: S20°17'19"E 8916.51 feet) with the east line of the 5393.08 acre tract, the west line of the 2048.74 acre tract and generally following a low wire fence and passing a steel deer-proof fence corner post at a distance of 1877 feet and continuing on the same course and generally following a deer-proof fence, to a three-way fence intersection half way between two eight inch steel pipe posts, the south corner of the 2048.74 acre tract and the west corner of "Share no. 3," a deflection point on the east line of this tract;

THENCE S20°16'17"E 9939.71 feet (record: S20°16'17"E 1217.26 feet and S20°16'17"E 8722.45 feet) with the west line of "Share no. 3" and generally following the deer-proof fence, to the POINT OF BEGINNING, containing 1600.00 acres of land.

Bearings and Coordinates are based on Grid North according to the Texas Coordinate System, South Central Zone, North American Datum 1983, relative to the National Geodetic Survey Continuously Operating Reference System station TXLR.
"Set" corners are #4 rebar capped with a red plastic cap stamped "CAREY 4454."
Record courses refer to Volume 681, page 586, Webb County Deed Records.
A survey plat accompanies this description.

PAUL T. CAREY, RPLS 4454
Surveyed: October 26, 2011
Released: July 19, 2012
Job Number 10973

"1"

10973mb.doc



House

Goyle M. Rettig
2046.74 Acres
(V. 622, p. 23)

Grid North

Remaining Portion
of 1775.33 Acres
(V. 681, p. 586)

*Joaquin Galan Survey 2292, Abstract 3226*

1600.00 ACRES

1198 Acres
(V. 681, p. 586)

Triphone Middleton
Store No. 5
(Cause No. 5185)

Remaining Portion
of 848.21 Acres
(V. 681, p. 586)

1473.54 Acres
(V. 681, p. 586)

**Point of Beginning**

*Land Boundary Survey of*
1600.00 Acres of Land out of the Juaquin Galan 15 League Grant,
Survey 2292, Abstract 3226, Webb County, Texas and being out of
a 5393.08 Acre Tract described in Volume 681 on page 586 of the
Deed Records of Webb County, Texas.

Triphone Middleton
10046.63 Acres
(V. 1319, p. 380)

Referenced Documents:
V. 13 , P. 247 ;
V. 184 , P. 513 ;
V. 193 , P. 431 ;
V. 194 , P. 464 ;
V. 283 , P. 289 ;
V. 391 , P. 828 ;
V. 391 , P. 833 ;
V. 582 , P. 539 ;
V. 622 , P. 23 ;
V. 681 , P. 586 ;
V. 1036 , P. 312 ;
V. 1319 , P. 380 ;
V. 1791 , P. 518 ;
V. 3083 , P. 704 ,
Deed Records, Webb County, Texas.

Legend
graded road
—X— wire fence

COMPLAINTS IN REGARD TO VIOLATIONS OF GENERAL
RULES OF SURVEYING PROCEDURES AND PRACTICES
SHOULD BE DIRECTED TO:

TEXAS BOARD OF PROFESSIONAL LAND SURVEYING
12100 PARK 35 CIRCLE, BLDG. A, STE. 156, MC-230
AUSTIN, TEXAS 78753

**Medina Valley Surveys, Inc.**
P. O. Box 1189, Castroville, Texas 78009
830.931.9783    medinavalleysurveys.com

All "SET" corners are marked with a red plastic cap stamped "CAREY 4454."
Record Courses, shown in RED, refer to Volume 681, page 586.

Bearings are based on Grid North according to the Texas Coordinate System, South Central Zone, North American Datum, 1983, relative to NGS CORS "TXLR".

| | |
|---|---|
| Surveyed: October 26, 2011 | |
| Released: October 28, 2011 | |
| Requested by: James K. Jones | |
| Company: Jones and Gonzales, P.C. | |
| Deliver to: Jones and Gonzales, P.C. | |
| Reference #: | |
| File Number: 10973 | |

THIS PLAT IS THE PROPERTY OF MEDINA VALLEY SURVEYS, INC. AND
SHALL NOT BE ALTERED, DUPLICATED, OR ELECTRONICALLY REPRODUCED
WITHOUT THE WRITTEN AUTHORIZATION OF MEDINA VALLEY SURVEYS, INC.
THIS PLAT, AS PREPARED, HAS MY SIGNATURE, IN RED, AND IS EMBOSSED
WITH MY IMPRESSION SEAL. IF THIS PLAT DOES NOT DISPLAY THESE TWO
ITEMS IT IS A COPY AND IT MAY HAVE BEEN ALTERED. I ASSUME NO
RESPONSIBILITY FOR INFORMATION CONVEYED ON SUCH COPIES.
MEDINA VALLEY SURVEYS, INC. ACCEPTS NO RESPONSIBILITY FOR THE
USE OF THIS PLAT FOR ANY PURPOSE AFTER SIX MONTHS FROM THE
LAST DATE INDICATED HEREON.
ALL RIGHTS RESERVED. COPYRIGHT 2011, MEDINA VALLEY SURVEYS, INC. ©
WARNING: ALTERATION OF CERTIFIED MATERIAL IS FORGERY.

STATE OF TEXAS
COUNTY OF MEDINA

I HEREBY CERTIFY THAT THIS ORIGINAL PLAT IS TRUE AND CORRECT AND
WAS PREPARED FROM AN ACTUAL SURVEY MADE ON THE GROUND UNDER
MY SUPERVISION AND THAT THERE ARE NO VISIBLE ENCROACHMENTS OR
EASEMENTS EXCEPT AS SHOWN.

Paul T. Carey, RPLS, LSLS
Licensed State Land Surveyor, Registered Professional Land Surveyor 4454

BEGINNING AT A SET ½" IRON ROD IN THE CENTER OF AN EXISTING CALICHE ROAD, WHICH BEARS FROM A FOUND ½" IRON ROD BY A FENCE CORNER POST S 45°32'12" E A DISTANCE OF 63.29 FEET TO THE SOUTH PROPERTY CORNER OF SAID 1773.33 ACRE TRACT, AND CONTINUE IN 63°29'06" E A DISTANCE OF 1561.34 FEET ALONG THE SOUTHEAST PROPERTY LINE OF SAID 1773.33 ACRE TRACT, FOR THE TRUE POINT OF BEGINNING OF THIS TRACT;

THENCE, ALONG SAID EXISTING CALICHE ROAD THE FOLLOWING CALLS:

| | |
|---|---|
| N 45°04'06" E | 218.67 FEET TO A SET ½" IRON ROD |
| N 45°57'26" E | 130.42 FEET TO A SET ½" IRON ROD |
| N 47°00'07" E | 405.05 FEET TO A SET ½" IRON ROD |
| N 46°22'59" E | 376.49 FEET TO A SET ½" IRON ROD |
| N 48°50'10" E | 239.20 FEET TO A SET ½" IRON ROD |
| N 55°14'21" E | 189.30 FEET TO A SET ½" IRON ROD |
| N 62°00'13" E | 192.21 FEET TO A SET ½" IRON ROD |
| N 71°22'48" E | 144.87 FEET TO A SET ½" IRON ROD |
| N 74°51'44" E | 419.03 FEET TO A SET ½" IRON ROD |
| N 75°35'35" E | 492.54 FEET TO A SET ½" IRON ROD |
| N 75°36'56" E | 733.11 FEET TO A SET ½" IRON ROD AN EXTERIOR CORNER OF THIS TRACT; |

THENCE, S 26°49'37" E, A DISTANCE OF 66.69 FEET TO A SET ½" IRON ROD FOR THE SOUTHEAST BOUNDARY LINE OF SAID 1773.33 ACRE TRACT, FOR AN EXTERIOR CORNER OF THIS TRACT;

THENCE, S 63°29'06" W, ALONG THE SOUTHEAST BOUNDARY LINE OF SAID 1773.33 ACRE TRACT, A DISTANCE OF 3443.98 FEET TO THE POINT OF BEGINNING OF THIS 19.956 ACRE TRACT OF LAND, MORE OR LESS.

1036 314

# EXHIBIT J

## 1. LAND AND LEASE DESCRIPTIONS

1.01 Premises. William T. Booth owns, as his separate property, the surface of 2,721.54 acres, more or less, in two tracts of approximately 1773.33 acres and 948.21 acres, out of the Joaquin Galan Grant No. 2292, Abstract No. 3226, in Webb County, Texas, being the same lands described as Parcel "A" (herein called Parcel "A") in Exhibit "A" attached hereto and made a part hereof. Kay Booth is the wife of William T. Booth and is joining in this Agreement because a portion of Parcel "A" constitutes their homestead. John Vernon Booth owns, as his separate property, the surface of 2,671.54 acres, more or less, in two tracts of approximately 1473.54 acres and 1198 acres, out of said Grant, being the same lands described as Parcel "B" (herein called Parcel "B") in said Exhibit "A". No portion of Parcel "B" constitutes the homestead of John Vernon Booth. Parcel "A" and Parcel "B" collectively comprise 5,393.08 acres, more or less, and are herein collectively called the "Premises".

1.02 Leases. Grantee is the owner of all or portions of three oil and gas leases (herein called, collectively, "Leases" and individually, "Lease") covering a portion of the Premises, said Leases being more particularly described as follows:

a. Oil, Gas and Mineral Lease dated August 19, 1966, from W. V. Booth, Jr., et al., as Lessor, to Dan A. Hughes, as Lessee, recorded in Volume 339, Page 413 of the Deed Records of Webb County, Texas, covering 1773.33 acres, more or less, as more particularly described therein (herein called and commonly known as the Booth "A" Lease), as the same may have been or may hereafter be amended, extended and/or ratified from time to time;

b. Oil, Gas and Mineral Lease dated August 19, 1966, from W. V. Booth, Jr., et al., as Lessor, to Dan A. Hughes, as Lessee, recorded in Volume 339, Page 406 of the Deed Records of Webb County, Texas, covering 881.24 acres (sometimes called 901.26 acres), more or less, being all of the 1773.33-acre tract described in said lease, SAVE and EXCEPT 892.09 acres, more or less, being all of the lands described in partial release recorded in Volume 1329, Page 799 of the Real Property Records of said county (herein called and commonly known as the Booth "B" Lease), as the same may have been or may hereafter be amended, extended and/or ratified from time to time; and

c. Oil, Gas and Mineral Lease dated March 22, 1971, from W. V. Booth, Jr., et al., as Lessor, to Union Oil Company of California, as Lessee, recorded in Volume 405, Page 543 of the Deed Records of said county, covering 3546.66 acres, more or less, as more particularly described in said lease (herein called the "Unocal Lease"), as the same may have been or may hereafter be amended, extended and/or ratified from time to time.

The terms "Lease" or "Leases" shall not include any other oil, gas and/or mineral leases as may hereafter exist and cover all or any portion of the Premises, irrespective of whether any such other lease is granted in favor of Grantee or a third party or is a renewal of any Lease or a new lease. Surface Owners are not by executing this Agreement, or by this Agreement making reference to the Leases, ratifying, adopting or confirming any Lease or acknowledging that any Lease is presently in force and effect, and nothing in this Agreement shall be construed as expressly or impliedly being a ratification by the Surface Owners of any Lease.

1.03 Leased Premises. The portion of the Premises presently covered by the Leases is herein called the "Leased Premises".

1.04 Unleased Premises. The portion of the Premises (if any) not presently covered by the Leases is herein called the "Unleased Premises".

1.05 After-Acquired Interests. This Agreement affects and burdens not only all rights, titles and interests now owned by Grantee in the Leases, but this Agreement also affects and burdens all rights, titles and interests hereafter acquired in any manner by any Grantee in any of the Leases or in any other oil, gas and/or other mineral lease hereafter covering any portion of the Premises.

1.06 Hydrocarbons. Natural gas, liquid hydrocarbons and gaseous substances (including hydrogen sulfide gas) produced in association with natural gas and the products thereof are herein called "Hydrocarbons".

1.07 Booth Gas. Hydrocarbons produced from the Premises are herein called "Booth Gas".

1.08 Extraneous Gas. Hydrocarbons produced from lands other than the Premises are herein called "Extraneous Gas".

## II. DEFAULT AND TERMINATION

2.01 Default. If Grantee defaults in the timely and complete performance of any covenant or condition contained in this Agreement or if Grantee should violate any restriction or limitation contained in this Agreement, and such default or violation continues for a period of sixty (60) days after written notice thereof is given to Grantee in accordance with the notice provisions in Paragraphs 2.02 and 13.01 of this Agreement, then this Agreement and all rights conferred upon Grantee under this Agreement shall thereupon terminate in their entirety without further notice or the necessity thereof being given to Grantee.

2.02 Right to Cure. This Agreement shall not terminate until Grantee is notified in writing by Surface Owner that Grantee has defaulted in the performance of a covenant or condition in this Agreement or has violated a restriction or limitation in this Agreement. Such notice shall specify, either generally or in reasonable detail if (and only to the extent) details are known to Surface Owner, the nature of each default or violation. Grantee shall have sixty (60) days from the date that the notice is received by Grantee to correct, cure or remedy each

performable by Grantee at the time of the termination thereof; and Surface Owner shall continue to have the right to enforce such other rights and pursue such other remedies (including, but not limited to, the right to have the Premises restored to its original condition and the right to enforce the indemnification provisions in this Agreement) against Grantee after the termination of this Agreement. Similarly, the termination thereof shall not affect, restrict or destroy any rights and remedies conferred upon Grantee by this Agreement or as may be available to Grantee at law or in equity or relieve Surface Owner of any obligation, liability or duty owing or performable by Surface Owner at the time of the termination thereof.

## III. TERM AND RELEASE

3.01 _Termination_. This Agreement shall be and remain in force and effect until the earlier to occur of (a) the failure or refusal of Grantee for any reason to complete prior to November 1, 1999 the underground installation of one flowline extending from the Hughes-Booth 1A Well in a westerly direction to the West boundary line of the Premises that is common with the Fuller tract and another flowline extending from the Hughes-Booth 2A Well in the same direction and ending at the same point on such boundary line, (b) the termination, expiration, release or cancellation of the last of the Leases to terminate, expire or be released or cancelled, or (c) the termination of this Agreement pursuant to Article III of this Agreement. Upon termination or expiration of this Agreement for any reason, Grantee shall cease to use the Premises for any purpose whatsoever, except Grantee shall have the right to enter thereafter upon the Premises for property removal and surface restoration purposes as provided elsewhere in this Agreement.

3.02 _Release_. Within ninety (90) days after the termination or expiration of this Agreement, Grantee shall prepare and file of record, at Grantee's sole expense, a duly executed, recordable instrument in the office of the County Clerk of Webb County, Texas, releasing this Agreement and all rights granted to Grantee under this Agreement. Within said 90-day period, Grantee shall furnish Surface Owner with a certified or xerox copy of the recorded or filed release. Should Grantee fail or refuse to timely file of record such release, Surface Owner (or any agent or representative of Surface Owner as Surface Owner may hereafter designate in writing) is hereby appointed as agent and attorney-in-fact for the purpose of executing and filing of record such release on behalf of Grantee. Such release filed of record by Surface Owner or Surface Owner's agent or representative in conformity with the terms of this Agreement, after the expiration of the period within which Grantee is required to file such release, shall be binding upon Grantee, and the respective successors and assigns of Grantee, in the same manner as if Grantee had executed and filed of record such release.

3.03 _Lease Termination_. Upon termination, expiration, release or cancellation of any Lease as to any portion of the Leased Premises or any depths thereunder, Grantee shall have and retain such easements of ingress and egress over such portion of the Leased Premises for purposes of carrying out Grantee's rights conferred upon Grantee by this Agreement or any Lease that then remains in effect. With respect to the foregoing, it shall not be necessary for Grantee to remove or relocate any gathering lines, flowlines, storage batteries or other surface equipment, installations or facilities from any portion of the Leased Premises as to which a Lease terminates, expires or is released or cancelled, if and so long as the same are being used and continue to be used for the operation of the remaining portion of the Premises or for the production of Booth Gas or other minerals therefrom.

## IV. PROHIBITED OPERATIONS

4.01 _Booth 1B Well_. Grantee presently owns and operates the Null-Booth 1B Well (the "Booth 1B Well") situated on the Unocal Lease. Grantee warrants and represents to Surface Owner that the Booth 1B Well is presently producing Booth Gas in commercial quantities from the Austin Chalk Formation, that the Austin Chalk Formation is situated at a depth above the Edwards Formation, that a cast iron plug has been set by Grantee in the Booth 1B Well at a depth between the top of the Edwards Formation and the base of the Austin Chalk Formation, and that at least two hundred feet (200') of cement have been placed on top of the cast iron plug, all in accordance with the rules, regulations and directives of the Texas Railroad Commission. Surface Owner and Grantee acknowledge that Booth Gas in and that may be produced from the Edwards Formation and possibly deeper formations underlying the Premises contains hydrogen sulfide gas that is extremely toxic and dangerous to human and animal life and the environment. Grantee further acknowledges that William T. Booth and wife, Kay Booth, presently reside on the Premises in close proximity to the Booth 1B Well and that their guests stay in a guest house situated approximately two hundred feet (200') from the Booth 1B Well. Grantee hereby irrevocably and forever waives and relinquishes Grantee's rights (a) to deepen or sidetrack the Booth 1B Well, or to drill within 3000 feet in any direction from the Booth 1B Well a replacement well therefor, to depths at or below the top of the Edwards Formation, and (b) to produce or attempt to produce Booth Gas or other minerals or substances from the Booth 1B Well from such depths.

4.02 _Surface Use Waiver_. Grantee shall not (and hereby irrevocably and forever waives and relinquishes unto Surface Owner the right of Grantee to) use the surface of the portion of the Premises situated within three thousand feet (3000') in any direction from the Booth 1B Well (the "Waived Surface Use Tract") for the purpose of drilling for and/or producing Booth Gas and other minerals from depths below the top of the Edwards Formation or from depths below 8,000 feet below the surface of the Waived Surface Use Tract, whichever depth is shallower (the "Deep Depths"), and for treating, dehydrating, processing, gathering, transporting or storing Hydrocarbons produced from the Deep Depths; provided, however, nothing in this Agreement shall be construed as a waiver or relinquishment of Grantee's rights to explore, develop and produce Booth Gas and other minerals in and under the Waived Surface Use Tract (a) by drilling wells situated on the Waived Surface Use Tract down to (but not below) the Deep Depths, (b) by pooling or (c) by directional or horizontal drilling to any depth (including the Deep Depths) underneath the Waived Surface Use Tract from a surface location or locations situated on the rest of the Premises or lands in the vicinity thereof. With respect to any well hereafter drilled on the Waived Surface Use Tract that produces Booth Gas or other minerals from a depth above the Deep Depths, Grantee shall have the right to install appurtenant surface facilities, equipment, gathering lines and flowlines on the Waived Surface Use Tract, subject to the provisions of Paragraph 7.03 hereof.

outside diameter of not greater than four inches (4") that is used to gather or flow, and move, Booth Gas or oil or other liquids (including salt water) from any well now or hereafter situated on the Premises that is operated by Grantee to any pipeline, a tank battery or other storage receptacle, or any other facility of any kind or that is used for any other purpose permitted by this Agreement. As used in this Agreement, "pipeline" shall mean any line having an outside diameter of greater than four inches (4") that is used for any purpose.

4.04 <u>No Compressors or Dehydrators.</u> In the absence of a separate, written agreement between Surface Owner and Grantee, Grantee shall not (and hereby irrevocably and forever waives and relinquishes unto Surface Owner any right to) install, place or construct compressors or dehydrators of any kind anywhere on the Premises, including on a producing wellsite location. Notwithstanding the foregoing, Surface Owner hereby consents to the installation by Grantee of one compressor on the Premises on the Gonzales/Fuller (West) boundary line where the Hughes main separator is presently located.

4.05 <u>No Disposal or Injection Facilities.</u> In the absence of a separate, written agreement between Surface Owner and Grantee, Grantee shall not (and hereby irrevocably and forever waives and relinquishes unto Surface Owner any right to) (a) drill injection or disposal wells of any kind (including for the injection or disposal of salt water or other substances produced by Grantee from the Premises in connection with Grantee's operations on or the production of Booth Gas from the Premises) or (b) install, construct, maintain or operate injection or disposal facilities of any kind on the Premises.

4.06 <u>No Plants.</u> In the absence of a separate, written agreement between Surface Owner and Grantee, Grantee shall not (and hereby irrevocably and forever waives and relinquishes unto Surface Owner any right to) (a) install, place or construct any plant or facility on the Premises to treat, process or refine Hydrocarbons or other minerals or to extract or separate liquids, impurities or contaminants therefrom or (b) run Hydrocarbons or other minerals through any gas treatment or processing plant presently situated on the Premises (including the gas treatment facility presently situated on the Premises that is or was formerly owned and operated by VirTex Petroleum Company).

4.07 <u>No Utility Service Lines.</u> In the absence of a separate, written agreement between Surface Owner and Grantee, Grantee shall not (and hereby irrevocably and forever waives and relinquishes unto Surface Owner any right to) install, place or construct any utility lines and appurtenant facilities (including for electricity, gas, water, telephone or other utility purposes) on, over or under the Premises, except Grantee shall have the right to use and replace any existing electrical lines situated on, over or under the Premises that are presently being used by Grantee.

4.08 <u>No New Gates.</u> Grantee shall use and maintain existing gates on the Premises. In the absence of a separate, written agreement between Surface Owner and Grantee, Grantee shall not (and hereby irrevocably and forever waives and relinquishes unto Surface Owner any right to) install, place or construct gates in existing exterior and interior fences situated anywhere on the Premises, unless the prior written consent of Surface Owner to cut a fence and install a gate is obtained pursuant to Paragraph 7.12 of this Agreement.

4.09 <u>Existing Flowlines.</u> Grantee acknowledges that no existing flowline or gathering line on or under the Premises is suitable for testing, storing, flowing, gathering, transporting or otherwise moving hydrogen sulfide gas through same. Accordingly, no existing flowline or gathering line shall be used at any time, for any reason and in any manner to test, store, flow, gather, transport or otherwise move hydrogen sulfide gas in or through same nor shall any existing flowline or gathering line be otherwise used in any other manner whatsoever with respect to hydrogen sulfide gas. As used in this Agreement, an existing flowline or gathering line shall mean a flowline or gathering line that is in place on the Premises as of July 1, 1999.

## V. HYDROGEN SULFIDE GAS SAFEGUARDS

5.01 <u>Sour Gas Well Quality.</u> Each well of Grantee now or hereafter situated on the Premises drilled in search of or that produces or is capable of producing hydrogen sulfide gas shall be drilled, completed, tested, equipped and produced in a good and workmanlike manner in accordance with generally accepted industry practices for drilling and producing Sour Gas Wells (as defined in Paragraph 7.16 of this Agreement) and in strict compliance with all permits, designs and specifications and in strict conformity with all applicable statutes, ordinances, rules, regulations or directives enacted, promulgated or issued from time to time by any governmental authority having jurisdiction, including Statewide Rule 36 promulgated by the Texas Railroad Commission, as may be amended from time to time.

5.02 <u>Contingency Plans.</u> Prior to producing hydrogen sulfide gas from either the Hughes-Booth #A1 or A2 Wells, Grantee shall prepare and furnish to Surface Owner a contingency plan approved by the Texas Railroad Commission for each such well. Prior to commencement of the drilling of any new well on the Premises that is permitted with the Texas Railroad Commission to be drilled to the Deep Depths, Grantee shall prepare and furnish to Surface Owner a contingency plan approved by the Texas Railroad Commission for such well. Each contingency plan furnished to Surface Owner shall be prepared at Grantee's sole cost and expense and shall be submitted by Grantee to Surface Owner as having been approved by the Texas Railroad Commission. Each contingency plan shall be prepared in conformity with Statewide Rule 36 promulgated by the Texas Railroad Commission, as may be amended from time to time, and any other statute, rule, regulation or directive requiring the preparation of a contingency or similar plan, and shall be modified and updated from time to time by Grantee with the Texas Railroad Commission's approval as and whenever necessary to safeguard the lives and property of Surface Owner or the public or as and whenever required by any governmental authority.

5.03 <u>Monitoring.</u> Grantee shall install, operate and maintain monitors acceptable to Surface Owner to detect the presence of hydrogen sulfide gas. Not less than four (4) monitors shall be installed on each wellsite for each Sour Gas Well that is drilling, producing or capable of being produced. The monitors on each site shall be installed at or near the four corners of each site. The monitoring system for each site shall be designed, installed, equipped, operated, maintained and repaired in a good and workmanlike manner in accordance with generally accepted industry practices and in strict compliance with all applicable governmental statutes, rules, regulations and directives. Each monitoring system shall be equipped with an automatic shut-off device or devices so that, upon the detection of the presence of any hydrogen

Monitors with Vibrator. All monitors and monitoring systems to be installed or provided by Grantee shall be furnished, installed, equipped, maintained, operated, monitored, repaired and/or replaced at Grantee's sole cost, risk and expense except Surface Owner shall be responsible for the operation of all portable monitors. Prior to the installation or furnishing of any monitors or monitoring systems, Grantee shall provide Surface Owner or Surface Owner's representative the opportunity to review, inspect and approve the design of all monitoring systems and monitoring equipment; provided, however, neither the inspection or approval by Surface Owner or Surface Owner's representative nor their failure to inspect or approve such monitoring systems and monitoring equipment shall relieve Grantee of any obligation or absolve Grantee of any liability under the Agreement.

5.04 No Venting. Grantee shall not vent hydrogen sulfide gas, but Grantee may flare hydrogen sulfide gas subject to and only to the extent allowed by applicable governmental statutes, rules, regulations and directives.

5.05 Safety Meetings. Grantee shall conduct hydrogen sulfide safety meetings from time to time and shall in advance notify Surface Owner and invite Surface Owner to attend any such meeting in order to afford Surface Owner the opportunity to attend such meetings when held on the Premises.

5.06 Cooperation with and by Surface Owner. Surface Owner and/or Surface Owner's representatives and agents shall have the right from time to time to discuss and have their questions answered and concerns addressed regarding the Sour Gas Well permitting processes, operations, maintenance, repairs and other related matters with any officer, employee or representative of Grantee, and Grantee agrees that its officers, employees and representatives shall fully cooperate, discuss, answer and address the foregoing with them and shall be made available by Grantee at such reasonable times as Surface Owner and/or Surface Owner's representatives and agents may request. Similarly, Grantee's representatives and agents shall have the right from time to time to discuss and have their questions answered and concerns addressed regarding Grantee's operations and proposed operations on the Premises, and Surface Owner agrees to make themselves available for such purposes.

## 6. WELL OPERATIONS, INFORMATION AND DATA

6.01 Proposed Operations. Except for (a) emergency operations which Grantee shall discuss with Surface Owner contemporaneously with or after such operations are conducted and (b) routine operations which Grantee shall discuss with Surface Owner from time to time so as to keep Surface Owner informed of same, Grantee shall notify Surface Owner in advance of all drilling or reworking operations and all operations involving the clearing of any portion of the surface of the Premises for any reason. Grantee shall notify Surface Owner of any drilling or reworking operations that Grantee intends to conduct on the Premises, or on lands with which the Premises are then pooled, at least three (3) days in advance of the actual commencement of such operations. The notice shall (a) specify the type of operations that Grantee anticipates will be conducted, (b) identify the well on which such operations are proposed to be conducted, (c) state the approximate date on which Grantee anticipates such operations will be commenced, (d) state the approximate location at which such operations are anticipated to be conducted, (e) state the deepest depth and the objective formation or formations to which it is anticipated that the well will be drilled or reworked, and (f) state the approximate date on which Grantee anticipates such operations will be completed. Grantee shall also notify Surface Owner at least three (3) days in advance of all such other operations but such notices shall be general in nature. As provided elsewhere in this Agreement, all clearing operations shall first be coordinated with Surface Owner.

6.02 Well and Pipeline Access. With respect to any and all wells drilled or reworked by Grantee on the Premises or on lands pooled therewith, Surface Owner and Surface Owner's authorized representatives, at his, her or their own risk, shall have access at all times to the wellsite for said well or wells and shall have the right to observe all operations. Surface Owner and Surface Owner's authorized representatives shall also have the right to be present to witness the gauging of tanks and the metering of production.

6.03 Well and Pipeline Information. As to any and all wells drilled or reworked by Grantee on the Premises or on lands pooled therewith, Grantee shall provide Surface Owner with written daily drilling, completion, testing and initial production reports and written daily re-completion and workover reports. Grantee shall furnish to Surface Owner, at Grantee's cost and expense, two (2) final copies of all wireless surveys, well logs, formation surveys or tests and core reports or analyses within ten (10) days after the final copies thereof are made and furnished to Grantee; provided, however, Surface Owner shall keep the same confidential and shall not divulge the same to third parties (except to Mineral Owners and to lenders, attorneys, accountants and such third party consultants as may be retained by Mineral Owners or Surface Owners to interpret the same for Mineral Owners' and/or Surface Owners' exclusive use and benefit) unless (a) the prior written consent of Grantee is obtained, (b) the Lease (or other lease) on which the well is situated has terminated as to the portion of the Premises on which the well is situated with respect to which such well data relates, or (c) the same has already been divulged or released by Grantee or a third party to the public. Contemporaneously with or promptly after filing or receiving same, Grantee shall provide Surface Owner with true, correct and complete copies of all applications, amended applications, reports, corrected reports and other filings submitted by or on behalf of Grantee to the Railroad Commission of Texas, the Federal Energy Regulatory Commission or any other governmental authority having jurisdiction in connection with such well or wells, together with copies of all orders issued by the Railroad Commission of Texas, the Federal Energy Regulatory Commission or such other governmental authority in response thereto or in connection therewith. Grantee shall provide Surface Owner with not less than fifteen (15) days advance written notice of any hearings before the Railroad Commission of Texas, the Federal Energy Regulatory Commission or such other governmental authority in connection with such filings.

6.04 Title Opinions. If Grantee should have the title to all or any portion of the Premises examined by an attorney, Grantee shall furnish to Surface Owner a true, correct and complete copy of every title opinion and supplemental title opinion covering the title thereto within thirty (30) days after the receipt thereof by Grantee.

6.05 Abstracts and Run Sheets. If Grantee prepares or causes to be prepared an abstract of title, a complemental or supplemental abstract of title, a certified or uncertified run sheet or a certified or uncertified complemental or supplemental run sheet, Grantee shall

## VII. SURFACE USE

**7.01 No Internal Boundaries.** Surface Owner agrees that Grantee may conduct all operations on the Premises during the term of and for purposes of this Agreement (but not for purposes of maintaining the Leases or any other lease) without regard to (a) the boundary lines of the respective Leases, (b) the boundary lines between Parcel "A" and Parcel "B", (c) any portion of the Premises being unleased for oil and gas purposes from time to time and (d) Grantee presently owning no interest in the Unocal Lease except as to approximately 320 acres covered thereby as to certain depths. In other words, Grantee may use the surface of the Premises for the purposes stated in this Agreement, subject to the terms, provisions, covenants, conditions, restrictions and limitations contained in this Agreement, for and during the term of this Agreement to the same extent as if the Premises were covered by one oil and gas lease owned entirely by Grantee. The termination, expiration, release or cancellation of any Lease (or any other oil and gas lease that may hereafter cover any portion of the Premises during the term of this Agreement) shall not affect the rights of Grantee to use the surface of the lands covered by the terminated, expired, released or cancelled Lease (or other lease) in connection with the operations of Grantee on other lands within the Premises.

**7.02 Burial of Lines.** Grantee shall bury or cause to be buried the tops of all new gathering lines and flowlines at least thirty-six (36) inches below the surface of the ground. The location of each such gathering line and flowline and each existing gathering line and flowline shall be marked adequately as such by metal signs, painted posts and/or other surface markers at all road and fence crossings. Grantee shall cover with fill dirt any gathering lines or flowlines that become exposed at the surface as a result of washouts, erosion, grading or otherwise.

**7.03 Surface Structures.** No well hereafter drilled by Grantee (whether drilled on or off the Waived Surface Use Tract), and no surface facilities and equipment hereafter installed by Grantee, shall be located within five hundred (500) feet of any residence, guest house, barn or similar structure now situated on the Premises or hereafter constructed on the Premises prior to the drilling of such well (and in no event shall the surface location of a well drilled to the Deep Depths be situated anywhere on the Waived Surface Use Tract). No gathering line or flowline shall be laid within five hundred (500) feet of any such structure (and in no event shall a gathering line or flowline through which hydrogen sulfide gas is or may be moved shall be laid anywhere on the Waived Surface Use Tract). The Booth 1B Well and existing gathering lines and flowlines used in connection therewith are not subject to the foregoing restrictions, but any well that may hereafter be drilled in replacement of the Booth 1B Well shall be drilled in compliance with the foregoing restrictions.

**7.04 Removal of Property.** Except as may be otherwise provided in this Agreement, Grantee shall have the right to remove at any time while this Agreement is in effect, and Grantee shall in any event remove within one hundred fifty (150) days after the termination or expiration of this Agreement, any personal property and fixtures placed by Grantee on the Premises, except Grantee shall have the right (but not the obligation) to draw and remove all pipe and casing from Grantee's wells situated on the Premises (subject to the provisions of Paragraph 7.18 of this Agreement). If Grantee fails or refuses to remove such property and fixtures before the expiration of said 150-day period, Surface Owner shall have the right at any time thereafter to notify Grantee in writing that Surface Owner considers such property and fixtures to have been abandoned. Upon receipt by Grantee of such written notice, such property and fixtures shall be deemed to have been abandoned by Grantee and to have become the property of Surface Owner thereby entitling Surface Owner to take possession thereof and dispose of the same as Surface Owner deems appropriate; provided, however, the abandonment thereof shall not relieve Grantee of Grantee's liability to plug any well that Grantee abandons and to restore the surface of the Premises to as near its original condition as is reasonably practicable. Until such written notice is received by Grantee, all such property and fixtures shall belong to Grantee and Grantee shall be responsible for the maintenance and removal thereof and shall bear all costs, risks and expenses incurred in connection therewith.

**7.05 Removal of Lines.** Within one hundred fifty (150) days after the termination or expiration of this Agreement, Grantee shall, at Grantee's sole cost, risk and expense, remove all gathering lines and flowlines (whether presently existing or hereafter installed) used at any time by Grantee during the term of this Agreement. If Grantee fails or refuses to remove all of the foregoing within such 150-day period, Surface Owner shall have the right to cause such work to be performed by a contractor or contractors on behalf of Grantee and the right to cause Grantee's property to be removed, all at the expense of Grantee. If Surface Owner should pay such contractor or contractors on Grantee's behalf for the performance of such work and the removal of such property, Grantee shall promptly reimburse Surface Owner for the actual costs paid by Surface Owner to have such work performed and such property removed, plus interest at the rate of twelve percent (12%) per annum accruing from the date of each payment made by Surface Owner to a contractor or other third party used for such work and removal. Such right of Surface Owner shall not be exclusive and shall be in addition to any other rights or remedies as may be available at law or in equity to Surface Owner for the failure or refusal of Grantee to perform such work and remove such property.

**7.06 Reservation of Rights.** Surface Owner expressly reserves and retains the right to use and enjoy the surface of the Premises in any manner and for any other purposes whatsoever which do not unreasonably interfere with Grantee's use and enjoyment of the Premises for the purposes permitted in this Agreement. Surface Owner reserves the right to grant or issue additional rights-of-way, easements, permits and licenses to such other parties for such other purposes as Surface Owner may desire, including (but not limited to) for purposes of using Grantee's roads and for purposes of constructing, installing, operating, maintaining, repairing, replacing and removing pipelines, gathering lines, flowlines, utility service lines for any purposes (including for electricity, gas, water, telephone, cable television, data processing or sewer purposes), roads or any other purposes whatsoever on, over, under or across any portion of the Premises; provided, however, in no event shall the granting or issuance of same unreasonably interfere with Grantee's use and enjoyment of the Premises for the purposes permitted in the Agreement.

**7.07 No Hunting or Fishing.** This Agreement does not cover or include, or confer upon Grantee, Grantee's employees, officers, directors, servants, representatives, invitees, agents and contractors, or any other person, the right or privilege to hunt, fish, camp, swim, picnic or otherwise recreate on the Premises; and all hunting, fishing and other sporting and recreational rights are hereby reserved by Surface Owner. Any such person bringing onto the Premises a rifle, pistol or other firearm, bow and arrow, crossbow, slingshot, dog, fishing tackle, camping gear, picnic equipment or other sporting or recreational paraphernalia shall be deemed a trespasser and subject to the

7.08 <u>No Alcohol or Illegal Drugs</u>. Grantee shall use all efforts to prevent alcohol and illegal drugs from being brought onto the Premises, and Grantee shall remove or cause to be removed from the Premises any person on the Premises on behalf of Grantee who brings alcohol or illegal drugs onto the Premises.

7.09 <u>Surface Facilities</u>. Subject to surface use restrictions in this Agreement relating to the Waived Surface Use Tract, Grantee is hereby granted the right to place or install on the Premises gathering lines, flowlines, storage tank batteries, Christmas trees, pumpjacks, separators and other equipment (except compressors and dehydrators) customarily used in the oil and gas industry on or near wellsites for purposes of producing, separating, storing, gathering and marketing (but not treating, dehydrating, compressing or processing) Hydrocarbons. Grantee shall paint and keep painted all such surface equipment and maintain the same in a good state of repair. All pumpjacks shall be operated by quiet motors and equipment. All pumpjacks shall have crankguards installed on them which shall be maintained in good repair. As provided elsewhere in this Agreement, Grantee is prohibited from placing, installing or constructing on the Premises power stations, pipelines, compressors, dehydrators, utility service lines, houses, cabins or camps to house Grantee's employees, disposal wells, injection wells, treatment facilities, products plants or other processing plants, refineries, terminal facilities or other facilities except the Pipeline, gathering lines, flowlines and the above-mentioned equipment that is customarily used in the oil and gas industry for the aforesaid purposes.

7.10 <u>Gathering Line Construction</u>. To the extent it is reasonable to do so, Grantee shall lay any gathering line or flowline installed by Grantee adjacent to, parallel with and within ten (10) feet of existing roads, fence lines, pipelines, gathering lines, flowlines, ditches, canals and exterior boundary lines of the Premises. If it is not reasonable to lay any part of a gathering line or flowline along any such route, Grantee shall obtain the written approval of Surface Owner as to the location and specifications thereof prior to the commencement of laying such gathering line or flowline. As to any Sour Gas gathering line or flowline so laid on the Premises prior to July 1, 2004, and as to any other gathering line or flowline so laid on the Premises prior to July 1, 2014, Grantee shall pay Surface Owner a sum equal to the product of One Dollar ($1.00) per foot multiplied by the length, in feet, of the gathering line or flowline; provided, however, no damages shall be paid for any such line laid alongside a road constructed by Grantee for which Surface Owner has been paid damages by Grantee pursuant to Paragraph 9.01 of this Agreement. On July 1, 2004, the amount of surface damages payable for Sour Gas gathering lines or flowlines shall escalate and increase to One Dollar and Forty Cents ($1.40) per foot. On July 1, 2009 and every five (5) years thereafter, such amount shall escalate and increase by forty percent (40%). For example, such amount shall escalate and increase on July 1, 2009 to One Dollar and Ninety-six Cents ($1.96). On July 1, 2014, the amount of surface damages payable for all other gathering lines or flowlines that are not Sour Gas gathering lines or flowlines shall escalate and increase to One Dollar and Forty Cents ($1.40) per foot, and every five years thereafter, beginning July 1, 2019 (provided the parties have theretofore agreed in writing to extend this Agreement), such amount shall escalate and increase by forty percent (40%). If any Lease should terminate, expire or be released or cancelled, the right of Grantee to lay gathering lines and flowlines hereunder on, over, under and across the portion of the Premises as to which such Lease terminates, expires or is released or cancelled shall not expire contemporaneously with the termination, expiration, release or cancellation of such Lease as to such portion of the Premises; and, furthermore, Grantee shall not be required to remove or relocate any gathering lines or flowlines theretofore laid thereon if and so long as the same are being used and continue to be used for the operation of the remaining portion of the Premises or for the production of Hydrocarbons therefrom. As used in this paragraph, a Sour Gas gathering line or flowline shall be any such line used to gather, flow or otherwise move through such line Hydrocarbons containing more than twenty (20) grains of total sulphur, or more than one-fourth (1/4) grain of hydrogen sulfide, per one hundred (100) cubic feet of gas.

7.11 <u>Roads and Gates</u>. Grantee and all persons entering or leaving the Premises on behalf of Grantee or in connection with Grantee's operations thereon shall use existing roads and gates. If the use of such existing roads and gates by Grantee results in any damage or deterioration to same, Grantee shall without delay repair the same so that the roads and gates will be at all times after such use by Grantee in the same or better condition as they were prior to such use by Grantee. To repair road damage, Grantee shall use the same material of which : road is constructed. For example, dirt roads shall be repaired with dirt fill and caliche roads shall be repaired with caliche. Grantee shall install adequate culverts under roads used by Grantee wherever needed to insure adequate drainage and shall clean out, repair and replace existing and new culverts under roads used by Grantee as needed to insure adequate drainage and to avoid damage to or destruction of crops, grasses, brush or timber now or hereafter growing on the surface of the Premises or on lands in the vicinity thereof. Unless and until notified in writing by Surface Owner to the contrary, Grantee shall at all times keep securely closed or cause to be kept securely closed all exterior (or perimeter) and interior gates crossing roads used to gain access to any wellsite or other facility, except when a vehicle or person is passing through such gate (in which event the gate shall be securely closed immediately after the vehicle or person passes through). With regard to the foregoing, Surface Owner and Grantee contemplate that Surface Owner may from time to time so notify Grantee to leave certain gates, as specified by Surface Owner in such notice, at all times when not in actual use in the same position as existed when approached so that such gates that are open upon approach shall be left open by Grantee after passing through the gate and such gates that are closed upon approach shall be closed by Grantee after passing through the gate. Grantee shall not place a separate lock on any existing exterior (or perimeter) or other gate unless directed in writing by Surface Owner to place a separate lock thereon. Grantee may construct additional roads for access to a wellsite from the exterior of the Premises or from an existing road if the existing roads thereon are inadequate for such purpose and the proposed roads will not unduly interfere with Surface Owner's use or proposed use of the surface thereof; provided, however, the route of the road shall be constructed along the route designated by Surface Owner. Notwithstanding the foregoing, Grantee shall not construct or grade more than one road from existing roads to each wellsite location, unless governmental rules or regulations now or hereafter require the construction or grading of more than one road to such wellsite in which event Grantee shall construct or grade no more than the minimum number of roads thereto as so required. No road hereafter constructed or graded by Grantee shall have a width greater than twenty (20) feet or less than fourteen (14) feet. Grantee shall maintain all such newly constructed or graded roads in good condition and repair. Grantee shall install such culverts under such newly constructed or graded roads and build such bridges as may be necessary to insure that such roads will not materially impede or interfere with the natural drainage of surface water across the Premises. Grantee shall also construct such diversion terraces and ditches along any newly constructed or graded roads, and along the Pipeline Easement, as may be reasonably necessary to prevent or minimize erosion. At such time as Grantee is no longer using roads constructed or graded by Grantee, such roads shall become the property of Surface Owner and the responsibility for the maintenance thereof shall then be assumed by Surface Owner. Notwithstanding anything above to the contrary, all existing roads presently being used by Grantee or as may hereafter be used by Grantee and all roads hereafter constructed or graded by Grantee shall be repaired or graded whenever and as often as needed so that same shall be and always

an exterior (or perimeter) fence, Grantee shall promptly after making such cut install and maintain in the opening an adequate metal gate (or game-proof gate if such exterior fence is a game-proof fence) of same height as the fence, and Grantee shall also, if Surface Owner so requests, install and maintain a substantial iron cattleguard capable of turning cattle. If the fence so cut is an interior fence, Grantee shall install in such opening and maintain either a metal gate or an iron cattleguard, whichever is designated by Surface Owner. All installed gates and cattleguards shall be at least sixteen feet (16') in width and of like design and quality as the most recent gate or cattleguard installed by or for Surface Owner (or Surface Owner's predecessor) on the Premises. Upon the termination of this Agreement, all such fence posts, gates and cattleguards shall, at the option of Surface Owner, remain and become the property of Surface Owner or be removed and the fence restored to its original condition.

7.13 <u>Drilling Wellsite Locations</u>. Grantee shall use in connection with the drilling or reworking of each well on the Premises no more than two (2) acres (exclusive of roads) surrounding the well being drilled or reworked. Grantee shall construct and maintain fences capable of turning livestock surrounding all pits and other excavations until such pits and excavations are leveled and filled. Within ninety (90) days after the completion or abandonment of a well that is drilled or reworked, Grantee shall level and fill all pits, remove from the Premises all equipment, material, trash, litter, debris, junk, pieces of iron and other metal, pipe, waste materials and other deleterious substances and materials (including drilling mud and fluids) placed thereon by Grantee, and otherwise clean up the wellsite and restore the portion of the surface thereof that will not be used to produce and save Hydrocarbons from the well so drilled or reworked to as near its original condition as is reasonably practicable. The restored portion of the surface thereof shall have all caliche, limestone, boards and other materials removed therefrom and shall be disced and seeded with five (5) pounds of buffel grass seed per acre.

7.14 <u>Producing Wellsite Locations</u>. If requested by Surface Owner, Grantee shall fence, in a workmanlike manner around its perimeter, the area surrounding a location on which a well presently or hereafter producing or capable of producing Hydrocarbons is situated with a fence capable of turning livestock and will install a gate or gates thereon. The area around each such location shall not exceed one-half (1/2) of an acre (exclusive of roads). If the well on such location is a Sour Gas Well (as defined in Paragraph 7.16 of this Agreement), then Grantee shall place within such area only wellheads, pumpjacks, and associated valves, meters and other wellhead appurtenances (but no separate facilities or equipment) for such well. If the well on such location is producing or capable of producing Hydrocarbons or other minerals from only depths above the Deep Depths (and the operation of such well is not otherwise subject to or governed by Statewide Rule 36 promulgated by the Texas Railroad Commission), then Grantee shall place within such area all surface wellhead equipment and all storage, separator and other surface facilities for such well that are permitted by this Agreement to be installed on the surface of the Premises. Notwithstanding the foregoing, the area around the Hughes-Booth 2A Well (near the Fuller fenceline) may exceed in area one-half (1/2) of an acre but may not exceed two (2) acres in area. Grantee shall maintain any such fences in good repair. Within each fenced or unfenced producing wellsite location perimeter, Grantee shall construct (to the extent not already constructed) and maintain firewalls conforming to all rules and regulations of all governmental authorities having jurisdiction around all Hydrocarbon and salt water storage batteries, all separators and all other surface receptacles and other equipment for which the construction of firewalls is so required; provided, however, unless such rules and regulations require that firewalls be constructed so as to contain a larger volume of liquids, each firewall shall be constructed in such a manner and to such a height so as to contain a volume of liquids at least twice the volume of the largest surface receptacle that a firewall surrounds. Grantee shall keep the area mowed around and within the fenced or unfenced perimeter of each producing wellsite location. Upon abandonment of any such wellsite location, Grantee shall remove within one hundred fifty (150) days thereafter all structures and improvements, including any aforementioned fences and gates, placed thereon. Grantee shall also level all firewalls and shell pads and remove from the Premises around such abandoned well all gravel, limestone, caliche, boards and other materials and substances used in the construction thereof, and Grantee shall restore the surface of the area around such abandoned well to as near its original condition as is reasonably practicable. Grantee shall disc the abandoned wellsite area and seed same with five (5) pounds of buffel grass seed per acre.

7.15 <u>Governmental Compliance</u>. At all times during the term of this Agreement, Grantee's wells, Grantee's gathering lines and flowlines, and Grantee's equipment shall be used, operated, repaired and maintained by Grantee in full compliance with all applicable federal, state and local laws, rules, regulations, directives and ordinances including, without limitation, all safety rules, regulations and directives applicable with respect thereto. To the extent that any such wells, gathering lines, flowlines or equipment of Grantee are not presently in full compliance therewith, Grantee shall immediately after execution hereof repair same, replace same or otherwise undertake action so as to bring same immediately into compliance therewith. In the event any such law, rule, regulation, directive or ordinance in any manner regarding safety or the operation or maintenance of any of the foregoing is now or hereafter in conflict or inconsistent with any covenant, condition, limitation or restriction regarding safety or the operation or maintenance of the foregoing, then Grantee shall comply with the stricter or more onerous of the two.

7.16 <u>Relocation of Sour Gas Well Facilities</u>. As used in this Agreement, the term "Sour Gas Well" shall mean (a) any well now or hereafter producing or capable of producing Hydrocarbons or other minerals from the Deep Depths or (b) any well (regardless of its depth) that is now or hereafter subject to or governed by Statewide Rule 36 promulgated by the Texas Railroad Commission, as such Rule 36 may be amended from time to time. Except as otherwise provided below in this paragraph, all tank batteries, salt water storage batteries, separators, dehydrators and other well facilities, surface facilities and equipment used by Grantee in connection with a Sour Gas Well that are presently situated on the Leased Premises shall be relocated at Grantee's sole cost, risk and expense from their present location to the immediate area next to and surrounding the Hughes-Booth 2A Well situated in the westernmost Northwest corner of the Premises (near the Fuller fenceline). Such relocation operations shall be completed by Grantee at its sole cost, risk and expense no later than November 1, 1999. All well and other surface equipment and facilities (except wellheads and pumpjacks and associated valves, meters and other wellhead appurtenances) hereafter placed by Grantee on the Premises in connection with a Sour Gas Well shall be placed in such immediate area surrounding the Hughes-Booth 2A Well so that all Sour Gas Wells of Grantee now or hereafter located on the Premises shall be serviced by well and other surface equipment and facilities situated on the immediate area surrounding the Hughes-Booth 2A Well. Notwithstanding the foregoing, the existing tank battery used to service the Booth 1B Well that is presently situated at the Hughes-Booth 1A wellsite may remain in its present location so long as the tank battery is not replaced or no hydrogen sulfide gas is run through or escapes into such tank battery. Upon replacement of such tank battery, the new tank battery shall be installed in the immediate area surrounding the Hughes-Booth 2A Well. Prior

forty-eight (48) hours after the receipt thereof if a drilling or workover rig is on the well to be abandoned] within which to elect to take over such well for completion as a water well (in the case of a well drilled in search of Hydrocarbons or other minerals) or to take over such well (in the case of a water well). If the well that Surface Owner elects to take over is a well drilled in search of Hydrocarbons or other minerals, then Grantee shall leave the surface casing in such well and shall promptly plug back such well to the depth designated by Surface Owner and thereafter Surface Owner shall own such well together with the obligation to plug the remaining, unplugged portion of such well when Surface Owner abandons same. Prior to plugging back such well, Grantee shall set and cement permanent plugs in the well as to all depths below the plugged-back depth in accordance with all applicable governmental rules and regulations. If the well that Surface Owner elects to take over is a water well, Grantee shall not remove the casing, pipe, pump or water lines from such water well or used in connection therewith, but shall leave the same in place in such manner that the well is a usable water well, and thereafter Surface Owner shall own such water well (and its appurtenant equipment) together with the obligation to plug such well when Surface Owner abandons same. Surface Owner agrees to execute all forms required by the Texas Railroad Commission or other regulatory authority in order to transfer operations and ownership of, as well as liability for, such well to Surface Owner. In the event Surface Owner elects not to take over a well, then Grantee shall promptly plug and abandon such well in accordance with the other provisions in this Agreement.

## VIII. WATER

8.01 Underground Water. As may also be provided elsewhere in this Agreement, Grantee shall conduct all operations on, adjacent to or in the vicinity of the Premises in such manner so as not to damage, contaminate or pollute the fresh water sands underlying the Premises and so as not to permit salt water, hydrogen sulfide and other toxic liquids, gases or other substances, contaminants or pollutants underlying the Premises or such other lands from entering into, contaminating or polluting fresh water sands underlying the Premises.

8.02 Surface Owner's Water. In the absence of a separate written agreement between Surface Owner and Grantee, Grantee shall not use any surface water or underground fresh water from Surface Owner's water wells in connection with Grantee's operations. Grantee shall ve the right to drill its own water well or wells for use in connection with Grantee's operations; provided, however, if the use of water by Grantee from any water well drilled by Grantee should result in reducing the capacity of any water well of Surface Owner below the capacity needed by Surface Owner for domestic and ranching (but not irrigation) purposes, then Grantee shall cease using the water from Grantee's well or wells causing such loss of water capacity until such time as conditions change and water may be used therefrom without pulling down the capacity of Surface Owner's water well below the capacity needed for such purposes.

8.03 Grantee's Water Wells. Surface Owner shall have the right to use water from any water well drilled or operated by Grantee for domestic or ranching (but not irrigation) purposes so long as such use does not unduly interfere with Grantee's operations and does not reduce the capacity of such water well below the capacity needed by Grantee for Grantee's operations.

## IX. SURFACE MAINTENANCE, RESTORATION AND DAMAGES

9.01 Property Damage. Grantee shall be responsible for all injury to or death of livestock or wildlife, and for all damage to or destruction of grass, growing or planted crops, trees, timber, windmills, water wells, stock ponds, lakes, canals, ditches, fences, cattleguards, gates, roads, personal property, buildings or other structures or improvements, sustained by Surface Owner and/or any tenant on the Premises, arising out of any operations conducted by Grantee. Grantee agrees to pay the party or parties incurring such damages the actual amount of said loss. In addition to the foregoing and as compensation for the temporary loss of the use of the portion of the surface of the mises used by Grantee, Grantee shall pay Surface Owner the following:

(a)  A sum equal to the product of One Dollar ($1.00) per foot multiplied by the length, in feet, of each new road constructed;

(b)  The sum of Five Thousand Dollars ($5,000.00) for each well hereafter drilled, deepened or sidetracked by Grantee on the Premises that is permitted with the Texas Railroad Commission or other regulatory authority to be drilled, deepened or sidetracked to a subsurface depth of 8,000 feet or less; and

(c)  The sum of Seven Thousand Dollars ($7,000.00) for each well hereafter drilled, deepened or sidetracked by Grantee on the Premises that is permitted with the Texas Railroad Commission or other regulatory authority to be drilled, deepened or sidetracked to a subsurface depth greater than 8,000 feet (irrespective of whether such well is drilled to a shallower depth and completed or abandoned at a shallower depth).

The surface damages payable for wellsites as set forth in clauses (b) and (c) of this paragraph shall escalate and be increased by One Thousand Dollars ($1,000.00) every five (5) years, beginning July 1, 2004. By way of example, the amounts payable beginning July 1, 2004 and July 1, 2009 shall be (i) $6,000.00 and $7,000.00, respectively, for wells drilled, deepened or sidetracked to a depth of 8,000 feet or less and (ii) $8,000.00 and $9,000.00, respectively, for wells drilled, deepened or sidetracked to a subsurface depth greater than 8,000 feet. No surface damages shall be payable for any well that is permitted with a regulatory authority to be drilled, deepened or sidetracked but for which no location is cleared. A well that is permitted with a regulatory authority to be drilled, deepened or sidetracked and for which a location is cleared shall be deemed to be a well drilled, deepened or sidetracked to the permitted depth even if the well is never drilled, deepened or sidetracked or is not drilled, deepened or sidetracked to the permitted depth. The foregoing surface damages shall not be payable with respect to any well heretofore or hereafter drilled that is reworked, plugged back or recompleted, but such surface damages shall be payable with respect to any well heretofore drilled that is hereafter deepened or sidetracked and with respect to any well hereafter drilled that is later re-entered and deepened or sidetracked. All surface damages (including surface damages for gathering lines and flowlines as provided elsewhere in this Agreement) shall be payable with respect to any well for which Grantee shall be the operator or a non-operator. Such surface damages

Dollars ($1,000.00) as surface damages for the recent laying of such flowline and the previous laying of such previously-unused flowline.

9.03   Surface Restoration.  In addition to the payment of damages as provided elsewhere in this Agreement, Grantee shall fill any and all ditches, ruts, holes, cave-ins, pockets and depressions created by Grantee and otherwise restore the surface of the Premises to the extent used by Grantee to as near its original condition as is reasonably practicable after the completion of each operation or activity thereon, whether or not it is expressly provided elsewhere in this Agreement that the surface be so restored after the completion thereof.  If at any time during or within two (2) years after the termination or expiration of this Agreement there should be any settling of the surface of any portion of the Premises previously restored, resulting in the creation of holes, cave-ins, pockets or depressions thereon (or in the vicinity thereof), then Grantee shall add soil and take such other action as is appropriate to restore and maintain the surface of the restored (or nearby) area level with the surface of the adjoining areas.

9.04   Contamination or Pollution.  Grantee shall use every effort to prevent the escape or flow of waste oil, drilling mud and fluids, chemicals, salt water or other noxious, toxic, contaminating or polluting substances or materials on, over, under or across the surface of the Premises, or into any stream, stock tank, canal or other body of impounded or flowing surface water, water well, ditch, gully, ravine or draw, or to otherwise prevent the contamination or pollution of the soil, bodies of impounded or flowing surface water, and underground water on, in or under the Premises or lands in the vicinity thereof.  Grantee shall contain and dispose of all such noxious, toxic, contaminating or polluting substances and materials in accordance with all applicable orders, rules and regulations of all governmental authorities having jurisdiction over the containment and disposition thereof.  Grantee shall pay for any actual damages caused by or resulting from Grantee's operations on or in the vicinity of the Premises which result in the contamination or pollution of the Premises or other lands, and Grantee shall also restore the Premises (or such other lands) to as near the condition that the Premises (or such other lands) were in prior to the contamination or pollution thereof as is reasonably practicable or as may be ordered or mandated by any such governmental authority.

9.05   Fires, Cleared Brush and Trash.  Grantee shall have the right to clear and remove brush and trees from newly constructed or installed roads, gathering lines, flowlines and wellsites.  Grantee shall have no right to burn any brush or trees cleared by Grantee.  Grantee shall use every effort to prevent all fires on the Premises.  All cleared brush and trees shall be pushed and stacked into piles at regular intervals along the edge of cleared roads, gathering lines, flowlines and wellsites.  Grantee shall use every effort to prevent pipe, pumping rods, broken equipment, papers, boxes, sacks, paint cans, containers, waste materials and other trash, litter and debris used or generated by Grantee from being buried, stored or discarded on the Premises.  Grantee shall not burn or bury such trash, litter and debris on the Premises.  Grantee shall remove, at Grantee's sole risk and expense, all trash, litter and debris of Grantee from the Premises on a regular basis and whenever requested by Surface Owner, and shall cause the surface of the Premises to be maintained at all times in a clean condition free of such trash, litter and debris and otherwise in good appearance.

9.06   Well Plugging.  Subject to the provisions of Paragraph 7.18 of this Agreement, any well (including a well drilled in search of Hydrocarbons or a water well) drilled on the Premises and abandoned by Grantee shall be plugged and abandoned promptly after the abandonment thereof in accordance with the rules, regulations and orders of any governmental authority having jurisdiction over the plugging and abandonment thereof.  Grantee shall cut off and remove all casing within at least thirty-six (36) inches below the surface of the ground.  Grantee shall fill the abandoned hole to the surface with compacted soil, and Grantee shall restore the surface of the ground over and around the abandoned well to as near its original condition as is reasonably practicable.  Grantee shall also fill in all abandoned well cave-ins or settlings occurring within two (2) years after the latter to occur of (a) the abandonment of such well or (b) the termination or expiration of this Agreement, and Grantee shall be solely liable for all injury or death to any person, livestock or wildlife caused by or arising out of any such cave-in or settling.

THIRD PARTY BENEFICIARIES

10.01   Mineral Owners.  Shirley Booth Middleton and W. V. Booth Family Partnership (herein called "Mineral Owners") own, in equal proportions, all the mineral interest in, to and under the Premises and all royalties payable under the terms of the Leases.  The Mineral Owners; and their respective heirs, devisees, legal and personal representatives, successors, oil and gas lessees; and assigns, are third party beneficiaries of this Agreement only to the extent of the terms and provisions of this Article X and every other paragraph wherein mention is made of or reference is made to the Mineral Owners.  Except for the Mineral Owners, there are no third party beneficiaries to this Agreement.

10.02   Leased Premises Hydrocarbons.  Except as provided below in this paragraph, the royalty of the Mineral Owners on Booth Gas produced from the Leased Premises and transported through the Pipeline shall never bear, be charged with or have deducted therefrom, either directly or indirectly, any portion of (a) the costs or expenses to gather, pipe or transport Booth Gas on or from the Premises or lands pooled therewith, or (b) the costs or expenses (including depreciation) to lay, install, construct, reconstruct, repair, maintain, operate, inspect, patrol, replace or remove the Pipeline and appurtenant facilities and equipment used in the operation or monitoring of the Pipeline or the transportation of Hydrocarbons through the Pipeline.  Except as provided below, all such costs and expenses shall be borne entirely by Grantee, and Grantee shall have no right to recoup from the Mineral Owners, or to deduct from royalties payable to the Mineral Owners on Booth Gas produced from the Leased Premises and transported through the Pipeline or otherwise, such costs or expenses allocable or attributable to the Mineral Owners' royalty on such Booth Gas.  Notwithstanding the foregoing, Mineral Owners' royalty on such Booth Gas shall bear its proportionate part of all costs and expenses actually charged by Grantee, an affiliated third party purchaser or transporter, or an unaffiliated third party purchaser or transporter to gather, pipe or transport Booth Gas; provided, however, such royalty shall not bear or be charged with its proportionate part of any gathering, piping or transportation charge or charges that exceed, in the aggregate, twenty cents ($.20) per MCF of Booth Gas produced from the Premises (of which Mineral Owners may be charged a maximum of $.025 per MCF based on the Leases presently providing for 1/8 royalties).  Such maximum charge shall escalate and increase by forty percent (40%) every five years, beginning five years after Booth Gas is first transported through the Pipeline.

## XI. ASSIGNMENTS AND OTHER TRANSFERS

11.01 Transfers by Surface Owner. The rights of Surface Owner under this Agreement may be assigned or otherwise transferred in whole or in part, in the event of which the provisions hereof shall extend to, inure to the benefit of and be binding upon the heirs, devisees, legal and personal representatives, successors and assigns of Surface Owner, but no change or division in the ownership of the Premises or in the ownership of or the right to receive surface damage payments, however accomplished, shall operate to enlarge the obligations or diminish the rights of Grantee. Notwithstanding any actual or constructive knowledge of or notice to Grantee thereof, no change or division in such ownership or such right to receive surface damage payments shall be binding upon Grantee until thirty (30) days after Grantee is notified of the change or division in such ownership and is furnished with a certified copy or xerox copy of the recorded or filed instrument or instruments evidencing the same. In the event of the death of any person entitled to receive surface damages hereunder, Grantee may pay or tender to the estate of the deceased person surface damages attributable to the interest of such decedent until such time as Grantee is furnished with proper evidence of the appointment and qualification of the personal representative of the estate, or if there is to be no personal representative, then until Grantee is furnished with evidence satisfactory to Grantee as to the heirs or devisees of the decedent entitled to receive such payments and as to the payment of any debts and taxes owing by the estate.

11.02 Transfers by Grantee. The rights of Grantee under this Agreement may be assigned, subleased or otherwise transferred in whole or in part, in the event of which the provisions hereof shall extend to, inure to the benefit of and be binding upon Grantee's heirs, devisees, legal and personal representatives, sublessees, successors and assigns, but no change or division in the ownership of this Agreement shall diminish the rights of Surface Owner; provided, however, (a) the assignee, sublessee or other transferee named in the assignment, sublease or other transfer of this Agreement or any portion hereof or any interest herein that is assigned, subleased or otherwise transferred by Grantee, or Grantee's heirs, devisees, legal and personal representatives, successors and assigns, shall be deemed to be bound by the terms of this Agreement and to have assumed responsibility and liability for all obligations and duties imposed by this Agreement upon Grantee, irrespective of whether the assignee, sublessee or other transferee expressly agrees in such assignment, sublease or other transfer to be bound hereby and to assume the foregoing, (b) no such assignment, sublease or other transfer shall relieve Grantee of any duty, obligation or liability (or modify any such duty, obligation or liability), whether fixed or contingent, imposed upon Grantee hereunder that is performable or owing or remains unsatisfied at the time such assignment, sublease or other transfer is made or that is to survive the termination of this Agreement, (c) the assignee, sublessee or other transferee named therein has a net worth of $25,000,000 or more using generally accepted accounting principles, (d) Grantee or Grantee's heirs, devisees, legal and personal representatives, successors and assigns, may not assign or sublease this Agreement in whole or in part, or as to any undivided interest herein, to an assignee, sublessee or other transferee having a net worth less than $25,000,000 using generally accepted accounting principles, unless the prior written consent thereto is obtained from Surface Owner (which consent may be withheld for any reason or no reason at all or may be granted with such conditions or restrictions as Surface Owner may desire to impose), and no attempted assignment or sublease by any of them shall be binding upon Surface Owner or valid between the parties thereto unless the prior written consent thereto is obtained from Surface Owner, (e) such assignment or sublease shall not prohibit, restrict, limit or otherwise adversely affect or impact in any manner the rights conferred upon the Mineral Owners by this Agreement to transport or cause to be transported Booth Gas through the Pipeline, and (f) a certified or xerox copy of the recorded or filed instrument evidencing such assignment, sublease or other transfer (or a true, correct and exact copy thereof if the same is not recorded or filed) shall be furnished to Surface Owner for Surface Owner's records promptly after its recordation or filing (or after its execution if the same is not recorded or filed), and no such assignment, sublease or other transfer shall be binding upon Surface Owner until Surface Owner shall have been furnished by the assignee, sublessee or other transferee with a certified or xerox copy of such recorded or filed instrument (or a true, correct and exact copy thereof if the same is not recorded or filed) and with the correct address and telephone number of such assignee, sublessee or other transferee.

## XII. ENVIRONMENTAL MATTERS

12.01 Compliance by Grantee. Grantee hereby covenants with Surface Owner that the portion of the Premises in which Grantee now or hereafter owns an interest or on which Grantee now or hereafter conducts operations (herein called "Grantee's Premises") is to Grantee's knowledge and shall always be in compliance with all applicable federal, state and local laws, rules, regulations and ordinances, including, without limitation, those relating to any flammables, explosives, radioactive materials, hazardous wastes, friable asbestos or any material containing asbestos, toxic substances or related materials, including, without limitation, substances defined as "hazardous substances", "hazardous materials" or "toxic substances" (hereinafter collectively called "Hazardous Materials") in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601, et. seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Sec. 1801, et. seq., or the Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901, et. seq., as each of the same may be amended from time to time, or as so classified from time to time by the Texas Railroad Commission, the Texas Natural Resources Conservation Commission, the United States Environmental Protection Agency or any other regulatory authority. In this regard, Grantee shall comply with any and all applicable local, state and federal laws, ordinances, rules, regulations and orders (a) related to any natural or environmental resource or media located on, above, within, in the vicinity of, related to or affected by the Premises or (b) required for the performance or conduct of Grantee's operations hereunder. Grantee shall not generate, use, treat, store or dispose of, or deposit, discharge or release, any Hazardous Materials in, on, under or over the Premises or transport any Hazardous Materials to, from or across the Premises except to the extent Hazardous Materials are produced by, or are required for, actual operations conducted on the Premises, and in such event such Hazardous Materials shall be used, stored, transported and disposed of in a safe manner and in compliance with all such laws, ordinances, rules, regulations and orders. Surface Owner shall have no obligation, responsibility or duty to inspect or oversee Grantee's operations hereunder or to identify or correct any potentially harmful, damaging or dangerous condition. Surface Owner and Grantee acknowledge that Surface Owner shall have no right to control any details of Grantee's operations or to designate or control Grantee's contractors or their subcontractors. Grantee and Grantee's contractors and their subcontractors, and their respective heirs, devisees, legal and personal representatives, successors and assigns, shall have no right to contribution or indemnity from Surface Owner for any matter relating to or arising out of operations conducted on the Premises.

codes and ordinances applicable to the use, generation, handling, storage, treatment, transportation and disposal of any Hazardous Materials now or hereafter located or present on or under the Premises.

12.03 Hazardous Materials Indemnity. GRANTEE, FOR GRANTEE AND GRANTEE'S HEIRS, DEVISEES, LEGAL AND PERSONAL REPRESENTATIVES, SUBLESSEES, SUCCESSORS AND ASSIGNS, SHALL PROTECT AND DEFEND SURFACE OWNER AT GRANTEE'S SOLE COST AND EXPENSE FROM AND AGAINST AND HEREBY INDEMNIFIES AND HOLDS HARMLESS SURFACE OWNER FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES, LIABILITIES, SETTLEMENTS, FINES, INTEREST, PENALTIES, CHARGES, ADMINISTRATIVE AND JUDICIAL PROCEEDINGS AND ORDERS, JUDGMENTS, REMEDIAL ACTIONS, REQUIREMENTS AND ENFORCEMENT ACTIONS OF ANY KIND OR NATURE, KNOWN OR UNKNOWN, CONTINGENT OR OTHERWISE, AND ALL COSTS AND EXPENSES INCURRED IN CONNECTION THEREWITH (INCLUDING, WITHOUT LIMITATION, ATTORNEY'S FEES, EXPERT WITNESS AND CONSULTANT FEES, INVESTIGATION AND LABORATORY FEES, COURT COSTS AND LITIGATION EXPENSES), IN ANY WAY ARISING DIRECTLY OR INDIRECTLY, IN WHOLE OR IN PART, OUT OF (a) THE PRESENCE, DISPOSAL, RELEASE OR THREATENED RELEASE OF ANY HAZARDOUS MATERIALS ON, UNDER OR FROM THE PREMISES DURING THE TERM HEREOF, OR (b) ANY ACTIVITY CARRIED ON OR UNDERTAKEN ON OR OFF THE PREMISES DURING THE TERM HEREOF, WHETHER BY GRANTEE OR ANY SUCCESSOR OF GRANTEE OR ANY EMPLOYEES, AGENTS, REPRESENTATIVES, CONTRACTORS, SUBCONTRACTORS OR SUBLESSEES OF GRANTEE OR ANY SUCCESSOR OF GRANTEE IN CONNECTION WITH THE HANDLING, TREATMENT, REMOVAL, STORAGE, DECONTAMINATION, CLEANUP, TRANSPORTATION OR DISPOSAL OF ANY HAZARDOUS MATERIALS AT ANY TIME LOCATED OR PRESENT DURING THE TERM HEREOF ON OR UNDER THE PREMISES, INCLUDING, WITHOUT LIMITATION, ANY OF THE FOREGOING ARISING IN PART (BUT NOT IN WHOLE) FROM NEGLIGENCE ON THE PART OF SURFACE OWNER (THE FOREGOING INDEMNITY BEING HEREINAFTER CALLED "THE HAZARDOUS MATERIALS INDEMNITY"). THE HAZARDOUS MATERIALS INDEMNITY SHALL FURTHER APPLY TO ANY RESIDUAL CONTAMINATION ON OR UNDER THE PREMISES OR LANDS ADJOINING OR IN THE VICINITY THEREOF, OR AFFECTING ANY NATURAL RESOURCES, AND TO ANY CONTAMINATION OF ANY LANDS WHERESOEVER SITUATED (INCLUDING THE PREMISES), ANY PERSONAL PROPERTY, FIXTURES OR EQUIPMENT WHERESOEVER SITUATED OR ANY NATURAL RESOURCES ARISING IN CONNECTION WITH THE GENERATION, USE, TREATMENT, HANDLING, STORAGE, TRANSPORTATION OR DISPOSAL OF ANY HAZARDOUS MATERIALS, IRRESPECTIVE OF WHETHER ANY OF SUCH ACTIVITIES WERE OR WILL BE UNDERTAKEN IN ACCORDANCE WITH APPLICABLE LAWS, REGULATIONS, CODES AND ORDINANCES. THE HAZARDOUS MATERIALS INDEMNITY SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT, PROVIDED THAT THE CLAIMS AND OTHER ACTIONS OF ANY KIND AGAINST SURFACE OWNER WHICH GIVE RISE TO THE HAZARDOUS MATERIALS INDEMNITY ARE NOT BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS AT THE TIME SUCH CLAIMS OR ACTIONS ARE INSTITUTED.

## XIII. NOTICES AND GENERAL INDEMNITY

13.01 Notice Methods. All notices, consents, waivers or other communications required, authorized or permitted to be given under this Agreement, except as otherwise expressly provided in this Agreement, shall be in writing and shall be deemed to have been furnished when delivered in person or deposited in the United States mail by certified mail, return receipt requested with postage and charges pre-paid, addressed to Surface Owner at Surface Owner's address above if directed to Surface Owner, or to Grantee at Grantee's address above if directed to Grantee. Either Surface Owner or Grantee (or any heir, devisee, legal or personal representative, successor or assign of either) may change his, her or its address but no such change shall be binding on the other (or others) until written notice thereof has been furnished the other (or others) in the manner stated above.

13.02 General Indemnity. IN ADDITION TO THE HAZARDOUS MATERIALS INDEMNITY, GRANTEE, FOR GRANTEE AND GRANTEE'S HEIRS, DEVISEES, LEGAL AND PERSONAL REPRESENTATIVES, SUBLESSEES, SUCCESSORS AND ASSIGNS, SHALL PROTECT AND DEFEND SURFACE OWNER AT GRANTEE'S SOLE COST AND EXPENSE FROM AND AGAINST AND HEREBY INDEMNIFIES AND HOLDS SURFACE OWNER HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, DISPUTES (INCLUDING BOUNDARY DISPUTES), LOSSES, DAMAGES, LIABILITIES, SETTLEMENTS, INTEREST, PENALTIES, ADMINISTRATIVE AND JUDICIAL PROCEEDINGS AND ORDERS, JUDGMENTS AND ENFORCEMENT ACTIONS OF ANY KIND OR NATURE, KNOWN OR UNKNOWN, CONTINGENT OR OTHERWISE, AND ALL COSTS AND EXPENSES INCURRED IN CONNECTION THEREWITH (INCLUDING, WITHOUT LIMITATION, ATTORNEY'S FEES, EXPERT WITNESS AND CONSULTATION FEES, INVESTIGATION AND LABORATORY FEES, COURT COSTS AND LITIGATION EXPENSES), IN ANY WAY ARISING FROM, GROWING OUT OF, ATTRIBUTABLE OR INCIDENTAL TO OR RESULTING FROM THE GRANTING OF THIS AGREEMENT BY SURFACE OWNER OR ARISING FROM, GROWING OUT OF, ATTRIBUTABLE OR INCIDENTAL TO OR RESULTING FROM GRANTEE'S OPERATIONS OR ACTIONS HEREUNDER OR UNDER THE TERMS OF ANY LEASE. GRANTEE, FOR GRANTEE AND GRANTEE'S HEIRS, DEVISEES, LEGAL AND PERSONAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS, HEREBY AGREES THAT SURFACE OWNER SHALL HAVE OR OWE NO RESPONSIBILITY, OBLIGATION OR DUTY TO GRANTEE TO COOPERATE OR PARTICIPATE WITH GRANTEE IN RESOLVING OR SETTLING ANY DISPUTE, SUIT OR ACTION BETWEEN GRANTEE AND ANY THIRD PARTIES IN ANY WAY ARISING FROM, GROWING OUT OF, ATTRIBUTABLE TO OR RESULTING FROM THE GRANTING OF THIS AGREEMENT BY SURFACE OWNER OR ARISING FROM, GROWING OUT OF, ATTRIBUTABLE TO OR RESULTING FROM GRANTEE'S OPERATIONS OR ACTIONS HEREUNDER OR UNDER THE TERMS OF ANY LEASE. THE PROVISIONS AND OBLIGATIONS CONTAINED IN THIS PARAGRAPH SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

during any period work is being performed by them on the Premises as required and in amounts sufficient to comply with the governing laws of the State of Texas;

b. Commercial General Liability Insurance with a combined single limit for bodily injury and property damage of not less than $1,000,000.00 per occurrence, and such coverage shall be written on an "occurrence" form and shall include broad form comprehensive general liability coverage, broad form contractual liability coverage (contemplating and insuring the indemnity covenants of Grantee in this Agreement), products and completed operations liability coverage, premises/operations liability coverage, sudden and accidental pollution liability coverage and such other coverage as may be necessary to cover Grantee's operations on the Premises and all risks assumed by Grantee under this Agreement;

c. Umbrella or Excess Liability Insurance (through one or more policies) with limits of not less than $19,000,000.00 per occurrence and aggregate where applicable in excess of the coverages and limits of liability of the policy listed as policy b above; and

d. Control of Well Insurance, including seepage and pollution coverage and clean-up and contamination coverage, for the first well hereafter drilled by Grantee on the Premises to the Deep Depths, with limits of not less than $3,000,000.00 per occurrence and aggregate, written on an "occurrence" form, and with endorsements for underground control of well, evacuation expenses, and making wells safe. After the drilling and completion of the initial well hereafter drilled to the Deep Depths by Grantee on the Premises, if the drilling, logging, testing and completion thereof does not show the Edwards Formation or other sour gas formation to be an overpressured formation, then Grantee shall not be required to procure and carry Control of Well Insurance in connection with the drilling of subsequent wells drilled to Deep Depths.

The required insurance coverages are minimum insurance requirements to be maintained by Grantee hereunder and do not (and shall not be construed to) (a) void or limit the indemnity obligations or other liabilities of Grantee provided for elsewhere in this Agreement or (b) represent in any manner a determination or recommendation of the insurance coverages that Grantee should or should not maintain for Grantee's own protection. Such insurance coverages are being provided by Grantee in support of such indemnity obligations and other liabilities of Grantee and in recognition that Grantee is and shall be engaged in potentially hazardous and catastrophic activities on the Premises. All insurance policies reflecting such coverages shall be issued by reliable insurance carriers satisfactory to Surface Owner and licensed or otherwise authorized to do business in the State of Texas. However, the insolvency, reorganization, bankruptcy or failure of any such insurance carrier, the loss of its license or other authority to do business, or the failure of any such carrier to pay for any reason or no reason claims as they accrue, shall not affect, negate or waive any indemnity or other liability provisions in this Agreement or be deemed to release Grantee of any obligation under this Agreement to pay such claims as they accrue. Grantee may from time to time change insurance carriers without the prior approval of Surface Owner. The deductible on any of the insurance policies listed above shall not exceed Fifty Thousand Dollars ($50,000.00).

14.02 Insurance Endorsements. Each such insurance policy shall contain endorsements that (a) the carrier issuing such policy will not cancel or materially change the policy without at least thirty (30) days prior written notice to Surface Owner, (b) the carrier issuing such policy waives any rights of subrogation and any other rights of recourse or recovery against Surface Owner, insofar as the same relate to or cover Grantee's operations on the Premises and Grantee's indemnity and defense obligations under this Agreement, and (c) names Surface Owner as an additional insured or insureds, insofar as the same relate to or cover Grantee's operations on the Premises and Grantee's indemnity and defense obligations under this Agreement (except Surface Owner shall not be so named on any worker's compensation or similar policy). Grantee shall furnish Surface Owner with Certificates of Insurance reflecting such insurance coverages and endorsements before commencing production from any well capable of producing hydrogen sulfide gas, but the commencement thereof without furnishing same shall not waive the rights of Surface Owner under this paragraph. Grantee shall provide Surface Owner at least thirty (30) days before the expiration of any coverage with a Certificate of Insurance reflecting that such coverage has been renewed or that new coverage has been obtained from a carrier previously approved by Surface Owner, together with proof satisfactory to Surface Owner of Grantee's payment of all insurance premiums for such coverages. Upon request, Grantee shall provide Surface Owner with certified, complete copies of all insurance policies reflecting coverages that Grantee is required by this Agreement to carry. All such insurance policies and coverages (to the extent of the indemnity and defense obligations assumed by Contractor under this Contract) shall be primary to, and shall receive no contribution from, any insurance policies and coverages maintained by or on behalf of Surface Owner. Surface Owner shall not be responsible or liable for and is hereby released from the payment of any deductibles, co-insurance penalties, defense costs or self-insured retentions set forth in such policies.

XV. GEOLOGICAL AND GEOPHYSICAL SURVEYS

15.01 Leased Premises. To the extent that Grantee is conferred the right to conduct such surveys by the terms of a Lease, Grantee shall have the right to conduct geological and geophysical surveys by seismograph, core test, gravity and magnetic methods in, on, over, under or across the Leased Premises and to contract with third parties to conduct such surveys thereon. All such surveys which require the use of the surface of the Leased Premises shall be conducted only in dry weather and dry soil conditions. Prior to entering the Leased Premises to conduct such surveys, Grantee shall notify Surface Owner and any tenant occupying the portion of the surface estate on which such surveys are to be conducted. Promptly upon completion of such surveys, Grantee shall remove all debris and restore the surface of the Leased Premises to the same condition that the Leased Premises were in prior to conducting such surveys as provided elsewhere in this Agreement. Grantee shall pay damages for all damage to the surface estate and any structures, wells, roads, fences or other improvements thereon caused by or arising out of such surveys or for injury or death to any person, livestock or wildlife thereon as provided elsewhere in this Agreement. No such geological or geophysical surveys shall be conducted in, on, over, under or across the Premises between November 1 and February 1 of any calendar year.

15.03 Explosive Charges. Grantee shall not use any explosive charges on the Leased Premises without the prior written consent of Surface Owner. Prior to commencement of seismic operations involving explosive charges, Grantee shall provide Surface Owner with a plat on which the proposed seismic survey line and all proposed "shot" holes are depicted. Grantee shall conduct such operations strictly along such line and within eight (8) feet of either side of the line. It shall be the sole responsibility of Grantee to place all "shot" holes a sufficient distance away from all producing, shut-in or abandoned oil or gas wells, all water wells, all stock tanks and other bodies of impounded or flowing surface water, and all non-abandoned pipelines, gathering lines and flowlines situated on the Leased Premises or on lands in the vicinity thereof; provided, however, in no event shall any "shot" holes be drilled any nearer than (a) five hundred (500) feet of any such producing, shut-in or abandoned oil or gas well, (b) one thousand (1000) feet of any such water well, (c) three hundred (300) feet of any such body of surface water, and (d) five hundred (500) feet of any such pipeline, gathering line or flowline. It shall be the sole responsibility of Grantee to locate on the ground all such wells, bodies of surface waters and lines prior to conducting such operations or surveys. Promptly after the last explosive is discharged in a "shot" hole, such "shot" hole shall be plugged with a good and sufficient cement plug and filled to the surface with compacted soil. Grantee shall also fill in all "shot" hole cave-ins or settlings occurring within two (2) years after the latter to occur of (a) a "shot" hole is plugged and filled or (b) this Agreement terminates, and Grantee shall be solely liable for all injury or death to any person, livestock or wildlife caused by or arising out of any such cave-in or settling.

15.04 Seismic Data. With respect to any 2-D seismic survey conducted on the Leased Premises by or on behalf of Grantee, Grantee shall furnish or cause to be furnished to Surface Owner, within ninety (90) days after such seismic operations are commenced, the final processed data relating to and obtained from the seismic operations so conducted from a point two (2) miles from and beyond the point where the seismic line enters the Leased Premises to a point two (2) miles from and beyond the point where the seismic line exits the Leased Premises. In other words, the final processed data to be furnished shall cover an area extending two (2) miles in any direction from and beyond the boundaries of the Leased Premises. Such final processed data shall consist of (a) the black line print, (b) the final migrated section of the seismic line, and (c) a "shot" point plat on which all "shot" points are accurately depicted. With respect to any 3-D seismic survey conducted on the Leased Premises by or on behalf of Grantee, Grantee shall furnish to Surface Owner within one hundred eighty (180) days after such seismic operations are commenced a professionally usable copy of: (a) a post-plot map showing the acquired lines and any special processing such as attribute analysis, etc.; and (b) 3-D seismic tapes of all final stack and migration data. A listing of the four corners of the processed 3-D binned data, giving the inline number and crossline number, and X and Y state plane coordinates of each corner, specifying the zone and datum used for all these data are to be supplied on a diskette in ASCII format. All data furnished by Grantee to Surface Owner shall be in a SEG-Y format (or comparable format output) compatible with industry available PC-based or workstation-based 3-D interpretation packages. The SEG-Y format output will contain processed full record length, binned data of all 3-D data resulting from seismic processing of the acquired data which covers the Leased Premises and any land situated within two miles of the Leased Premises over which the seismic survey was conducted. If more than one SEG-Y format output of the processed 3-D binned data is generated by Grantee, Grantee shall furnish Surface Owner with that portion of that additional processed 3-D binned data which covers the Leased Premises and any land situated within two miles of the Leased Premises over which the seismic survey was conducted; and (c) cartographic data over the area of the survey in Tobin format on a DOS diskette. Grantee shall not provide Surface Owner copies of attribute analysis, prints of interpreted maps or any other interpretations of any 3-D seismic survey performed by Grantee. Notwithstanding the foregoing, Grantee shall not furnish Surface Owner any seismic or other geophysical data that is not proprietary to Grantee and that the furnishing or dissemination thereof to Surface Owner is contractually prohibited by license, confidentiality or similar agreement with a third party not an Affiliate of Grantee. As used in this Agreement, the term "Affiliate" shall mean and include any individual, corporation, partnership, trust, estate or other legal entity controlling, controlled by or under common control with Grantee, with the concept of control in such context meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another whether through the ownership of voting securities, by contract or otherwise, and shall also include any employee, officer, director or agent of Grantee or any Affiliate of Grantee.

15.05 Unleased Premises. This Agreement confers no right upon Grantee to conduct geological or geophysical surveys in, on, over, under or across the Unleased Premises, and none shall be conducted by or on behalf of Grantee without the prior written consent of Surface Owner.

## XVI. WARRANTY

16.01 Title to the Premises. This Agreement and the rights granted hereby are made by Surface Owner without any warranty of title to the Premises, express, implied, at common law, by statute or otherwise, and are made without recourse (even as to the return of any consideration or surface damages paid herefor or hereafter paid to Surface Owner hereunder).

16.02 Condition of the Premises. GRANTEE HEREBY ACCEPTS THE PREMISES IN ITS PRESENT CONDITION, "AS IS," "WHERE IS" AND WITH ALL FAULTS AND DEFECTS, WHETHER KNOWN OR UNKNOWN. SURFACE OWNER HEREBY EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY OF ANY KIND, CHARACTER OR NATURE, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE SURFACE OR SUBSURFACE OF THE PREMISES OR OF ANY HYDROCARBON THAT MAY BE PRODUCED THEREFROM, INCLUDING (BUT NOT LIMITED TO) ANY REPRESENTATIONS AND WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR PERTAINING TO ANY ENVIRONMENTAL, GEOLOGICAL OR OTHER CONDITION OR HAZARD (OR THE ABSENCE THEREOF) IN ANY MANNER HERETOFORE, PRESENTLY OR HEREAFTER AFFECTING THE PREMISES. GRANTEE ACKNOWLEDGES THAT FORMATIONS UNDERNEATH THE PREMISES AND HYDROCARBONS PRODUCED FROM THE PREMISES MAY CONTAIN NATURALLY OCCURRING RADIOACTIVE MATERIAL, HYDROGEN SULFIDE AND OTHER DANGEROUS, TOXIC OR HAZARDOUS MATERIALS OR SUBSTANCES.

therein.

## XVII. REIMBURSEMENT OF THIRD PARTY FEES

17.01 Legal Fees. Grantee acknowledges and understands that Surface Owner has retained legal counsel ("Surface Owner's Counsel") in connection with the negotiation and preparation of this Agreement, and that Surface Owner's Counsel has not represented and is not representing Grantee in connection with the negotiation and preparation of this Agreement. Grantee reaffirms its prior agreement with Surface Owner and Surface Owner's Counsel to pay for all attorney's fees and disbursements incurred by Surface Owner in connection with the negotiation and preparation of this Agreement. Such payment shall be made in accordance with such prior agreement. Grantee hereby acknowledges receipt of a copy of the statement of Surface Owner's Counsel addressed to Surface Owner for such fees and disbursements.

17.02 Safety Consultant Fees. Surface Owner has retained a safety consultant to advise Surface Owner with respect to Surface Owner's safety concerns relating to the possible production from, gathering on and transportation across and from the Premises of hydrogen sulfide gas. Grantee covenants and agrees to reimburse Surface Owner for all consultant fees and expenses incurred by Surface Owner, not to exceed the sum of Two Hundred Dollars ($200.00), in connection with Surface Owner's consultations with such consultant. Such reimbursement shall be made by check payable to the order of William T. Booth contemporaneously with the execution of this Agreement. Grantee hereby acknowledges receipt of a copy of such consultant's statement addressed to William T. Booth for such fees and expenses.

## XVIII. MISCELLANEOUS

18.01 Headings and Captions. The headings and captions used in this Agreement are for convenient reference only and shall not in any way affect the meaning or interpretation, and shall not be considered in construing, this Agreement.

18.02 Entire Agreement. Except for (a) any implied covenants or duties hereunder as may be imposed by law upon Grantee and (b) any express covenants or duties as may be imposed upon Grantee by the terms of any Lease, this Agreement encompasses the final, entire agreement between Surface Owner and Grantee relating to the Premises and supersedes any and all prior proposals, agreements, representations and understandings, whether written or oral, relating to the Premises. If any term, provision or covenant in any Lease conflicts or is inconsistent with any term, provision or covenant in this Agreement, then the term, provision or covenant in this Agreement shall govern and control.

18.03 Amendments. No change, amendment, alteration, extension, modification, supplement or ratification of this Agreement shall be valid unless the same is in writing, makes legal reference to this Agreement and is executed by the party against whom or which such change, amendment, alteration, extension, modification, supplement or ratification is sought to be enforced.

18.04 Confidentiality. Surface Owner and Grantee agree not to disclose any part of this Agreement, except as (a) expressly required by law or regulatory authority; (b) ordered by a court of competent jurisdiction; (c) to accountants, attorneys and employees of the parties, to officers of corporate or company parties, to partners of partnership parties, and to immediate family of individual parties; or (d) as expressly agreed to in advance in writing by the other parties. A copy of this Agreement may be provided by either Surface Owner or Grantee to any prospective purchaser of any portion of, or interest in, the Premises or any of the Leases who may request a copy; provided, however, such prospective purchaser agrees in writing to abide by this confidentiality provision.

18.05 Injunctive Relief. In the event of a breach or threatened breach of any term or provision in this Agreement by Grantee, Surface Owner shall be entitled to injunctive relief, both temporary and permanent and both mandatory and prohibitive, enjoining and restraining such breach or threatened breach. Such remedy shall be in addition to all other remedies available to Surface Owner at law or in equity, and Surface Owner shall be entitled to injunctive relief notwithstanding there may be one or more adequate remedies at law available to Surface Owner at the time injunctive relief is sought by Surface Owner. Nothing herein shall be deemed an election of remedies or a waiver of any other rights or remedies available at law or in equity.

18.06 Joint and Several. The obligations, duties and liabilities of Grantee and each Guarantor under or imposed by the terms of this Agreement shall be joint and several with respect to each of them and may be enforced by Surface Owner (or by any Surface Owner acting alone) against Grantee or any Guarantor individually, against any two or more of them, or against all of them as a group.

18.07 Applicable Law and Venue. THIS AGREEMENT SHALL BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH AND SUBJECT TO THE LAWS OF THE STATE OF TEXAS AND THE UNITED STATES OF AMERICA. This Agreement is performable for all purposes in Webb County, Texas.

18.08 Time. Time is of the essence in this Agreement.

18.09 Severability. If any term, covenant or condition of this Agreement is declared invalid, illegal or unenforceable in any respect by final decree of a court having jurisdiction, the other terms, covenants and conditions herein shall nevertheless remain in full force and effect. In lieu of such invalid, illegal or unenforceable term, covenant or condition, there shall be added automatically as a part of this Agreement a term, covenant or condition that is as similar as possible to the one which is declared invalid, illegal or unenforceable and still be valid, legal and enforceable.

18.10 Agreement Memorandum. Contemporaneously herewith, Surface Owner and Grantee have executed an instrument of even date herewith entitled "Memorandum of Surface Use Agreement" which refers to the existence of this Agreement. Surface Owner and Grantee

acknowledged by Surface Owner, Grantee and each Guarantor.

18.12 <u>Binding Effect</u>. The terms and provisions of this Agreement are and shall be binding upon, and shall inure to the benefit of, each Surface Owner and Grantee, and their respective heirs, devisees, legal and personal representatives, successors and assigns. This Agreement is a covenant running with the Premises and the interests of Grantee in the Leases. The term "Grantee," as used in this Agreement, shall include, in addition to the entity named in this Agreement as Grantee, any individual or entity from time to time owning record, legal or equitable title to any right or interest of Grantee in or under this Agreement or any portion hereof.

18.13 <u>Mediation</u>. If a dispute arises between Surface Owner and Grantee that they are unable to resolve on their own, Surface Owner and Grantee agree to submit their dispute to mediation, following the mediation provisions and guidelines set forth in Exhibit "B" hereto, before resorting to litigation to settle the dispute. Nothing herein shall prevent a party from filing a lawsuit to prevent an applicable statute of limitation from expiring.

IN WITNESS WHEREOF, this Agreement is dated and executed by Surface Owner, Grantee and each Guarantor in triplicate originals hereof as of the date first written or typed above, one of which shall be retained by William T. Booth and wife, Kay Booth, one of which shall be retained by John Vernon Booth, and the last of which shall be retained by Grantee.

SURFACE OWNER:

_____
WILLIAM T. BOOTH

_____
KAY BOOTH

_____
JOHN VERNON BOOTH

GRANTEE:

NAVARRO GAS COMPANY

By: _____
Rodney R. Lewis
President

STATE OF TEXAS        §
                      §
COUNTY OF WEBB        §

This instrument was acknowledged before me on _____Aug 27th_____, 1999 by WILLIAM T. BOOTH and wife, KAY BOOTH.

_____
Notary Public, State of Texas
Name Printed: Maria V. Garza
My Commission Expires: 2-18-2001



JUNKO CHONG
Comm. # 1163546
NOTARY PUBLIC CALIFORNIA
Los Angeles County
My Comm. Expires Nov. 28, 2001

Notary Public, State of California
Name Printed: _JUNKO CHONG_
My Commission Expires: _November 28, 19__ 2001_

STATE OF TEXAS    §
                     §

COUNTY OF BEXAR    §

This instrument was acknowledged before me on _August 27_ , 1999 by Rodney R. Lewis, President of NAVARRO GAS COMPANY, a Texas corporation, on behalf of said corporation.

Notary Public, State of Texas
Name Printed: _Natalie J.D. Miller_
My Commission Expires: _3-3-01_

NATALIE JENE DORN
NOTARY PUBLIC
State of Texas
Comm. Exp. 03-03-2001

RVK/BOOTH/SURF-USE.DOC

and Navarro Gas Company, as Grantee,
covering 5,393.08 acres, more or less

The lands covered by the Surface Use Agreement to which this Exhibit "A" is attached are situated in the Joaquin Galan Grant No. 2292, Abstract No. 3226, in Webb County, Texas, and are more particularly described on the pages of this Exhibit "A" that follow.

[SEE PAGES THAT FOLLOW FOR A DESCRIPTION OF PREMISES]

RVV/BOOTH/SURF-USE.DOC

...particularly described as follows:

Beginning at the Southwest corner of a called 1,773.33 acre tract as described in deed to Verner Wayne Middleton and Martin Michael Middleton filed for record July 31, 1992 in Volume 47, Page 51, Official Public Records of Webb County, Texas and being on the East line of a tract as described in deed to Norbert J. Dickman and Robert Dickson, Trustees, recorded in Volume 364, Page 722, Official Public Records of Webb County, Texas. A 1/2 inch iron rod, found, bears N 45 deg 32 min 12 sec W, 63.29 feet.

Thence S 45 deg 32 min 12 sec E along the most Eastern West line of the said called 7,093.32 acres, 562.05 feet to a fence corner at the inside Ell corner in the West line of the said called 7,093.32 acres and the Southeast corner of the said Norbert J. Dickman et al tract, same being the Northeast corner of a 1,198.00 acre tract as described in deed of even date.

Thence S 53 deg 12 min 01 sec E along the East line of the said 1,198.00 acres, 9,215.22 feet to a fence post at a deflection in said line, continuing S 23 deg 44 min 16 sec E, 472.35 feet to a fence corner at the Southeast corner of the said 1,198.00 acres and at the outside Ell corner in the North line of a 2,421.75 acre tract as described in deed of even date.

Thence S 30 deg 01 min 56 sec E a distance of 1,197.73 feet to a 1/2 inch iron rod set the inside Ell corner in the North line of the said 2,421.75 acres.

Thence N 59 deg 26 min 10 sec E along the North line of the said 2,421.75 acres, 5,075.04 feet to a 1/2 inch iron rod set at the Northeast corner of same on the West line of a called 3,628.88 acre tract as described in deed from Bert Mars et ux to R. M. Middleton, filed for record on September 1, 1960 in Volume 283, Page 289, Deed Records of Webb County, Texas.

Thence N 20 deg 16 min 17 sec W along said West line, 1,217.26 feet to a fence corner at the Southwest corner of a called 2,048.74 acre tract as described in deed to Gayle M. Rettig, filed for record July 14, 1980 in Volume 622, Page 23, Deed Records of Webb County, Texas.

Thence S 63 deg 29 min 04 sec W along the South line of the said called 1,773.33 acres, 10,534.05 feet to the place of beginning and containing 1,773.33 acres of land.

948.21 ACRE TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A SET ½" IRON ROD BEING THE SOUTH CORNER OF THIS TRACT WHICH BEARS N 69°35'33" E A DISTANCE OF 5990.99 FEET FROM THE SOUTHWEST CORNER OF SAID 7093.32 ACRE TRACT ALSO BEING THE SOUTHWEST CORNER OF SAID 2421.75 ACRE TRACT TO A FOUND 3" BRASS DISK, THENCE N 69°34'17" E A DISTANCE OF 1740.73 FEET TO THE SOUTH CORNER OF THIS TRACT, FOR THE TRUE POINT OF BEGINNING;

THENCE, N 26°30'28" W, A DISTANCE OF 9009.88 FEET TO A SET ½" IRON ROD BEING ON THE NORTHWEST BOUNDARY LINE OF SAID 2421.75 ACRE TRACT, FOR THE NORTHWEST CORNER OF THIS TRACT;

THENCE, N 59°45'45" E, ALONG SAID NORTHWEST BOUNDARY LINE OF SAID 2421.75 ACRE TRACT, A DISTANCE OF 299.90 FEET TO A FOUND FENCE CORNER POST BEING AN EXTERIOR CORNER OF SAID 2421.75 ACRE TRACT, FOR AN EXTERIOR CORNER OF THIS TRACT;

THENCE, S 30°01'56" E, CONTINUING ALONG SAID 2421.75 ACRE BOUNDARY LINE, A DISTANCE OF 1197.73 FEET TO A FOUND ½" IRON ROD BEING AN INTERIOR CORNER OF SAID 2421.75 ACRE TRACT, FOR AN INTERIOR CORNER OF THIS TRACT;

THENCE, N 59°26'10" E, CONTINUING ALONG SAME BOUNDARY LINE, A DISTANCE OF 5075.04 FEET TO A FOUND ½" IRON ROD BEING THE MOST NORTH CORNER OF SAID 2421.75 ACRE TRACT, FOR THE MOST NORTH CORNER OF THIS TRACT;

THENCE, S 20°16'17" E, CONTINUING ALONG SAME, A DISTANCE OF 8722.45 FEET TO A FOUND FENCE CORNER POST BEING THE EAST CORNER OF SAID 2421.75 ACRE TRACT, FOR THE EAST CORNER OF THIS TRACT;

THENCE, S 69°34'17" W, ALONG SAME, A DISTANCE OF 4513.09 FEET TO THE POINT OF BEGINNING OF THIS 948.21 ACRE TRACT OF LAND, MORE OR LESS.

1473.54 ACRE TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A FOUND 2" PIPE BEING THE SOUTH CORNER OF SAID 7093.32 ACRE TRACT ALSO BEING THE SOUTH CORNER OF SAID 2421.75 ACRE, FOR THE SOUTH CORNER OF THIS TRACT AND THE TRUE POINT OF BEGINNING;

THENCE, N 26°30'28" W, ALONG THE SOUTHWEST BOUNDARY LINE OF SAID 7093.32 ACRE TRACT, A DISTANCE OF 7687.71 FEET TO A FOUND FENCE CORNER POST BEING THE WEST CORNER OF SAID 2421.75 ACRE TRACT, FOR THE WEST CORNER OF THIS TRACT;

THENCE, N 59°45'45" E, ALONG SAID NORTHWEST BOUNDARY LINE OF SAID 2421.75 ACRE TRACT, A DISTANCE OF 7704.32 FEET TO A SET ½" IRON ROD, FOR THE NORTH CORNER OF THIS TRACT;

THENCE, S 26°30'28" E, PARALLELING THE SOUTHWEST BOUNDARY OF SAID 7093.32 ACRE TRACT, A DISTANCE OF 9009.88 FEET TO A SET ½" IRON ROD BEING ON THE SOUTHEAST BOUNDARY LINE OF SAID 7093.32 ACRE TRACT, FOR THE EAST CORNER OF THIS TRACT;

THENCE, S 69°34'17" W, ALONG THE SOUTHEAST BOUNDARY LINE OF SAID 7093.32 ACRE TRACT, A DISTANCE OF 1740.73 FEET TO A FOUND 3" BRASS DISC, FOR A DEFLECTION POINT RIGHT OF THIS TRACT;

THENCE, S 69°35'33" W, CONTINUING ALONG SAME, A DISTANCE OF 5990.99 FEET TO THE POINT OF BEGINNING OF THIS 1473.54 ACRE TRACT OF LAND, MORE OR LESS.

tract as described in deed dated January 20,1947, from George W.Lyles to W.V.Booth, recorded in Volume 193, Page 431, of the Deed Records of Webb County, Texas, and being more particularly described as follows:

BEGINNING at a fence corner at the most Southern Northwest corner of the said called 7,093.32 acres at the Northeast corner of a called 642.29 acres as described in deed to Dailey Fuller, filed for record on May 26,1953 in Volume 230, Page 25, of the Deed Records of Webb County, Texas, and being on the South line of a tract as described in deed from Barbara Fasken to Norbert J.Dickman and Robert Dickson, Trustees, recorded in Volume 364, Page 722, of the Official Public Records of Webb County, Texas;

THENCE S. 26 Deg. 33 Min. 36 Sec. E. along the East line of the said called 642.29 acres and the West line of the said called 7,093/32 acres, 7,877.42 feet to a fence corner at the Northwest corner of a 2,421.75 acre tract as described in this Deed hereinafter;

THENCE N.59 Deg. 45 Min. 45 Sec. E. along the North line of the said 2,421.75 acres, 8,004.22 feet to a fence corner on the West line of a 1,773.33 acre tract and an outside Ell corner in the North line of the said 2,421.75 acre tract;

THENCE N. 23 Deg. 44 Min. 16 Sec. W. along the West line of the said 1,773.33 acres, 472.35 feet to a fence post at a deflection in said West line, continuing N. 53 Deg. 12 Min. 01 Sec.W., 9,215.22 feet to a fence corner at the Southeast corner

of said tract described in deed to Norbert J.Dickman and Robert Dickson, same being an inside Ell corner in the West line of the said called 7,093.22 acres.

THENCE S. 44 Deg. 19 Min. 15 Sec. W. along the South line of the said Norbert J.Dickman et al tract, 4,105.47 feet to the Place of BEGINNING and containing 1,198.00 acres of land.

A.     **Agreement to Use Procedure.** If any dispute (the "Dispute") relating to this Agreement cannot be resolved within thirty (30) days after written notice by a party to mediate with the other party, the parties agree to utilize the procedures described in this Exhibit "B".

B.     **Initiation of Procedure.** The initiating party shall give written notice to the other party, describing the nature of the Dispute, its claim for relief and identifying one or more individuals with authority to resolve the Dispute on such party's behalf. The other party shall have five (5) business days within which to designate in writing one or more individuals with authority to resolve the Dispute on such party's behalf.

C.     **Selection of Mediator.** Within five (5) business days from the date of such designation, the parties shall make a good faith effort to select a person to mediate the Dispute. If no mediator has been selected under this procedure, the parties shall jointly request a State or Federal District Judge of their choosing (or if they cannot agree, the President of the Laredo Bar Association) to supply within ten (10) business days a list of potential qualified attorney-mediators. Within five (5) business days of receipt of the list, the parties shall rank the proposed mediators in numerical order of preference, simultaneously exchange such list, and select as the mediator the individual receiving the highest combined ranking. If such mediator is not available to serve, they shall proceed to contact the mediator who received the next highest ranking until they select a mediator.

D.     **Time and Place for Mediation; Parties Represented.** In consultation with the mediator selected, the parties shall promptly designate a mutually convenient time and place for the mediation, such time to be no later than thirty (30) days after selection of the mediator, subject to the mediator's availability. In the mediation, each party shall be represented by persons with authority and discretion to negotiate a resolution of the Dispute, and each party may be represented by counsel.

E.     **Conduct of Mediation.** The mediator shall determine the format for the meetings, and the mediation session shall be private. The mediator will keep confidential all information learned in private caucus with any party unless specifically authorized by such party to make disclosure of the information to the other party. The parties agree that the mediation shall be governed by the provisions of Chapter 154 of the Texas Civil Practice and Remedies Code and such other rules as the mediator shall prescribe.

F.     **Fees of Mediator; Disqualification.** The fees and expenses of the mediator shall be shared equally by the parties. The mediator shall be disqualified as a witness, consultant, expert or counsel for any party with respect to the Dispute and any related matters.

G.     **Confidentiality.** Mediation is a compromise negotiation for purposes of Federal and State Rules of Evidence and constitutes privileged communication under Texas law. The entire mediation process is confidential, and such conduct, statements, promises, offers, views and opinions shall not be discoverable or admissible in any legal proceeding for any purpose.

Dining table
8 dining table chairs
Dining room oriental rug
Dining room sideboard
Copper pot
Living room coffee table
Living room lamp
Living room 2 solid chairs
Living room metal end table
1 Living room end table
1 living room copper lamp
2 leather stools
2 entry candelabras:
Master bath candelabra
Fine china
Sterling silver service for 8

Sterling silver serving pieces
Guest room 1; 2 tables
Guest room 1: R. Lauren bed
Guest room 1: 2 lamps
Guest room 2: 2 twin beds and frames
Guest room 2; 1 lamp and 1 table
Den Floor Lamp
Master Bath: 3 oriental vases
2 indian paintings
Horse statue and deco pot
½ Fiesta pottery
½ of barware, including decanters and glasses
½ of guestroom books
½ guestroom collectible
1/2 kitchen pottery and dishes
½ kitchen cookware
Desert Water Color Painting at entrance
Washer and Dryer

**White House:**
Leather sofa
Leather/fabric chair
Bedroom : 2 beds and 1 table
Kay's deer head
Glass display end table
Refrigerator
Freezer

**Miscellaneous:**
Browning automatic shotgun
China machine gun
Browning Belgum Over & Under
Remington Black Shotgun
Winchester 30-30

EXHIBIT L

**To William:**

**Main House:**

~~Cougar Painting~~ *New 8-10-12*
Roulette Table
4 Roulette Tables
Living room Dhurrie Rug
Entry Table
Entry Deer Painting
1 Living Room Leather Sofa
1 Living room Print Chair
1 Living room wood end table
1 Living room lamp
Hand made custom bar located in living room
Den Leather Chair
3 barstools
Den sofa and tables
3 kitchen stools
Den tv cabinet chest
Den tv/stereo/dvd
Den nail head leather chair
Living room tv, dvd, stereo
Master bedroom Bedroom head board and bed
Master Bedroom End tables and lamps
Master Bedroom TV and dvd
Den Floor Lamp
Hall Oriental rug
Desert Watercolor
Alaskan Ivory Horn
William's shotglasses (approximately 40)
Garage Wine Cooler
Patio Furniture
Metal Horseshoe Stand
All Guestroom Book
Guestroom Collectibles
½ of Kitchen pottery and dishes
½ of kitchen cookware
Norman Lowell Charcoal—in H's possession
Corri Bean painting
Yucca Painting—in H's possession
Bear Painting—in H's possession

1

*Exhibit B*
*July 9. 2012* (*signature*)

EXHIBIT M

Personal photos and memorabilia
Wood bear and wood goat —in H's possession
Bronze mountain goat—in H's possession
Bronze bear—in H's possession
Bronze roadrunner—in H's possession
Cadillac bar glasses
½ of barware, including decanters and glasses
½ Fiesta pottery
½ of guestroom books
½ guestroom collectible
1/2 kitchen pottery and dishes
½ kitchen cookware
Scuba gear—belonging to H
Ski gear—belonging to H
All deer mounts in main house
Nilgai mount
2 hog heads        *MW  8-10-12*
Bronze wolf and deer given to H by his sister—in H's possession ✓
Ann Houston Watercolor given to H by his mother before marriage—in H's ✓
possession
Quail painting given to H before marriage—in H's possession
Personal clothing, boots, DVDs
2 deer heads and skull heads—in H's possession
7 first edition books—in H's possession


Colt AR15 gun—in H's possession
Weatherby 264W and W—in H's possession
Sako 222—in H's possession
Weatherby 3 00—in H's possession
Beretta 12 guage shotgun—in H's possession
Smith and Wesson 38P—in H's possession
Smith and Wesson 38 Steel—in H's possession
Smith and Wesson 357—in H's possession


Pronghorn knife
10 hunting knives
10,000 rounds of ammo

300 arrowheads Poleo Indian Museum Quality
Bill Coster Sauer Shotgun

2

a. Booth Partnership and Rod Lewis
b. William Booth and Rod Lewis
c.    Booth Trust and H: re: ½% OR on 892 acres
d.    Middleton Partnership and H regarding ½% OR on 892 acres
e.    Deed to Booth Ranch
f.    Deed to H evidencing Lewis overrides

Coin Collection
Panerai Watch Arktos/Mike Horn Edition
Panerai Watch Daylight
Gold Pocket Watch from Vernon Booth
Gold cufflinks from Vernon Booth
Parker 1951 gold ink pens
20 priceless arrowheads
30 gold coins
5000 Australian Dollars
5000 Canadian Dollars
Helen Hunter Cactus Painting
Silver coin collection


**White House:**

All of William's deer heads
Quail lamp
Bedroom1: Beds, table and lamp
All beds
Walnut men's chest
Ktchen chairs
Stereo equipment


**Separate Property of William**
Bobcat mount
Hog head mount
Piano (in H's possession)
Oak Table
Kitchen hutch
2 Joanne Avant Landscape paintings—in H's possession
Ann Houston Watercolor—in H's possession

3

Main house:
Music armoire
Sub-Zero fridge/freezer
Trash compactor
Dish washer
Ice maker
Wolf stove
U-line refrigerator drawers
Lighting fixtures
Mirrors in bathrooms
Wine cooler in bar area
·Security system, alarm and computer


White House:
Microwave
Stove
Dishwasher

STATE OF TEXAS
COUNTY OF WEBB
I HEREBY CERTIFY THAT THIS INSTRUMENT WAS
FILED ON THE DATE AND AT THE TIME STAMPED
HEREON BY ME AND WAS DULY RECORDED IN THE
VOLUME AND PAGE OF THE OFFICIAL PUBLIC
RECORDS OF WEBB COUNTY TEXAS AS STAMPED
HEREON BY ME



COUNTY CLERK
WEBB COUNTY, TEXAS

# APPENDIX 2

*Fourth Court of Appeals Opinion*

*And Judgment*



# Fourth Court of Appeals

## San Antonio, Texas

## OPINION

No. 04-12-00585-CV

Kay Lynn **MAYNARD** f/k/a Kay Lynn Maynard Booth,
Appellant

v.

William **BOOTH**,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2010-CVH-001376-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: November 27, 2013

AFFIRMED; MOTION TO DISMISS DENIED

On September 22, 2011, in connection with their divorce, Kay Lynn Maynard and William Booth signed a hand-written agreement dividing their marital assets ("the settlement agreement"). Later a dispute arose over whether William breached the settlement agreement. The trial court found William breached the agreement and signed a Final Judgment and Decree of Divorce on August 10, 2012. Kay has appealed the judgment, and William filed a motion to dismiss that was

carried with the appeal.[1] Kay raises two issues on appeal: (1) in the decree, she should have been awarded $42,000 in lost hog hunting income instead of only $18,000 and (2) the trial court should have awarded her an additional $178,000 in attorney's fees. We affirm.

## STANDARD OF REVIEW

Kay cites this court to both legal and factual sufficiency standards of review in her briefing. However, in her prayer for relief, Kay requested only that this court reverse the trial court's judgment and render in her favor. Kay did not request, in the alternative, a remand for a new trial. During oral argument, Kay's attorney stated Kay wanted a judgment rendered in her favor. Therefore, we review the evidence only under a legal sufficiency standard. *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986) (per curiam) (reiterating well-settled rule that "no evidence" points require rendition in favor of appealing party); *Elias v. Mr. Yamaha, Inc.*, 33 S.W.3d 54, 59 & n.6 (Tex. App.—El Paso 2000, no pet.) (construing appellant's challenge as a legal sufficiency challenge because he asked appellate court to render judgment in his prayer for relief).

When the party who had the burden of proof at trial complains of the legal insufficiency of an adverse finding, that party must demonstrate the evidence establishes conclusively (i.e., as a matter of law) all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A reviewing court must examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. *Id.* If more than a scintilla of evidence supports the adverse finding, the issue is overruled. *Id.* If there is no evidence to support the adverse finding, the entire record must be examined to determine whether the contrary proposition is established as a matter of law. *Id.* The issue is sustained only if the contrary proposition is

---

[1] William died after the appeal was filed and an administrator was later appointed. We deny the motion as moot.

conclusively established. *Id.* The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded fact finder to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819.

## HOG HUNTING INCOME

As a result of the delay between signing the settlement agreement and the divorce decree, Kay claimed she lost income because she was not able to allow hog hunting on her side of the ranch. The trial court awarded Kay $18,000 as lost hog hunting income. On appeal, Kay contends she proved lost hog hunting income in the amount of $42,000 as a matter of law. Kay offered into evidence several hog hunting contracts from people who knew she and William were getting a divorce and who she knew "would love to come back on my side of the ranch." However, the contracts were from 1991 to 1997, years before the divorce. Kay admitted that no hog hunting had been conducted on the ranch for six to seven years. When such hunts were conducted, she and William would schedule about six men for a three-day hunt during January, February, and March. She said if she could have done that again starting in January 2012, she would charge $200 per day per man. Kay calculated that at $600 per man per weekend, times four weekends a month for three months, she would have earned $42,000.

A report prepared by Kay's expert stated hunting operations were "substantially ceased due to concerns over legal liability issues." Kay stated the hunting and cattle operations on the ranch were always profitable. However, the report stated the community estate suffered tremendous losses from the hunting and cattle operations from 1996 through 2011, and after 2003 there was no revenue from hunting operations. Her expert's report showing the ranch suffered a loss contradicts Kay's testimony. William's expert acknowledged, after reviewing the report that the purpose of the report was to determine whether the community estate was entitled to an offset.

-3-

William's expert conceded whether the ranch suffered a loss for the purpose of an offset had nothing to do with whether Kay could have or should have gotten any hog hunting revenue.

Although Kay's testimony that she could have earned $42,000 was not contradicted, this testimony was based on her hope that hunters would have contracted with her in January, February, and/or March 2012. However, she also testified no hog hunting had been conducted on the ranch for six to seven years preceding the divorce. In this case, the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. Based on this record, we cannot say Kay established, as a matter of law, her entitlement to $42,000 in lost hog hunting income.

## ATTORNEY'S FEES

In the divorce decree, the trial court awarded Kay attorney's fees as follows:

IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH recover attorney's fees reasonably and necessarily incurred after October 12, 2011, for services rendered in the trial through June 28, 2012, in the amount of Two Hundred Thousand Dollars ($200,000); provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted.

Contrary to Kay's contention on appeal that the trial court erred in not awarding her attorney, James Jones, *any* fees, the judgment does not award fees specific to any attorney. Instead, the judgment awards a net lump sum to Kay for reasonable fees. Kay asserts she should have been awarded an additional $178,002.00, which is the amount of fees billed by Jones.

The parties agreed to a bench trial only on the issues of whether William breached the settlement agreement and attorney's fees. The court agreed with William's lawyer that the agreement called for each party to pay their own attorney's fees. Kay's attorneys argued they were not seeking fees prior to the date of the settlement agreement, but were instead, seeking fees

- 4 -

resulting from William's breach of the agreement. The court again stated Kay was responsible for her own fees, but allowed her attorneys to make a bill of exception record.

Kay's attorneys stated the breach of contract claim was first asserted in February 2012. Kay's three attorneys then each testified in "bills of exception." Adan Gonzalez testified his time was spent on both the divorce and the breach of contract action, and he averaged about $10,000 per month in fees, from February 2012 to June 2012, for a total of approximately $50,000. Cheryl Wilson testified she was retained in February or late March 2012, after William breached the agreement. She billed approximately $40,000. Jones testified his fee invoice was dated "6/22" but it should be "9/22" for services rendered since the date of the agreement. His fees totaled $178,002, at his hourly rate of $450.00 multiplied by 395.56 hours.

On appeal, Kay asserts William never contested the qualifications or invoices of any of her attorneys, and Jones's testimony was uncontradicted. This is true in part because the trial court did not allow any cross-examination during the bills of exception; however, William did raise an objection to Jones's Invoice No. 11084. Invoice 11084 indicates services for "Additional Charges" in the amount of $67,192.65, and "Professional Services" in the amount of $178,002.00. William objected that the invoice did not segregate fees related to the breach of contract claim from fees related to the divorce. The portion of the invoice related to "Professional Services" states as follows:

> For services rendered from the date of settlement by [Kay] including preparation for and attendance of mediation of case; preparation for and attendance of multiple meetings with client and client's parents and witness[es]; preparation of settlement documents; review of multiple drafts of same; preparation for and attendance of multiple hearings for entry of judgment; preparation for and attendance of depositions of Kay, William, Mrs. Booth, Teresa McComas, Dr. Jack Ferrel, Sterling, Redmond, and Hill; preparation for and attendance of further hearings of various motions by court; preparation for trial; research of issues; analysis of evidence.

The trial court determined William breached the settlement agreement; therefore, an award of reasonable attorney's fees to the prevailing party was mandatory if there was proof of the reasonableness of the fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008); *Hassell Constr. Co. v. Stature Commercial Co.*, 162 S.W.3d 664, 668 (Tex. App.—Houston [14th Dist.] 2005, no pet.). However, the amount of the award lies within the discretion of the trial court. *Hassell Constr. Co.*, 162 S.W.3d at 668. And, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. Finally, "[a] meaningful review of the hours claimed is particularly important because the usual incentive to charge only reasonable attorney's fees is absent when fees are paid by the opposing party." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762 (Tex. 2012).

Here, although Kay's attorney's fees evidence was not controverted, the trial court has discretion in determining what amount of attorney's fees is reasonable. Jones stated he dictated the invoice a few days before trial. At trial, to arrive at the number of hours he expended on the case, Jones divided $178,002.00 by his hourly rate of $450 to arrive at 395.56 hours. The invoice does not indicate and Jones did not testify about any record of his time attributable to each of the various tasks mentioned in the invoice. Nor did he segregate fees related to the breach of contract claim from any fees related to the divorce. The trial court awarded fees of $200,000 for services rendered after the date of October 12, 2011 "provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted." On this record, we cannot conclude the trial court abused its discretion in awarding attorney's fees in the amount it did. *See City of Laredo v. Montano*, No. 12-0274, 2013 WL 5763179, at *4 (Tex. Oct. 25, 2013) (encouraging attorneys using lodestar method to shift their fees to opponent to keep contemporaneous records of their time

- 6 -

as they would for their own client; concluding attorney's testimony was "devoid of substance" because he did not itemize specific tasks or the time required for those tasks).

## CONCLUSION

We overrule Kay's issues on appeal, and affirm the trial court's judgment.

Sandee Bryan Marion, Justice



# Fourth Court of Appeals
## San Antonio, Texas

## JUDGMENT

No. 04-12-00585-CV

Kay Lynn MAYNARD f/k/a Kay Lynn Maynard Booth,
Appellant

v.

William BOOTH,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2010-CVH-001376-D2
Honorable Monica Z. Notzon, Judge Presiding

BEFORE CHIEF JUSTICE STONE, JUSTICE MARION, AND JUSTICE ALVAREZ

In accordance with this court's opinion of this date, the trial court's judgment is AFFIRMED. Appellee's motion to dismiss is DENIED as moot.

It is ORDERED that appellee recover his costs of this appeal from appellant.

SIGNED November 27, 2013.

_Sandee Bryan Marion_
Sandee Bryan Marion, Justice

# APPENDIX 3

*Texas Supreme Court*

*Denial of Petition*

# IN THE SUPREME COURT OF TEXAS

-- -- -- --

NO. 14-0077

KAY LYNN MAYNARD, F/K/A KAY  §
LYNN MAYNARD BOOTH          §           Webb County,
                            §
v.                          §
                            §           4th District.
WILLIAM T. BOOTH            §
                            §

April 25, 2014

Petitioner's petition for review, filed herein in the above numbered and styled case, having been duly considered, is ordered, and hereby is, denied

.



★ ★ ★ ★ ★ ★ ★ ★ ★ ★

I, BLAKE A. HAWTHORNE, Clerk of the Supreme Court of Texas, do hereby certify that the above and attached is a true and correct copy of the orders of the Supreme Court of Texas in the case numbered and styled as above, as the same appear of record in the minutes of said Court under the date shown.

It is further ordered that petitioner, KAY LYNN MAYNARD, F/K/A KAY LYNN MAYNARD BOOTH, pay all costs incurred on this petition.

WITNESS my hand and seal of the Supreme Court of Texas, at the City of Austin, this the 6th day of June, 2014.

Blake A. Hawthorne, Clerk

By Kathy Sandoval, Deputy Clerk

# APPENDIX 4

*Fourth Court of Appeals Mandate*

# M A N D A T E

**THE STATE OF TEXAS**

**TO THE 111TH JUDICIAL DISTRICT COURT OF WEBB COUNTY, GREETINGS:**

Before our Court of Appeals for the Fourth District of Texas on November 27, 2013, the cause upon appeal to revise or reverse your judgment between

Kay Lynn Maynard f/k/a Kay Lynn Maynard Booth, Appellant

V.

William Booth, Appellee

No. 04-12-00585-CV and Tr. Ct. No. 2010-CVH-001376-D2

was determined, and therein our said Court of Appeals made its order in these words:

**In accordance with this court's opinion of this date, the trial court's judgment is AFFIRMED. Appellee's motion to dismiss is DENIED as moot.**

**It is ORDERED that appellee recover his costs of this appeal from appellant.**

WHEREFORE, WE COMMAND YOU to observe the order of our said Court of Appeals for the Fourth District of Texas, in this behalf and in all things have the order duly recognized, obeyed, and executed.

WITNESS the Hon. Catherine Stone, Chief Justice of the Court of Appeals for the Fourth District of Texas, with the seal of the Court affixed and the City of San Antonio on June 9, 2014.

KEITH E. HOTTLE, CLERK

Cynthia A. Martinez
Deputy Clerk, Ext. 3853

TAB 2
Page 1 of 2

# BILL OF COSTS

## TEXAS COURT OF APPEALS, FOURTH DISTRICT, AT SAN ANTONIO

### No. 04-12-00585-CV

### Kay Lynn Maynard f/k/a Kay Lynn Maynard Booth

### v.

### William Booth

### (NO. 2010-CVH-001376-D2 IN 111TH JUDICIAL DISTRICT COURT OF WEBB COUNTY)

| TYPE OF FEE | CHARGES | PAID | BY |
|---|---|---|---|
| MOTION FEE | $10.00 | PAID | DAN POZZA |
| MOTION FEE | $10.00 | PAID | DAN POZZA |
| MOTION FEE | $10.00 | PAID | DAN POZZA |
| MOTION FEE | $10.00 | PAID | JAMES K. JONES, JR. |
| MOTION FEE | $10.00 | PAID | JAMES K. JONES, JR. |
| MOTION FEE | $10.00 | PAID | CASSEB & CASSEB |
| MOTION FEE | $10.00 | E-PAID | DANIEL POZZA |
| MOTION FEE | $10.00 | PAID | CASSEB & CASSEB |
| INDIGENT | $25.00 | PAID | JAMES K. JONES, JR. |
| FILING | $100.00 | PAID | JAMES K. JONES, JR. |
| SUPREME COURT CHAPTER 51 FEE | $50.00 | PAID | JAMES K. JONES, JR. |

**Balance of costs owing to the Fourth Court of Appeals, San Antonio, Texas:  0.00**

*Court costs in this cause shall be paid as per the Judgment issued by this Court.*

I, **KEITH E. HOTTLE,** CLERK OF THE FOURTH COURT OF APPEALS OF THE STATE OF TEXAS, do hereby certify that the above and foregoing is a true and correct copy of the cost bill of THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS, showing the charges and payments, in the above numbered and styled cause, as the same appears of record in this office.

**IN TESTIMONY WHEREOF,** witness my hand and the Seal of the **COURT OF APPEALS** for the Fourth District of Texas, this June 9, 2014.

**KEITH E. HOTTLE, CLERK**

Cynthia A. Martinez
Deputy Clerk, Ext. 3853

TAB 2
Page 2 of 2

# APPENDIX 5

*Response of Michael McComas,*

*Independent Executor of the Estate of*

*William Thomas Booth, to Kay Maynard's*

*Request for Appellate Attorney's Fees*

Cause No. 2012-PC-2786

FILED
IN MATTERS PROBATE
2014 OCT -1 PM 12: 41
... O RICKHOFF
CLERK PROBATE COURTS
BEXAR COUNTY, TEXAS
BY_____ DEPUTY

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| WILLIAM THOMAS BOOTH, | § | NO. TWO |
| | § | |
| DECEASED | § | BEXAR COUNTY, TEXAS |

## RESPONSE OF MICHAEL McCOMAS, INDEPENDENT EXECUTOR OF THE ESTATE OF WILLIAM THOMAS BOOTH, TO KAY MAYNARD'S REQUEST FOR APPELLATE ATTORNEY'S FEES

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Michael McComas, Independent Executor of the Estate of William Thomas Booth, and files his Response to the request of Kay Maynard [Booth] ("Kay") for payment of Appellate Attorney's Fees (Ms. Maynard's pleading is entitled "Kay Maynard's Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in *Final Judgment and Decree of Divorce*").

### Facts

1.      The Decree of Divorce was based on the provisions of a mediated settlement agreement which was in the form of a "Rule 11" settlement agreement dated September 22, 2011. Kay sued William for breach of contract for his failure to follow some of the terms of the Rule 11 Settlement Agreement. At a bench trial in June, 2012, the trial court found that (i) the Rule 11 settlement agreement was an enforceable contract and (ii) William Booth ("William") breached that contract. The court awarded actual damages to Kay in the amount of $107,743.87 (which has been paid) and also awarded attorney's fees to her for William's breach of contract.

Otherwise, the Rule 11 settlement agreement provided that each party would pay his or her own attorney's fees incurred in the divorce action itself[1].

2.    In the Final Judgment and Decree of Divorce dated August 10, 2012 (the "Decree"), the Court incorporated the terms of its decision on the breach of contract suit filed by Kay. Consequently, the Decree not only includes the provisions about the divorce (property division, taxes, etc.) but also, the provisions about William's breach of the Rule 11 settlement agreement (see the first two full paragraphs on page 26 of the Decree).

3.    In the Decree, the Court included the award of attorney's fees for William's breach of contract[2]. The award of attorney fees is as follows:

> "IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH recover attorney's fees reasonably and necessarily incurred after October 12, 2011, for services rendered in the trial through June 28, 2012, in the amount of Two Hundred Thousand Dollars ($200,000); provided however, if this case is not appealed to the court of appeals, One-Hundred Thirty Thousand Dollars shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted."

4.    Kay filed an appeal of the trial court's holding on two grounds – the amount of hog-hunting damages awarded to her and the amount of attorney's fees awarded to her.

---

[1] The trial court was quite clear that each party was to pay his or her own attorney's fees for the divorce action as provided in the Rule 11 Settlement Agreement. June 25, 2012 hearing, page 37 ("Oh, Mrs. Booth pays all her debt and attorney's fees and court costs. And Mr. Booth pays his debt and attorney's fees and court costs."); page 57 (...the agreement makes clear each party pays their own attorney's fees. Period. We're finished. THE COURT: I agree."); page 59 ("I am finding that she [Ms. Booth] is responsible for her own attorney's fees."); page 69 ("...the contract you're [Ms. Booth] suing to enforce actually contemplates that she will pay her attorney's fees. I'll keep it in mind for the entry.") June 27, 2012 hearing, page 24 ("one of the provisions that is very clear is that each party shall pay their own attorney's fees.").

[2] Kay acknowledged and admitted this on page 5 of her Brief of Appellate filed with the Fourth Court of Appeals in Cause No. 04-12-00585-CV: "The Trial Court thereupon read into the record the 9-22-11 Agreement terms that would be included and enforced in a judgment and decree [which specifically provided that both Kay and William Booth would be responsible and pay their own attorney's fees and costs]. SF 7:52-61. Kay hastened to qualify that she would request fees incurred to enforce this Agreement as a contract, because the Agreement necessarily provided that Kay paid her attorneys fees before the parties signed the Agreement."

Response of Michael McComas, Executor of the Estate of        Page 2 of 6
William Thomas Booth to Kay Maynard's Request for Appellate Attorney's Fees

5.    Kay lost at the appellate court level and lost at the Supreme Court level. *Maynard v. Booth*, Opinion 04-12-00585-CV (San Antonio – Fourth Court of Appeals, 2013) ("We overrule Kay's issues on appeal, and affirm the trial court's judgment."); *Maynard v. Booth*, Case No. 14-0077 (Tex. Sup. April 25, 2014) ("Today the Supreme Court of Texas denied the [Kay's] petition for review in the above-referenced case.").

## Kay's Position

6.    Kay relies upon the quoted provision in the Final Judgment and Decree of Divorce dated August 10, 2012 (the "Decree") in her request for $200,000 of additional attorney's fees. Her request is patently absurd. If the paragraph in the Judgment was interpreted as Kay requests, she could have appealed the Decree on any flimsy excuse, whatsoever; lost in the Court of Appeals; sought relief in the Texas Supreme Court; lost in the Supreme Court; and then claimed that she is owed $200,000. Her interpretation would have allowed her to collect $130,000 of unlawful appellate attorney's fees regardless of the merits, or success, of her appeal.

## The Real Intention of the Clause

7.    The phrase in question was poorly worded but the intention of the phrase apparently is as follows: (i) Kay gets $70,000 of attorney's fees for the breach of contract by William; (ii) if Kay appeals to the Court of Appeals on the breach of contract, and is successful, she gets another $80,000; and (iii) if she appeals to the Supreme Court on the breach of contract, and is successful, she gets another $50,000 – a total of $200,000.

## Law

8. Courts have made it quite clear that any award of appellate attorney's fees is contingent upon success in the appeal. *Rittgers v. Rittgers*, 802, S.W.2d 109, 114 (Tex. App. – Corpus Christi 1990, writ denied) (the award of appellate fees must be predicated on the success or failure of the appeal and a trail court cannot grant a conditional award of appellate attorney's fees).

9. In *Spiller v. Spiller*, 901 S.W.2d 553, 560 (Tex. App. – San Antonio 1995, reh. denied), the trial court awarded "Hugh M." appellate fees through the filing of a writ of error, with remittiturs at each appellate stage in the event appeals were not sought [very similar if not identical to this case]. The Fourth Court of Appeals held that although "the judgment before us is not specific that attorney's fees are contingent upon appellee's success on appeal, we conclude that the award implicitly requires success in order to recover the fees." Id.

10. It is implicit in a court's judgment that the award of appellate attorney's fees is conditioned on a successful appeal. *Robinwood & Dev. Co. v. Pettigrew*, 737 S.W.2d 110 (Tex. App. – Tyler 1987, no writ); *Spiller* at 560.

11. The trial court may not grant an unconditional award of appellate attorney's fees. *Texas Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 400 (Tex. App. – Dallas 2000, pet. denied); *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 236 (Tex. App. – Houston [14th Dist.] 1996, writ denied); *Smith v. Smith*, 757 S.W.2d 422, 426 (Tex. App. – Dallas 1988, writ denied).

12. Interpreting the attorney's fees clause in the manner that Kay requests is against public policy. It would allow someone who is in a totally losing position to gain from their

position. It would allow frivolous appeals in order to charge large unwarranted and undeserved attorney's fees. Texas public policy should not, and would not, allow such an unfair result.

13. In addition, since attorney's fees were included in the subject matter of Kay's previous appeal, she was required to move for relief in the Court of Appeals on the issue of her interpretation of the attorney's fee clause. Having failed to do so, Kay has waived any relief to which she may have otherwise been entitled on this issue. *See* Rule 38 of the Texas Rules of Appellate Procedure (regarding requisites of briefs; the statement of an issue will be treated as covering every subsidiary question that is fairly included); *See also Bankhead v. Maddox*, 135 S.W.3d 162, 164 (Tex. App. –Tyler 2004, no pet.).

### Kay's Request for Attorney's Fees

14. Kay has asked that her attorney's fees incurred in filing her Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in *Final Judgment and Decree of Divorce* be paid by the Estate. There is no contractual or statutory basis for such a request and it should be denied. There is no provision in the Decree of Divorce for the payment of attorney's fees and the Decree specifically provides "...all relief ... not expressly granted is denied."

### Prayer

15. The Executor respectfully requests that Kay Maynard's Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in *Final Judgment and Decree of Divorce* and her request for attorney's fees be denied in total.

Response of Michael McComas, Executor of the Estate of
William Thomas Booth to Kay Maynard's Request for Appellate Attorney's Fees

Page 5 of 6

Respectfully submitted,

HEINRICHS & De GENNARO, P.C.
100 Northeast Loop 410, Suite 1075
San Antonio, Texas 78216
Telephone: (210) 366-0900
Facsimile: (210) 366-0981

BY: _____
A. Chris Heinrichs
State Bar No. 09382500
Email: chrish@heinrichslaw.com
ATTORNEYS FOR MICHAEL MCCOMAS,
INDEPENDENT EXECUTOR


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served as set forth below on this 1st day of October, 2014, to the following:

**VIA HAND-DELIVERY**
James K. Jones, Jr.
Email: jkjjr@icloud.com
Adán A. González, III
Email: aag@jgmlawtx.com
Jones & González, An Association
5601 San Dario, Suite 5
Laredo, Texas 78041
ATTORNEYS FOR KAY MAYNARD

_____
A. Chris Heinrichs

Response of Michael McComas, Executor of the Estate of
William Thomas Booth to Kay Maynard's Request for Appellate Attorney's Fees

Page 6 of 6

# APPENDIX 6

*Kay Maynard's Request for Full Payment Of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce*

E-FILED
IN MATTERS PROBATE
Accepted: 4/30/2014 8:44:52 AM
GERARD RICKHOFF
CLERK PROBATE COURTS
BEXAR COUNTY, TEXAS
BY:_____
Destiny Perez

CAUSE NO. 2012-PC-2786

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| WILLIAM THOMAS BOOTH, | § | NO. TWO |
| | § | |
| DECEASED | § | BEXAR COUNTY, TEXAS |

## KAY MAYNARD'S REQUEST FOR FULL PAYMENT OF DIVORCE TRIAL AND APPELLATE ATTORNEY'S FEES AWARDED IN *FINAL JUDGMENT AND DECREE OF DIVORCE*

TO THE HONORABLE JUDGE OF SAID COURT:

Now Comes, Kay Lynn Maynard ("Kay"), to respectfully show the Court as follows.

### I.

1. Before decedent William T. Booth ("William") died, the August 10, 2012, *Final Judgment and Decree of Divorce* ("the Judgment") between Kay and William, was entered. The Judgment has since become final; William never appealed any part of the Judgment; Kay complained about the hog hunting awards and attorneys fee awards in the Judgment to the Fourth Court of Appeals on April 29, 2013, and this court ruled against Kay on November 27, 2013. *See* Exhibit 1. Kay petitioned the Texas Supreme Court to review that decision on March 4, 2014, and that petition for review was denied on April 25, 2014. *See* Exhibit 2.

2. The Judgment unequivocally provides that Kay:

> "... recover attorney's fees reasonably and necessarily incurred after October 12, 2011, for services rendered in the trial through June 28, 2012, in the amount of Two Hundred Thousand Dollars ($200,000.00); provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000.00) shall be remitted; provided further, if this case is

*See* Exhibit A to *Claim of Kay Lynn Maynard* filed herein on May 23, 2013. Kay filed a Claim seeking this entire award of attorney's fees on May 23, 2013, and while some monies to Kay under the Judgment have been paid to Kay in this proceeding, Kay has not been paid the aforementioned Two Hundred Thousand Dollar ($200,000.00) attorneys fees that the Judgment awards and that is final. This entire attorneys fee is due and owing because, as stated above, Kay has appealed the Judgment both to the Court of Appeals and to the Texas Supreme Court. *See* Exhibits 1 and 2.

3. Should the instant Executor not pay the full Two Hundred Thousand Dollar ($200,000.00) attorney's fee to Kay, request is hereby made that this Request be set for hearing.

WHEREFORE PREMISES CONSIDERED, KAY LYNN MAYNARD respectfully requests that the Executor be ordered to pay the entire Two Hundred Thousand Dollar ($200,000.00) attorney's fee awarded to Kay in the Judgment, and for all other appropriate legal and equitable relief.

Respectfully Submitted,

JONES & GONZÁLEZ,
An Association
5601 San Dario, Suite 5
Laredo, Texas 78041
Telephone 956-723-5575
Facsimile 956-723-2025

James K. Jones, Jr.
State Bar No. 10910200
Adán A. González, III
State Bar No. 08122350
Counsel for Kay Lynn Maynard

## CERTIFICATE OF CONFERENCE

I hereby certify that A. Chris Heinrichs, counsel for the Executor, indicated that the Executor opposes this Request.

_____
Adán A. González, III

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Request was electronically filed with the Clerk of the Honorable Court, and was faxed to A. Chris Heinrichs (fax 210-366-0981) on April 29, 2014.

_____
Adán A. González, III



# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00585-CV

Kay Lynn **MAYNARD** f/k/a Kay Lynn Maynard Booth,
Appellant

v.

William **BOOTH**,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2010-CVH-001376-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by:   Sandee Bryan Marion, Justice

Sitting:      Catherine Stone, Chief Justice
              Sandee Bryan Marion, Justice
              Patricia O. Alvarez, Justice

Delivered and Filed: November 27, 2013

AFFIRMED; MOTION TO DISMISS DENIED

On September 22, 2011, in connection with their divorce, Kay Lynn Maynard and William Booth signed a hand-written agreement dividing their marital assets ("the settlement agreement"). Later a dispute arose over whether William breached the settlement agreement. The trial court found William breached the agreement and signed a Final Judgment and Decree of Divorce on August 10, 2012. Kay has appealed the judgment, and William filed a motion to dismiss that was



EXHIBIT
1

carried with the appeal.[1] Kay raises two issues on appeal: (1) in the decree, she should have been awarded $42,000 in lost hog hunting income instead of only $18,000 and (2) the trial court should have awarded her an additional $178,000 in attorney's fees. We affirm.

## STANDARD OF REVIEW

Kay cites this court to both legal and factual sufficiency standards of review in her briefing. However, in her prayer for relief, Kay requested only that this court reverse the trial court's judgment and render in her favor. Kay did not request, in the alternative, a remand for a new trial. During oral argument, Kay's attorney stated Kay wanted a judgment rendered in her favor. Therefore, we review the evidence only under a legal sufficiency standard. *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986) (per curiam) (reiterating well-settled rule that "no evidence" points require rendition in favor of appealing party); *Elias v. Mr. Yamaha, Inc.*, 33 S.W.3d 54, 59 & n.6 (Tex. App.—El Paso 2000, no pet.) (construing appellant's challenge as a legal sufficiency challenge because he asked appellate court to render judgment in his prayer for relief).

When the party who had the burden of proof at trial complains of the legal insufficiency of an adverse finding, that party must demonstrate the evidence establishes conclusively (i.e., as a matter of law) all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A reviewing court must examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. *Id.* If more than a scintilla of evidence supports the adverse finding, the issue is overruled. *Id.* If there is no evidence to support the adverse finding, the entire record must be examined to determine whether the contrary proposition is established as a matter of law. *Id.* The issue is sustained only if the contrary proposition is

---

[1] William died after the appeal was filed and an administrator was later appointed. We deny the motion as moot.

conclusively established. *Id.* The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded fact finder to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819.

## HOG HUNTING INCOME

As a result of the delay between signing the settlement agreement and the divorce decree, Kay claimed she lost income because she was not able to allow hog hunting on her side of the ranch. The trial court awarded Kay $18,000 as lost hog hunting income. On appeal, Kay contends she proved lost hog hunting income in the amount of $42,000 as a matter of law. Kay offered into evidence several hog hunting contracts from people who knew she and William were getting a divorce and who she knew "would love to come back on my side of the ranch." However, the contracts were from 1991 to 1997, years before the divorce. Kay admitted that no hog hunting had been conducted on the ranch for six to seven years. When such hunts were conducted, she and William would schedule about six men for a three-day hunt during January, February, and March. She said if she could have done that again starting in January 2012, she would charge $200 per day per man. Kay calculated that at $600 per man per weekend, times four weekends a month for three months, she would have earned $42,000.

A report prepared by Kay's expert stated hunting operations were "substantially ceased due to concerns over legal liability issues." Kay stated the hunting and cattle operations on the ranch were always profitable. However, the report stated the community estate suffered tremendous losses from the hunting and cattle operations from 1996 through 2011, and after 2003 there was no revenue from hunting operations. Her expert's report showing the ranch suffered a loss contradicts Kay's testimony. William's expert acknowledged, after reviewing the report that the purpose of the report was to determine whether the community estate was entitled to an offset.

William's expert conceded whether the ranch suffered a loss for the purpose of an offset had nothing to do with whether Kay could have or should have gotten any hog hunting revenue.

Although Kay's testimony that she could have earned $42,000 was not contradicted, this testimony was based on her hope that hunters would have contracted with her in January, February, and/or March 2012. However, she also testified no hog hunting had been conducted on the ranch for six to seven years preceding the divorce. In this case, the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. Based on this record, we cannot say Kay established, as a matter of law, her entitlement to $42,000 in lost hog hunting income.

## ATTORNEY'S FEES

In the divorce decree, the trial court awarded Kay attorney's fees as follows:

> IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH recover attorney's fees reasonably and necessarily incurred after October 12, 2011, for services rendered in the trial through June 28, 2012, in the amount of Two Hundred Thousand Dollars ($200,000); provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted.

Contrary to Kay's contention on appeal that the trial court erred in not awarding her attorney, James Jones, *any* fees, the judgment does not award fees specific to any attorney. Instead, the judgment awards a net lump sum to Kay for reasonable fees. Kay asserts she should have been awarded an additional $178,002.00, which is the amount of fees billed by Jones.

The parties agreed to a bench trial only on the issues of whether William breached the settlement agreement and attorney's fees. The court agreed with William's lawyer that the agreement called for each party to pay their own attorney's fees. Kay's attorneys argued they were not seeking fees prior to the date of the settlement agreement, but were instead, seeking fees

resulting from William's breach of the agreement. The court again stated Kay was responsible for her own fees, but allowed her attorneys to make a bill of exception record.

Kay's attorneys stated the breach of contract claim was first asserted in February 2012. Kay's three attorneys then each testified in "bills of exception." Adan Gonzalez testified his time was spent on both the divorce and the breach of contract action, and he averaged about $10,000 per month in fees, from February 2012 to June 2012, for a total of approximately $50,000. Cheryl Wilson testified she was retained in February or late March 2012, after William breached the agreement. She billed approximately $40,000. Jones testified his fee invoice was dated "6/22" but it should be "9/22" for services rendered since the date of the agreement. His fees totaled $178,002, at his hourly rate of $450.00 multiplied by 395.56 hours.

On appeal, Kay asserts William never contested the qualifications or invoices of any of her attorneys, and Jones's testimony was uncontradicted. This is true in part because the trial court did not allow any cross-examination during the bills of exception; however, William did raise an objection to Jones's Invoice No. 11084. Invoice 11084 indicates services for "Additional Charges" in the amount of $67,192.65, and "Professional Services" in the amount of $178,002.00. William objected that the invoice did not segregate fees related to the breach of contract claim from fees related to the divorce. The portion of the invoice related to "Professional Services" states as follows:

> For services rendered from the date of settlement by [Kay] including preparation for and attendance of mediation of case; preparation for and attendance of multiple meetings with client and client's parents and witness[es]; preparation of settlement documents; review of multiple drafts of same; preparation for and attendance of multiple hearings for entry of judgment; preparation for and attendance of depositions of Kay, William, Mrs. Booth, Teresa McComas, Dr. Jack Ferrel, Sterling, Redmond, and Hill; preparation for and attendance of further hearings of various motions by court; preparation for trial; research of issues; analysis of evidence.

The trial court determined William breached the settlement agreement; therefore, an award of reasonable attorney's fees to the prevailing party was mandatory if there was proof of the reasonableness of the fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008); *Hassell Constr. Co. v. Stature Commercial Co.*, 162 S.W.3d 664, 668 (Tex. App.—Houston [14th Dist.] 2005, no pet.). However, the amount of the award lies within the discretion of the trial court. *Hassell Constr. Co.*, 162 S.W.3d at 668. And, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. Finally, "[a] meaningful review of the hours claimed is particularly important because the usual incentive to charge only reasonable attorney's fees is absent when fees are paid by the opposing party." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762 (Tex. 2012).

Here, although Kay's attorney's fees evidence was not controverted, the trial court has discretion in determining what amount of attorney's fees is reasonable. Jones stated he dictated the invoice a few days before trial. At trial, to arrive at the number of hours he expended on the case, Jones divided $178,002.00 by his hourly rate of $450 to arrive at 395.56 hours. The invoice does not indicate and Jones did not testify about any record of his time attributable to each of the various tasks mentioned in the invoice. Nor did he segregate fees related to the breach of contract claim from any fees related to the divorce. The trial court awarded fees of $200,000 for services rendered after the date of October 12, 2011 "provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted." On this record, we cannot conclude the trial court abused its discretion in awarding attorney's fees in the amount it did. *See City of Laredo v. Montano*, No. 12-0274, 2013 WL 5763179, at *4 (Tex. Oct. 25, 2013) (encouraging attorneys using lodestar method to shift their fees to opponent to keep contemporaneous records of their time

as they would for their own client; concluding attorney's testimony was "devoid of substance" because he did not itemize specific tasks or the time required for those tasks).

## CONCLUSION

We overrule Kay's issues on appeal, and affirm the trial court's judgment.


Sandee Bryan Marion, Justice

FILE COPY

DATE: 4/25/2014

RE: Case No. 14-0077
    COA #: 04-12-00585-CV    TC#: 2010-CVH-001376-D2
STYLE: KAY LYNN MAYNARD, F/K/A KAY LYNN MAYNARD BOOTH
    v. WILLIAM T. BOOTH

    Today the Supreme Court of Texas denied the
petition for review in the above-referenced case.

MS. ESTHER DEGOLLADO
WEBB COUNTY DISTRICT CLERK
1110 VICTORIA ST. SUITE 203
LAREDO, TX  78040



EXHIBIT
2

tabbies

# APPENDIX 7

*Kay Maynard's Supplemental Request for Full Payment of Divorce Trial and*

*Appellate Attorney's Fees Awarded in*

*Final Judgment and Decree of Divorce*

E-FILED
IN MATTERS PROBATE
Accepted: 4/30/2014 4:14:20 PM
GERARD RICKHOFF
CLERK PROBATE COURTS
BEXAR COUNTY, TEXAS
BY:_____
Destiny Perez

CAUSE NO. 2012-PC-2786

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| WILLIAM THOMAS BOOTH, | § | NO. TWO |
| | § | |
| DECEASED | § | BEXAR COUNTY, TEXAS |

## KAY MAYNARD'S SUPPLEMENTAL REQUEST FOR FULL PAYMENT OF DIVORCE TRIAL AND APPELLATE ATTORNEY'S FEES AWARDED IN *FINAL JUDGMENT AND DECREE OF DIVORCE*

TO THE HONORABLE JUDGE OF SAID COURT:

Now Comes, Kay Lynn Maynard ("Kay"), and files her *Supplemental Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce*, and in support thereof would respectfully show the Court the following.

I.

Kay requests she be awarded reasonable attorney's fees for bringing this motion and requesting the relief sought herein. This request is made in supplementation of the Request filed herein on April 29, 2014.

WHEREFORE PREMISES CONSIDERED, KAY LYNN MAYNARD respectfully requests that the Executor be ordered to pay the entire Two Hundred Thousand Dollar ($200,000.00) attorney's fee awarded to Kay in the Judgment; the reasonable and necessary attorney's fees she incurred to bring this Request; and for all other appropriate legal and equitable relief.

1

Respectfully Submitted,

JONES & GONZÁLEZ,
An Association
5601 San Dario, Suite 5
Laredo, Texas 78041
Telephone 956-723-5575
Facsimile 956-723-2025

James K. Jones, Jr.
State Bar No. 10910200
Adán A. González, III
State Bar No. 08122350
Counsel for Kay Lynn Maynard

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing

*Supplemental Request* was electronically filed with the Clerk of the Honorable Court, and

was faxed to A. Chris Heinrichs (fax 210-366-0981) on April 30, 2014.

Adán A. González, III

2

# APPENDIX 8

*Partial Allowance of Claims*

Cause No. 2012-PC-2786

IN THE ESTATE OF                    §
                                    §       IN THE PROBATE COURT
WILLIAM THOMAS BOOTH,               §
                                    §       NO. TWO
DECEASED                            §
                                    §       BEXAR COUNTY, TEXAS

FILED
IN MATTERS PROBATE

2013 JUN 10 P 2: 06

GERARD C. RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY_____
              DEPUTY

## PARTIAL ALLOWANCE OF CLAIMS

The claims filed by Kay Lynn Maynard against the above styled and numbered Estate, were presented to me on May 22, 2013. The following action was taken with respect to each claim:

1.  Allowed -- in the amount of One Hundred Fifty Thousand and No/100ths Dollars ($150,000.00), together with prejudgment interest thereon of $5465.75 for the period from November 18, 2011 to an through August 10, 2012. and post-judgment interest thereon of $6431.59 for the period from August 11, 2012 to and through June 8, 2013, for a total claim of $161,897.34 through June 8, 2013, as provided on pages 5 and 26 of The Final Judgment.

2.  Allowed -- in the amount of Forty Thousand and No/100ths Dollars ($40,000.00) for loss of deer hunting income, together with post-judgment interest thereon of $1654.80 for the period from August 11, 2012 to and through June 8, 2013, for a total claim of $41,654.80 through June 8, 2013, as provided on page 26 of The Final Judgment.

3.  Allowed -- in the amount of Eighteen Thousand and No/100ths Dollars ($18,000.00) for loss of hog hunting income, together with post-judgment interest thereon of $744.66 for the period from August 11, 2012 to and through June 8, 2013, for a total claim of $18,744.66 through June 8, 2013, as provided on page 26 of The Final Judgment.

4.  Allowed -- in the amount of One Hundred Seven Thousand Seven Hundred Forty Three and 87/100ths Dollars ($107,743.87) for special damages directly and consequently resulting from William Thomas Booth's breach of contract, together with post-judgment interest thereon of $4,457.35 for the period from August 11, 2012 to and through June 8, 2013, for a total claim of $112,201.22 through June 8, 2013, as provided on page 26 of The Final Judgment.

5.  Not yet allowed -- in damages of as-of-yet-to-be-determined amounts that are presently pending in the appeal number 04-12-00585-CV, before the Court of Appeals for the Fourth Judicial District of Texas. The Administrator recognizes that there is an appeal before the Court of Appeals but cannot yet approve this claim under state law because the amount of the claim is not liquidated.

1

6. _Not allowed_ -- for the right to use water from all acreage awarded in The Final Judgment to William Thomas Booth for Kay Lynn Maynard's personal use, as well as to water her livestock by connecting to existing water wells and underground water lines, as provided on page 5 of The Final Judgment. The Administrator recognizes the provisions set out in Paragraph 6 on page 5 of the Final Judgment but this is not a claim for money and thus not subject to the claims procedure set out in the Texas Probate Code.

Signed this ___7___ day of June, 2013

_Betty Booth_
Betty Booth, Temporary Administrator
of the Estate of William Thomas Booth

## APPROVAL OF CLAIMS

Came on to be heard for approval the above claims against said Estate, and the same being considered by the Court, and it appearing to the Court that it is partially allowed and partially denied by Betty Booth, Temporary Administrator of said Estate, and that those claims allowed are just claims against said Estate.

**IT IS ORDERED** that the claims allowed above are hereby approved as a Class 8 claims against said Estate for the amount herein allowed.

SIGNED this the ___ day of _____, 2013.

_____
The Honorable Tom Rickhoff, Judge Presiding,
Probate Court No. 2

g:\clients\booth, william thomas-est-4895\pldgs\allowance of claim-- kay lynn maynard .doc

2

# APPENDIX 9

*Official Transcript –*

*October 1, 2014 Hearing*

REPORTER'S RECORD

TRIAL COURT CAUSE NO. 2012-PC-2786

IN THE ESTATE OF ) IN PROBATE COURT
)
WILLIAM THOMAS BOOTH ) NUMBER 2
)
DECEASED ) BEXAR COUNTY, TEXAS

---

**MOTIONS**

---

On the 1st day of October, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Tom Rickhoff, Judge Presiding, held in San Antonio, Bexar County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

A. Chris Heinrichs
SBOT NO. 09382500
Heinrichs & DeGennaro, P.C.
100 NE Loop 410 #1075
San Antonio, Texas 78216
Telephone: 210.366.0900
Attorney for Michael McComas As Administrator

Daniel V. 'Dan' Pozza
SBOT NO. 16224800
Law Offices Of Dan Pozza
239 E Commerce St
San Antonio, Texas 78205
Telephone: 210-226-8888
Appellate counsel

James K. Jones, Jr.
SBOT NO. 10910200
Adan Gonzalez,III
SBOT NO. 08122350
Jones & Gonzales, An Association
5601 San Dario, Ste. 5
Laredo, Texas 78041
Telephone No. 956.723.5575
Attorneys for Kay Lynn Maynard

THE COURT: Mr. Heinrichs, style the case please.

MR. HEINRICHS: This is cause number 2012-PC-2786 in the Estate of William Thomas Booth, Deceased.

THE COURT: And I've already addressed you, so we know on the record who you are. Introduce who ever else you brought.

MR. HEINRICHS: Well, I represent Michael McComas as the independent executor of the estate, who is here.

THE COURT: Okay.

MR. HEINRICHS: Dan Pozza is sitting beside me. He is our appellate counsel in this case.

THE COURT: Good. Go ahead. Anybody else? I see Casseb is here.

MR. HEINRICHS: Mr. Casseb is here. He was one of the attorneys in the trial of the divorce and --

THE COURT: Oh, I was wondering what he was doing here. Okay. And -- okay, let's -- is that it?

MR. HEINRICHS: Well, we've got McComas family members here.

THE COURT: Okay. Fine.

MR. HEINRICHS: Mrs. Booth.

THE COURT: Okay.

And on the other side?

MR. JONES: James K. Jones, Jr., assisted by Adan Gonzalez, Judge, representing Ms. Maynard.

THE COURT: Okay. And whose motion is it?

MR. JONES: It ours, Judge.

THE COURT: It is yours.

MR. JONES: Yes, sir.

THE COURT: Okay. Let's do this, if you sit down, please. Thank you. And bring that mic over where she can hear you. Okay. That's okay. That's what it does. Just really bring it over. It's not very good. You have to like have it close to you. I'm sorry. Okay. And so, tell me why you've brought us here.

MR. JONES: Judge, we filed a petition for payment of attorneys' fees which were awarded in the divorce decree, not appealed by the estate, and have now become final.

THE COURT: Awarded against whom?

MR. JONES: Against Mr. Booth prior to his death.

THE COURT: Prior to his death, of course. Can't get a divorce after. Oh, okay. So how much are they?

MR. JONES: $200,000.

THE COURT: Okay. And -- and who awarded them?

MR. JONES: The trial judge.

THE COURT: Who was that?

MR. JONES: Monica Notzon.

THE COURT: And she's a district judge down there?

MR. JONES: She is.

THE COURT: Okay. Is she the magistrate's daughter, the old magistrate?

MR. JONES: Daughter-in-law, I guess ex-daughter-in-law.

THE COURT: All right. So they awarded them, and now we have an estate, and you want them from that, right?

MR. JONES: That's correct, Judge.

THE COURT: Okay. Well, let's see what they say on the other side. And what else do you want to say if -- you know what --

MR. JONES: There were two conditional remissions --

THE COURT: Go ahead.

MR. JONES: -- that if there was no appeal to the Court of Appeals, $130,000 was to be remitted. If there was no appeal to the Supreme Court, $50,000 was to be remitted. There was both an appeal to the Court of Appeals and appeal to the Supreme Court --

THE COURT: Okay.

MR. JONES: -- so the entire $200,000 is due under the judgment.

THE COURT: All right. Have you had a chance to see the response that's filed?

MR. JONES: No. It was handed to me about five minutes ago. I've glanced at it.

THE COURT: You know, it would be so helpful if you, before we -- so we don't stumble through this -- if we all read it. Okay?

MR. JONES: Sure.

THE COURT: Okay. So who else hasn't seen it? Apparently no one. Okay. And then you and I are going to read it. Go ahead and read it.

MR. JONES: (Reading document).

THE COURT: Okay. Whenever you're ready.

MR. JONES: I'm ready.

THE COURT: All right. Well, don't be baited into responding to the part that says your

request is absurd. I knew they didn't talk like that in Laredo. So don't worry about that.

But he raises kind of an interesting thing that doesn't have any cites to it but public policy usually doesn't have it too much. But, he says if you allowed this construct, then it would encourage frivolous appeals which is something the Supreme Court is sensitive about and doesn't like. And unlike federal court, the circuit really pounds it. The Supreme Court just doesn't like it.

So what do you think about that, where he talks about public policy where you lose and lose, lose.

MR. JONES: I think the larger public policy is to -- the inferior courts have to follow the specific mandate which is handed down after a case has been appealed. This is a circumstance where -- where if they dislike the language which was contained in the trial court's judgment, they could have taken that up on appeal.

In fact, during oral argument, Justice Marion said You have an unconditional award of attorney fees here, whether you win or whether you lose. And I mean, that's the judge at will argument making that pronouncement. So she read this and she focused on it immediately. But -- but there was never a request at

any level to change the language to be what they would wish it would be as stated in here.

THE COURT: And did she have --

MR. JONES: And so --

THE COURT: Go ahead.

MR. JONES: Sorry.

THE COURT: No, I'm sorry.

MR. JONES: So what happened is we have a final judgment that's been appealed twice. We have a mandate which does not change the language of the final judgment. And so, the public policy argument is, well, should we revisit by way of collateral attack specific language in a judgment which is final, which has already been appealed to the Court of Appeals and thereafter the Supreme Court, neither of which changed the language, albeit it was never appealed, but it should have been appealed if they wanted to change it, versus have another court decide that is inferior to those two courts, well, I just don't like the language, so I'm not going to award it. I'm going to disregard the mandate which was handed down by the Court of Appeals.

THE COURT: Okay. And of course there's no record from the Fourth Court of Sandee Bryan Marion saying anything, right? Right.

MR. JONES: You know, I was told that

they have -- that they have the oral argument on tape. And I've been trying to find it so I can play it for you. But, you know, sitting here after I got this, I haven't had time to find that.

THE COURT: Okay. Did she happen to indicate that she also had the actual record including page 69 and 37 that are listed in the footnote one here before us? Did she say anything about that? Because -- okay. So what we have here is a classic case for them. And so, if she's giving me any hints, I sure want to hear them. Did she say anything else or any -- who was on the panel?

MR. JONES: It was Judge Marion. Who else, Dan?

MR. GONZALEZ: (Inaudible).

MR. JONES: I think it was Judge Alvarez also and Adan recalls Judge Angelina.

THE COURT: Okay.

MR. JONES: But I don't remember to be honest with you.

THE COURT: Okay. And then, you don't recall anything about the record being discussed because I'm sure it was in their briefing papers what the record said.

MR. JONES: Well, we never saw any

briefing papers.

THE COURT: Of course you wouldn't but, yeah --

MR. JONES: I don't recall any --

THE COURT: Okay.

MR. JONES: -- about the record said this or the record said that. Other than speaking specifically to, you know, the hunting --

THE COURT: I tried to talk Hardberger into having what's called a fast court where we take all of our briefing papers and have them summarized and we give them to the lawyers before the hearing so they can see what we're being told by our staff attorneys, exactly what we're being told, what's in the record and so forth. I thought it would bring clarity to the hearing because they would see what our attorneys were emphasizing, and they could make, as you are here, the counter argument.

MR. JONES: To narrow the issue.

THE COURT: What?

MR. JONES: To narrow down the issues.

THE COURT: Yeah. There are some fast courts but --

MR. JONES: One thing I'd point out to you, Your Honor, is that when you're dealing with res

judicata, it's not only what was entertained but what should have been put before the court for decision. We have -- we have a non-appealable judgment. It was not attacked by anybody on those particular grounds and is now final. And there's no ability to collaterally attack that judgment.

THE COURT: Okay. See I don't know what they'll do up there. But would you agree that footnote one is counterintuitive to the language in paragraph 3 of the response?

MR. JONES: Footnote one?

THE COURT: Well, the order of the Court and the language the Court used on the record are incongruous.

MR. JONES: No.

MR. GONZALEZ: May I?

THE COURT: Sure, yeah.

MR. GONZALEZ: If I may, Your Honor, in that colloquy between Judge Notzon and the Court and the lawyers that are in footnote one --

THE COURT: Yes?

MR. GONZALEZ: -- we respectfully submit that Judge Notzon was mistaken because here she's talking about the attorney fees award in the agreement, in the final agreement incident to divorce, which we're

only having a trial about because William breached it.

So she's not talking here about what she can do now that she has jurisdiction of the whole divorce. She's there talking, we feel erroneously, about the recitals in the agreement incident to divorce that they breached. That's what she's talking about here.

And that is why, if you had the transcript, we'd show you, we -- we corrected that later. And that's how she saw her way to giving us the unconditional award that's before this Court now in the decree.

It's not incongruous because she was making a mistake in footnote one talking about the condition. And when Mr. Jones pointed that out to her when we were down to writing the judgment, that's when she gave us the award of attorney fees. That's how you reconcile the decretal part of the judgment that is undisturbed on appeal.

That's what we're asking the Court to enforce today, and these random off-the-cuff remarks that were on the record in footnote one. She was mistakenly talking about the agreement incident to divorce in footnote one where indisputably the parties in the agreement said everybody pays his own attorney

fees.

THE COURT: Yeah. And the trial Judge, Notzon, read into the record, as it indicates in footnote two, the actual agreement, which is a safe thing to do.

MR. GONZALEZ: It is, except that because the decretal portion of the judgment is undisturbed, this Court does not need to plumb what she could have been thinking about when she entered the decree of divorce.

What they're trying to do, Judge, is inject two words into each level of appellate award. If successful. If successful. They're trying to inject that. There's no basis in Texas law to do that at this late date. The brief that we filed today talks about res judicata. Black letter law that they should have attacked this by cross notice of appeal and said, well, whatever else is true, she can't get to unconditional award of attorney fees regardless of what you do on hog hunting and anything else.

They didn't do that. And so what they're wanting now is a second bite at the apple. Texas law expressly forbids that. The only way they could get out of it is to say, well, at the time we had no reason to dispute that. We have no motive or incentive to dispute

that.

But the elements our brief today clearly sets out are squarely before the Court today. They had every opportunity to say what they are quoting here on page 4 of their brief -- of their response.

THE COURT: Yeah, I got it.

MR. GONZALEZ: This Spiller court, the Farmer's court, that -- all that case law should have been argued to the Fourth Court of Appeals before we reached this stage. Now importantly too, the Spiller case.

MR. JONES: Judge, one other thing I'd point out to you, you have an unambiguous judgment before you issued by a district court. There's no ambiguity at all in that judgment. You -- you -- you -- your -- your function at this point is ministerial. You read the judgment, you read the mandate from the Court of Appeals and see if anything in that judgment got changed, and you enforce the judgment as it stands.

You don't look behind the judgment to try to think -- to try to determine what the Court was thinking or rereview the evidence. All of those are absolute collateral attacks to the judgment. If that judgment is clear, and it is, there's no ambiguity, and, you know, there's certainly no pleading showing

ambiguity.

THE COURT: Okay. Let's take that as true. Okay?

MR. JONES: Yes.

THE COURT: And so if this is unambiguous and it's just a ministerial function, then -- if I believe that, then I would only give you 130,000, right?

MR. JONES: No.

THE COURT: Because it says Shall be reemitted -- well, you say that -- that they are adding the words if successful, but why would you --

MR. JONES: That's their words.

THE COURT: See I'm --

MR. JONES: That's not the judgment.

THE COURT: I'm a little worried about that because then the Supreme Court I think will -- no matter what the Fourth Court does -- readvise them. So, I'm a little worried about the Supreme Court on that.

Well, let's -- when you're finished, I don't mean to cut you off, then we'll go over there.

MR. JONES: Okay.

THE COURT: Okay.

MR. JONES: The -- the -- I need to offer these exhibits. Do you mind if I pass them to opposing counsel?

THE COURT: Sure. And we were just getting to the Spiller case. He kind of cut you off, but we'll let you finish saying --

MR. GONZALEZ: Well, importantly, the Spiller case talks about holding from the --

THE COURT: Bring the mic over. Bring the mic over.

MR. GONZALEZ: The Spiller case that they cite says the Fourth Court of Appeals held that although the judgment's not specific, attorney fees are contingent upon success on appeal. That would have been something very good to have elicited from the Fourth Court when we were before them.

But they were silent on the unconditionality of the attorney fees award. And so what they're trying to do now is they're conceding they never attacked it on appeal like they did in Spiller. They're conceding that. And they're saying, well, it doesn't matter that we didn't do that, please inject if successful into this judgment that we never attacked and that is not ambiguous.

THE COURT: Okay.

MR. JONES: And, Judge, I'm going to offer Plaintiff's Exhibits 1, 2 and 3.

*(Plaintiff's 1, 2, 3 offered)*

THE COURT: Okay. Oh, goodness. This is the final judgment?

MR. JONES: Yes, sir. And I folded one page that shows the award of attorneys fees that's in contest today.

THE COURT: Okay.

MR. JONES: It's dog-eared on the bottom.

THE COURT: Thank God I don't do divorces. Okay. Much.

MR. JONES: The one other thing that I would suggest to you, Judge, you know, as lawyers, we agonize over what the action of the Supreme Court is going to be. And -- and especially these days.

THE COURT: Say again.

THE REPORTER: Could I ask you to use the mic, please.

MR. JONES: Especially these days. But -- but as we stand before you today, the state of the law is specific. You have an unambiguous, unappealed issue in a judgment that has already been taken up on appeal, and a mandate's been issued, and there's no reason not to enforce that judgment as it stands.

THE COURT: Okay. Is there anything else in this final judgment that would give me some hints

about how to rule here other than that one paragraph, one sentence, couple sentences?

MR. JONES: No, I don't believe so.

THE COURT: Nothing else. Okay. Let's go over there.

MR. GONZALEZ: Well, may I?

THE COURT: Did you want to say Spiller?

MR. GONZALEZ: One last point.

THE COURT: Go ahead.

MR. GONZALEZ: Not necessarily on Spiller. As an officer of the court, I would note that this is the third setting of our request for these total attorney fees because the Court was very cooperative with us in setting it down as soon as we asked for a setting. We got two settings, but the last time -- and Mr. Heinrichs can correct me if I am mistaken -- we were reset because I discussed with Mr. Heinrichs on the phone the issue of res judicata. I said we think res judicata, slam dunk, we get the full award of attorney fees.

And he told me on the phone, well, I need to consult with our appellate counsel because that's the first I hear of res judicata with respect to this issue. Importantly, their response today is silent on the point of res judicata.

THE COURT: Okay.

MR. GONZALEZ: It only talks about, well, if you look behind it, there can't be an unconditional award of attorney fees. But that's why we're here, because of res judicata. And they speak not one word of it in their response.

THE COURT: Okay. All righty. And then who's going to speak over here?

MR. HEINRICHS: Well, we might both, but let me start off. First of all, I disagree with his version of the conversation. He called me the day before the hearing saying we forgot to set a claim for a hearing, do you agree on setting that. And I said, I don't know. I haven't thought about it. I will need time to look at it, but I'm certainly not prepared to go forward tomorrow on the claim that you filed. And so, he decided to postpone it. We never mentioned res judicata at all.

Second of all, the Spiller case is instructive for several reasons. One is it's a Fourth Court of Appeals case. Second reason is that you were on the panel of that case.

THE COURT: Oh, do you happen to have the hard copy there so I don't have to go back in my room?

MR. HEINRICHS: Sure, yeah.

THE COURT: Hopefully I was with Hardberger, not that there's anything wrong with anybody else.

MR. HEINRICHS: Judge Chapa and Judge Stone. And this case is very similar to the present case because in Spiller versus Spiller the trial court awarded Hugh M. appellate fees through the filing of a writ of error with remittiturs at each appellate stage in the event appeals were not sought. And the clause -- or the attorney fees clause in question was not contingent upon winning or losing the appeal.

But the Court said, it is implicit in a court's judgment however that the award of appellate attorney fees is conditioned on a successful appeal. Although the judgment before us is not specific that attorney fees are contingent upon appellee's success on appeal, we conclude that the award implicitly requires success in order to recover the fees.

So as soon as Judge Notzon signed the order, implicit in that order, as per the Spiller case, and others, implicit in that order is the requirement of success of appeal to recover the appellate fees.

This law is backed up by a number of cases in Texas down the line. The Rittgers case, courts have made it quite clear that any award of appellate

attorney fees is contingent upon success in the appeal. The Robinwood Pettigrew case is implicit, implicit, that is in the judgment it is implicit in a court's judgment that the award of appellate attorney fees is conditioned on a successful appeal. The trial court may not grant an unconditional award of appellate attorney fees.

So, it really doesn't matter what has happened before this day. This is the first time a court has looked at this language. They didn't bring it up on appeal either. And we've pointed out that the Texas Rules of Civil Procedure Rule 38 would have required them to have brought it up on appeal. Mr. Pozza can address that and other things.

THE COURT: Okay.

MR. HEINRICHS: But this paragraph --

THE COURT: Yeah, let's go through it together.

MR. HEINRICHS: -- this document --

THE COURT: At the risk of showing you how confused I am about this --

MR. HEINRICHS: Sure.

THE COURT: -- let's go through it together. Okay?

MR. HEINRICHS: Okay.

THE COURT: That Kay recover attorney

fees reasonably and necessary, kind of surplusage language, you know, because, you know that's going to be it, incurred after the October 12th, 11. Okay. So, are these attorney fees before us incurred after October 12th, 11?

MR. HEINRICHS: Here is what happened: They had a mediated settlement agreement. And I will -- let's see -- they had a mediated settlement agreement in which it is stated Kay pays all her --

THE COURT: Yeah, no, I read all that.

MR. HEINRICHS: -- attorney fees and court costs. William pays his debts and attorney fees.

THE COURT: Okay. Here, let's just walk through this thing. Incurred after October 12th but before June 28, 12. Is that how you read this thing?

MR. HEINRICHS: That's what it says.

THE COURT: Okay. All right.

MR. HEINRICHS: Well, I was explaining why it's like that.

THE COURT: Okay.

MR. HEINRICHS: Then the Court found in later proceedings that the Rule 11 settlement agreement was an enforceable Rule 11 contract.

THE REPORTER: Was an or wasn't?

MR. HEINRICHS: Was an enforceable

contract.

THE COURT: It's not your fault. That mic just doesn't work too good.

MR. HEINRICHS: I have a bad voice today. Maybe forever.

And so, there was a trial for breach of contract, William's breach of contract. And it was at that trial that the Court awarded fees. And this paragraph that you're reading got incorporated into the decree. So this is -- this paragraph is a result of a breach of contract by William. Kay's attorneys said we're entitled to attorney fees because William breached the contract. Okay?

So I was pointing out at footnote one that the -- and footnote two, that the attorney fees awarded was for breach of contract. All right? Now, this paragraph got put into the final decree. And those are the dates or parameters that the Court said, okay, these are the dates that you accrued attorney fees because of William's breach of contract.

THE COURT: Okay. And then she comes up with a quantum, 200,000, right?

MR. HEINRICHS: Comes up with a quantum.

THE COURT: Oddly a very even number. In any event, but then goes on to say, if not appealed,

there will be a $130,000 remittitur, right?

MR. HEINRICHS: Correct.

THE COURT: Okay. So, she won't get that 130 if she does not appeal?

MR. HEINRICHS: That's correct.

THE COURT: Is that right?

MR. HEINRICHS: If she does not successfully appeal because implicit in the language is a requirement for success.

THE COURT: No, no, no. It's even worse for her. Let's look at it.

MR. HEINRICHS: Okay.

THE COURT: If this case is not appealed to the Court of Appeals, if she doesn't do it, then -- doesn't appeal it, then she -- then $100 shall be remitted from that 200,000, right?

MR. HEINRICHS: Right.

THE COURT: Okay. So what it's actually saying is, for God sakes, if you don't appeal this thing, you're not going to get any money for attorney fees. Who in the world would write an order like that?

MR. HEINRICHS: Counsel.

THE COURT: Well, why didn't you tell me that when you first came in here? And then it goes on to say you get $50,000 back if it isn't appealed to the

Supreme Court. That means for God sakes, you're not going to get any money if you don't appeal this thing to the Supreme Court. Who would write that in here? And who -- and what --

MR. HEINRICHS: I wasn't --

THE COURT: -- Supreme Court would want those orders coming up to them?

MR. HEINRICHS: I can't imagine the Supreme Court would want that order.

THE COURT: Well, anyway, maybe they think entirely differently than I do. Okay. So I'm a bit confused by that particular order provision. Okay. And can you help me in any other way on this? I think it's -- when you said it was contrary to public policy in paragraph whatever it is here, that's what kind of caught my interest when I first saw this paragraph. That's what I thought. Anyway. Okay. Okay.

All right. And then, Spiller incidentally has a rather tortured background. It came out amid some controversy with Woodmen of the World and other things. But okay. All right. I didn't mean to ignore anybody. If you have anything else to say, please use the mic so she can hear you.

MR. POZZA: Your Honor, I just wanted to comment since Adan and I were -- actually

Mr. Gonzalez -- Mr. Gonzalez and I were actually participants in that oral argument, and so I don't agree with Jimmy -- Mr. Jones' or Mr. Gonzalez's recollection of the banter between the justices and counsel during oral argument. Jimmy certainly was in the audience at the time. It was one of those very nice oral arguments we have in Laredo, Laredo cases. I always seem to -- I don't have many Laredo cases. I seem to have enough where I'm always captured in the fall of whatever year when they go down there. And, you know, commissioners' court, nice courtroom.

In any event, there was -- there was -- the -- the implication if I understand it correctly of Mr. Gonzalez and Mr. Jones is that somehow the Court was sort of just on its own, Justice Marion was sort of agreeing with their interpretation of this paragraph that we're disputing -- we're disputing about now.

The only recollection I have is that Mr. Adan -- Mr. Gonzalez in passing had mentioned in his opening that -- that he -- the controversy just -- the controversy in the appeal -- and I have a brief. The controversy in the appeal was when you do the mathematics of that paragraph you just read from, it cashes out the $70,000 trial fees. That is $70,000 for breach of contract fees at the trial court level for

Ms. Maynard.

And so on appeal they were unhappy about the 70,000 at that time. And so, Mr. Jones had -- had an invoice that he had submitted to the trial court of $178,002. And he -- and on appeal their position was as a matter of law that should have been added on to the 70 --

THE REPORTER: Should have or shouldn't have?

MR. POZZA: Should have been added on to the 70 so that the total was something like 248,000. So in oral argument Mr. Gonzalez was describing their position that as a matter of law, the trial court should have added on this additional $178,000 at the trial court level, and saying something to the effect, and again it's unfortunate that we don't have the transcript, something to the effect -- and this is all the digression and irrelevance of the Court's construction of this paragraph, but since it was brought up, I'm sort of giving a bigger picture here -- something to the effect Mr. Gonzalez said about that the additional 130,000 for the appeal is something that they would have or arguably would have even if they don't prevail. And this is in the question and answers back and forth.

And I got up there and then said well it comes as a surprise to me now and it would be a very unusual and tortured reading if we're going to -- because at the time Mr. Gonzalez had not lost yet. If we're going through this process and if this Court determines that Mr. Gonzalez loses his attorney fees for additional trial court fees, no problem because in losing that he's now going to get more fees on the appellate side.

My recollection was collective rolling of eyes, but maybe that's the way I want to remember it, that there would be such a notion that you could be having -- you know, here's the way I can get some more -- I can't get my fees on this appeal. I'm not going to show, and in fact I failed to show both the Court of Appeals and the Supreme Court that I'm entitled to my additional $170,000 as a matter of law, but at least I can get another 130 just by going through this process unsuccessfully.

And their construction -- because I think that really this is a question of construing. The Court has to determine what's the reasonable construction. I don't think it's ambiguous. I think we just use normal court rules of construction. And so their rules of construction are such that -- their rules of

construction say any appeal, Mrs. Maynard gets her money on -- for any appeal by either party.

So they complained that well why didn't you appeal if you didn't like the language. It's not that we disliked the language. We dislike their interpretation of the language. But had I appealed, apparently under their interpretation, I lose. If they appeal and lose, I lose. If I appeal --

(Phone ringing)

MR. POZZA: -- if I appeal --

THE COURT: It's okay. We don't care. It doesn't matter.

Go ahead.

MR. POZZA: If I appeal, I lose. So under their interpretation, any appeal by either party doesn't need to be successful, I have to wind up paying $130,000 in attorney fees. So --

THE COURT: Okay. So the missing words -- he said what the missing words were. So the missing words may be these: If this case is not successfully appealed.

MR. POZZA: And I think that was the point of Mr. Heinrichs cases that show that that's implied in these cases, not just in the Spiller case, is because if you don't give it that, which I think is a

reasonable rule of construction to use, if you don't give it that, you wind up with, well, absurd results such as this particular one. And even more absurd results under their reading. For instance had I said, well, gosh, I don't like that language, I better appeal it, darn it, I lose that way too.

That's their view. That's their interpretation. And that can't -- in the sense of -- that can't be right. That can't be the reasonable interpretation.

So -- and I guess it's ironic in a sense that their view is, we failed to get -- we failed to convince the Court of Appeals, we failed to convince the trial court we're entitled to additional attorney fees at trial, but our failure allows us to have additional appellate fees. That's the interpretation that they want. And to me that is not the reasonable interpretation.

THE COURT: Okay. I heard that. Now let's go to what Chris Heinrichs and I talked about before we go back to them. Okay. Here's the paragraph before us. And then, you know, up on the Court of Appeals they get into reading things just as they are a lot. And so, unless I'm getting lost in double negatives, this is contrary to public policy because it

says if this case is not appealed, $130,000 shall be remitted. That means -- did you miss that point? You must appeal it. What do you think about that? I mean, they're asking me to literally read this thing. And then when I literally read it, it really doesn't make any sense. Well, what do you think?

MR. POZZA: I concur. I mean, the interpretation I'm giving it is probably -- the interpretation that I'm giving it and then criticizing them for having this -- is itself an interpretation that may not match a literal reading which may be even more absurd. So I'm trying to make it less absurd --

THE COURT: Okay. Well --

MR. POZZA: -- and they're trying to do -- but in their reading of it, they don't have the success or failure in it. But I agree, I think it may be more absurd than if you -- as a literal reading, it's even worse off than either of the views of the parties.

THE COURT: Okay. I was afraid I'm the only one here reading it like that. But, okay, fine. Okay. Did you have anything else? I didn't mean to cut into what you were saying.

MR. POZZA: No.

THE COURT: And then I'm coming back over here now. Okay. So I'm getting a little possibly

over-fixated on the fact that this paragraph doesn't make any sense.  I think you're kind of in a corner on it.  I mean, maybe not here, but somewhere else you're going to be in a corner because they're going to be going through this paragraph too, and they're trying to save it for you by putting successfully in it in a bit -- in a way to make it make sense.  But, as it stands does it make sense?

MR.  JONES:  Yes.

THE COURT:  Okay.  Tell me how.

MR.  JONES:  It doesn't say that -- that Kay has to appeal.  It says if there's an appeal --

THE COURT:  What else would you appeal?

MR.  JONES:  -- the trial court was anticipating was the -- Mr.  Booth lost.  He tried to not allow the Court to enforce the settlement --

THE COURT:  Oh, it's saying he lost.  Oh, okay.  Let me read it again.  She gets attorney fees.  Okay, fine.  And -- and so you're saying it means if he doesn't appeal.

MR.  JONES:  I'm saying --

THE COURT:  130 -- oh, I see.  Okay.  Well, then it does make sense.  All right.  It could make sense.  Well, that's why I need to read this whole order.

MR. POZZA: And, Your Honor, I mean, the way I always read this thing was we were the losers, we -- but we were -- I mean, Mr. Booth was no longer with us. The family had had this family tragedy after this decree was entered. And so even though we were the losers, although Mr. Jones thought he was the loser on attorney fees, so we wind up with an appeal. What I think is meant from this decree is obviously anticipating that us as the losers were going to appeal.

THE COURT: Oh, okay.

MR. POZZA: And of course they want -- they're trying to bait me into appealing. I did not appeal. So under that interpretation, there never was an appeal by Mr. Booth; and therefore, 70,000 is all that's owed. So either way you slice it, we don't owe more than $70,000.

THE COURT: Okay. Well, sorry for getting after you about the thing because otherwise it wouldn't make any sense to me. But I see it now that you have explained it both -- on both sides. Okay. See what else you have to say.

MR. GONZALEZ: Except the name William does not appear anywhere in that line. It just says if an appeal. It doesn't say what Mr. Pozza wants it to say which is if an appeal by William. It just says if

an appeal, by any parties, Mr. Jones noted.

But more importantly than that, Your Honor, Mr. Pozza's reference to I think we just use the normal rules of construction, that seals the fate of the estate, and they must pay us $200,000. The only rule of construction at issue here is whether this phrase is ambiguous. And it's not. No one has ever said it's ambiguous.

Indeed in this colloquy today they say it's not ambiguous. They're saying it says what it says. The result is just ridiculous. This would have been an excellent point again to have brought to the Fourth Court of Appeals.

And I take exception to Mr. Pozza saying, well, had I done that, it would have been more money to Kay. That's incorrect. What he would have done on his cross notice of appeal with his first point of error obviously would have been to cite Spiller, cite Pettigrew, cite Texas Farmers versus Cameron and said you cannot have -- whatever else is true, don't let her have more money just because we're in San Antonio and then just because somebody filed something in Austin.

They could have said that to correct the explicit unambiguous decretal language of the judgment. And they didn't do that. I think they had ample

opportunity to do that. Spiller did it. They complained to the court -- Fourth Court of Appeals and the Fourth Court of Appeals said, you know, you're right, you can have an unconditional award. So now there's --

THE COURT: Yeah.

MR. GONZALEZ: -- a collateral attack that they don't cite a single case to this Court. As you -- as the Court well knows, some collateral attacks are -- on a judgment are okay. But they don't have any case law that says this is a good time for a collateral attack based on Texas law. They don't have that because they know it's not.

And finally --

THE COURT: Yes?

MR. GONZALEZ: -- as to the literal not making any sense, where is that in the maxims of construction in Texas? That just because you can way after the appeal mandate is issued you can spin it and say, well under this scenario, under this law school hypothetical it's absurd and so, reform the judgment.

We have umpteen ways of attacking a judgment after it's final. They availed themselves of none of them. But they want the probate court to do now -- do that now. They have not cited a single case

that empowers this Court to be a kind of rule being commission to clean up divorce judgments that are long since final out of Webb County. There's no such precedent. There's no such Texas rule of appellate procedure.

MR. HEINRICHS: What Spiller says and the other cases say is when you have a paragraph like that implicit in the paragraph is the requirement of --

THE COURT: Yeah, success. I know that's the Spiller --

MR. HEINRICHS: And so --

THE COURT: I'm going to read Emil Prohl's actual order and read through that opinion again which I haven't revisited in a long time. And sorry I didn't quite understand this thing but -- yeah, because I didn't understand who was appealing. But I do now.

And then, so, if they hadn't appealed -- let's see. If -- well you didn't appeal, right?

MR. POZZA: Correct.

THE COURT: So you didn't appeal, but they did, right?

MR. POZZA: Yes.

THE COURT: Okay. So what would have happened if they hadn't appealed attorney fees wise?

MR. HEINRICHS: Well, I presume they

wouldn't have been trying to claim another $130,000. I'd like to think that.

THE COURT: Okay.

MR. GONZALEZ: We believe we would have gotten $70,000 if we had filed nothing in San Antonio.

MR. JONES: If nobody had in San Antonio.

MR. GONZALEZ: If no one had filed in --

MR. JONES: That's enforcing the exact language of that judgment.

THE COURT: Okay. Well, let --

MR. JONES: And, Judge, I'd point out one thing to you. And -- and -- and, you know, the cases point this out over and over, so it's almost beyond discussion. But when a second judge comes in to review a court order and their parallel courts, that second judge doesn't have the benefit of having sat through the trial, listened to the arguments, watch the demeanor of the parties, seeing -- seeing if somebody backed out of a settlement agreement --

THE COURT: No, I realize all that.

MR. JONES: -- six months of fights and arguments over the meaning of the judgment --

THE COURT: I don't think -- they're not asking me to second-guess her. They're just asking me to figure out as it appears --

MR. JONES: But, Judge, if you -- if you add language to that judgment that's not there, you've second-guessed her.

THE COURT: Okay. Incidentally, there are many district judges that do feel this is an inferior court, but who cares.

MR. HEINRICHS: You would not be adding the language. The appellate court has already done that.

THE COURT: Yeah. Okay. Well, I'm going to have to spend some time with this. I'm certainly going -- and I apologize for not reading it before I came out here. I should have prepared and read Spiller, but I didn't. And I didn't look at this paragraph. So let me go in my room and quietly look after this. And it will be done before the end of the day. So if two sides call in, you'll know about it before the end of the day. Okay?

MR. GONZALEZ: One -- I have a question if I may, Your Honor. Would the Court inquire with William -- with the estate as to their position on res judicata? Or how do they contend with that.

THE COURT: Well, if it's not before the Court -- if it's not on notice before the Court, it would be a useless thing to do.

MR. JONES: It's in our pleadings.

THE COURT: What?

MR. GONZALEZ: It's in our brief today.

THE COURT: Okay. Well, did you have notice of it?

MR. HEINRICHS: We got the brief in less time -- with less time to study it than they did. And it's a brief. It's not a pleading.

THE COURT: Humm.

MR. GONZALEZ: Well, could we do this then --

THE COURT: Well, it's filed with the Court, right?

MR. JONES: Yes.

MR. GONZALEZ: Yes.

THE COURT: Okay. Well, it's in the file.

MR. GONZALEZ: Right.

THE COURT: I don't need to have their opinion.

MR. GONZALEZ: Okay. That's fine.

THE COURT: Okay. All right. Okay. Well, thank you everybody. And don't get up. You're fine. And I'm going to go study it and hopefully I'll have some time here today so. And then I'll do it

before I leave the place today.

MR. GONZALEZ: We also would be remiss if we didn't note that we are requesting attorney fees for having to conduct this.

THE COURT: For today, of course, yeah. Okay.

MR. GONZALEZ: Would we be also able to submit additional briefing to the Court just based on today's exchange?

THE COURT: Well, then I can't decide it today.

MR. GONZALEZ: No. Additional briefing to the Court.

THE COURT: For what?

MR. GONZALEZ: On this point that we discussed today.

THE COURT: Res judicata?

MR. GONZALEZ: Right. And anything else that has been discussed. Would the Court allow us to submit additional briefing?

THE COURT: Well, I don't think they're prepared to discuss res judicata.

Or are you?

MR. GONZALEZ: No. I've left that point, Judge. I'm just saying about what's been discussed in

general today, may we submit additional brief?

THE COURT: I guess there's no hurry on this. You don't have your money and this will just delay your getting it, if you ever do. But it's fine with me.

What do you think?

MR. HEINRICHS: I like the idea of having a judgment by 5:00, but --

THE COURT: Well, that's what I usually do. That's the way we proceed here usually.

MR. GONZALEZ: I know the Court --

THE COURT: What do you feel you need to give us? I mean we've got the cases. What else do you think you need?

MR. GONZALEZ: Well, as a matter of housekeeping I would like to put on my evidence of attorneys fees for having filed the claim and submit this brief.

THE COURT: You can do that. That's fine.

MR. GONZALEZ: May I do it just --

THE COURT: Yeah. No, stay there. Just relax. But make sure we can hear you. Okay. You're already under oath.

MR. GONZALEZ: My name is Adan Gonzales.

I'm an associate counsel for Mrs. Maynard. And I've been licensed to practice in the state of Texas since 1988. I graduated from the University of Michigan law school and St. Mary's undergrad. I've been practicing in Webb County for almost 30 years. And in the course of that, I've become well aware of what is a customary and normal rate for the type of work I have presented in the claim, the supplemental claim, the request for award of total attorneys fees based on final agreement incident to final judgment and divorce decree, for having filed those three things, and also for having filed today's brief.

It is customary and reasonable for me to charge a $300-an-hour rate for these services. And I anticipate that I have spent about 15 hours total in the filing of the claim, the supplemental claim, the request, and today's brief. And that comes to a total of $4,500. In the event that an appeal must be taken of whatever rulings we get from this tribunal, I believe a customary and reasonable attorney fees at the San Antonio Court of Appeals level would be 75 -- $25,000 to prepare a brief, and then at the Texas Supreme Court probably another $15,000.

THE COURT: Another what?

MR. GONZALEZ: Fifteen, $15,000.

THE COURT: Okay. Okay. He says 45, 25, 15.

MR. GONZALEZ: 4500.

THE COURT: Yeah, I know, 4500; 25,000; 15,000. Okay.

Do you have questions?

MR. HEINRICHS: Yes. Is the 25,000-dollar appeal to the Court of Appeals based upon successful appeal or do you get it anyway?

MR. GONZALEZ: It would be for the judge to decide.

THE COURT: That's a trick question.

MR. HEINRICHS: It's a straightforward question. For the Judge to decide if you get to once again appeal it without success and still get your $25,000?

MR. GONZALEZ: Right. And I think Judge Rickhoff has told us today that he would condition it on success.

THE COURT: Okay. We'll see what happens. Okay. I'm still going to decide this thing by 5:00, before the end of the day. Well, before I leave. Before I leave, I'm going to decide it. And I usually try and make sure that they're here so they can tell you about it. So, I'm going to endeavor to do that and I

usually do.  Okay.  So thank you very much.

MR. POZZA:  Thank you, Your Honor.

(Proceedings conclude, 2:34.)

STATE OF TEXAS

COUNTY OF BEXAR

I, Veronica Lugo Bowles, Certified Court Reporter in and for Bexar County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $292.50 and was paid/will be paid by Adan A. Gonzalez.

WITNESS MY OFFICIAL HAND this the 8th day of October, 2014.

Veronica Lugo Bowles, CSR 2027
Probate Court No. 2, Room 117
Bexar County Courthouse
100 Dolorosa Street
San Antonio, Texas 78205
Telephone: 210.335.2466
Expiration: 12/31/2015

# APPENDIX 10

*Order Denying Kay Lynn Maynard's*

*Requests for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in*

*Final Judgment and Decree of Divorce*

No. 2012-PC-2786

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| WILLIAM THOMAS BOOTH, | § | NO. TWO |
| | § | |
| DECEASED | § | BEXAR COUNTY, TEXAS |

## ORDER DENYING KAY LYNN MAYNARD'S REQUESTS FOR FULL PAYMENT OF DIVORCE TRIAL AND APPELLATE ATTORNEY'S FEES AWARDED IN FINAL JUDGMENT AND DECREE OF DIVORCE

On the 1st day of October, 2014, the Court heard and considered (i) Kay Lynn Maynard's Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce, filed on or about April 29, 2014; and (ii) Kay Lynn Maynard's Supplemental Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce, filed on or about April 30, 2014 (at times collectively referred to as "Kay Lynn Maynard's Requests").

Having considered the pleadings, the evidence and the arguments of counsel, the Court finds that Kay Lynn Maynard's Requests should be denied.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that (i) Kay Lynn Maynard's Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce and all relief requested therein are hereby denied; and (ii) Kay Lynn Maynard's Supplemental Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce and all relief requested therein are hereby denied.

SIGNED the ___ day of October, 2014.

FILED

OCT 0 2 2014

GERARD RICKHOFF
CLERK PROBATE COURT NO. 2
BEXAR COUNTY TEXAS
BY: _____
DEPUTY

_____
Honorable Thomas B. Rickhoff
Judge Presiding

V 0 2 1 4 1 P 7 8 9 6



# APPENDIX 11

## Kay Lynn Maynard's Motion for New Trial

E-FILED
IN MATTERS PROBATE
Accepted: 11/3/2014 4:28:49 PM
GERARD RICKHOFF
CLERK PROBATE COURTS
BEXAR COUNTY, TEXAS
BY:_____
Connie Perez

CAUSE NO. 2012-PC-2786

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| | § | |
| WILLIAM THOMAS BOOTH, | § | NO. TWO |
| | § | |
| DECEASED | § | BEXAR COUNTY, TEXAS |

## KAY LYNN MAYNARD'S MOTION FOR NEW TRIAL

TO JUDGE TOM RICKHOFF:

COMES NOW, KAY LYNN MAYNARD, Claimant and Movant herein and hereinafter referred to as "Kay," pursuant to TEX. R. CIV. P. 320 *et seq.*, to show the Court the following.

I.
## MATERIALS SUPPORTING MOTION

1. In support of the instant motion, Kay relies on the following materials which are duly filed among the papers of this probate proceeding, and requests that the Court take judicial notice of same.

    a. the *Final Judgment and Decree of Divorce* entered in the Booth divorce action (hereinafter "the Final Divorce Judgment")[1];

    b. the *Claim of Kay Lynn Maynard* filed herein on May 23, 2013;

    c. the *Partial Allowance of Claims* filed by the Estate herein on June 10, 2013;

    d. *Kay Maynard's Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce* filed herein on April 29, 2014;

    e. *Kay Maynard's Supplemental Requests for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce* filed herein on April 30, 2014;

---

[1] *In the Matter of the Marriage of William Booth and Kay Lynn Maynard Booth*, cause no. 2010-001376D4, 111th District Court, Webb County, Texas (hereinafter "the Divorce Action");

1

f. *Kay Maynard's Brief in Support of her Request for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in "Final Judgment and Decree of Divorce" and her Claim and Supplemental Claim* filed herein on October 1, 2014 (which brief is hereinafter referred to as "Kay's Brief Proving Her Appeals");

g. *Order* that denied Kay Lynn Maynard's Requests for Full Payment of Divorce Trial and Appellate Attorney's Fees Awarded in Final Judgment and Decree of Divorce, which was entered herein on October 2, 2014 (which *Order* is hereinafter referred to as "the October 2nd Order" and is attached to this Motion as Tab 1);

h. The docket sheet maintained for this probate proceeding indicating that the Estate never filed any response to Kay's Claims, or any response that supports the October 2nd Order, other than arguably the above June 10, 2013, *Partial Allowance* and the Estate Response filed at the October 1st hearing of Kay's claims ; and

i. **the Court of Appeals mandate issued that affirmed the Divorce Judgment, which mandate the instant Court admitted as Exhibit "1" without objection at the October 1, 2014, hearing of Kay's claims, and which mandate is attached to this Motion as Tab 2.**

Items a, c, d, and e above are hereinafter collectively referred to as "Kay's Claims." The above appellate mandate is referred to herein as "the Mandate." In particular, Kay relies upon uncontroverted proof that Kay appealed the Final Divorce Judgment to the Fourth Court of Appeals and to the Texas Supreme Court, which appeals are noted as Exhibits to Kay's Brief Establishing Appeals. William's Estate never contends or proves that Kay failed to appeal the Final Divorce Judgment to the Fourth Court of Appeals or to the Texas Supreme Court—and never contended or appealed that the Final Divorce Judgment erroneously awards unconditional attorney's fees to Kay.

II.
PREDICATE FOR MOTION

2. <u>Timeliness of Motion.</u> The October 2nd Order is final and appealable regarding Kay's claim for payment by the Estate of all her trial and appellate fees awarded in the Final

2

Divorce Judgment. The instant Motion seeks a new trial of Kay's Claims, and to set aside the October 2nd Order in all things. This motion is timely brought because the thirtieth (30th) day following the entry of the instant October 2nd *Order* is November 1, 2014, a Saturday, so the instant Motion is due on November 3, 2014. TEX. R. CIV. P. 329b and 5.

3.      Point Relied Upon in Motion. "Each point relied upon in a motion for new trial or in arrest of judgment shall briefly refer to that part of the ruling of the court... complained of, in such a way that the objection can clearly be identified and understood by the court." *Id.,* Rule 321. The October 2nd Order refers to Kay's Claims as "Kay Lynn Maynard's Requests," then provides that, "[h]aving considered the pleadings, the evidence and the arguments of counsel, the Court finds that Kay Lynn Maynard's Requests should be denied." *See* Tab 1. After this sentence, the October 2nd Order then specifically denies the above items d and e by name. *Id.* **Kay relies on the points that in the October 2nd Order, the instant court erroneously denied Kay's Claims—and erroneously failed to award trial and appellate attorney's fees to Kay for pursuing Kay's Claims that Kay proved at the October 1st hearing of Kay's Claims.** Further, this Court had no authority to deny Kay's Claims since in doing so it disregards the mandate of the Honorable Court of Appeals not disturbing the trial court's Final Divorce Judgment ordering payment of attorney's fees for services rendered in the Divorce Action.

4.      Rule 320 Grounds for New Trial. "New trials may be granted and judgment set aside for good cause, on motion or on the court's own motion on such terms as the court shall direct." TEX. R. CIV. P. 320. New trials may also be granted "... on a point or points that affect only a part of the matters in controversy and ... such part that is clearly separable without unfairness to the parties...." *Id.* Each motion for new trial shall be in writing and signed by the party or the attorney. *Id.*

3

III.
## "GOOD CAUSE" GROUNDS FOR NEW TRIAL

5.      Good cause exists to set aside the October 2nd Order, and to order a new trial regarding Kay's Claims, because the Mandate affirmed the Final Divorce Judgment, and thus entry of a probate court order granting Kay's Claims, and awarding Kay Two Hundred Thousand dollars ($200,000.00) for Kay's trial and appellate attorneys, **was and is a purely ministerial act about which the instant probate court had no discretion.** *See McVeigh v. Lerner*, 849 S.W.2d 911, 913-914 (Tex. App—Houston [1st Dist.] 1993, pet. denied).

6.      Good cause also exists to set aside the October 2nd Order, and to order a new trial regarding Kay's Claims, because:

   a. *Res judicata* requires total attorney's fee payment. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992); *Jeanes v. Henderson*, 688 S.W.2d 100, 103 (Tex. 1985); *Miller v. State & County Mut. Fire Ins. Co.*, 1 S.W.3d 709, 714 (Tex. App.—Fort Worth 1999, pet. denied); *Jones v. Grubb*, no. 01-02-00672-CV (Tex. App. LEXIS 3351—Houston 2003, pet. denied);

   b. No authority holds that "public policy" confers a trial court with discretion to ignore the Mandate, contrary to the Court's pronouncement neither case authority nor evidence during the October 1st hearing of Kay's Claims;

   c. William T. Booth ("William") and his Estate waived any complaint that the Final Divorce Judgment erroneously awarded Kay unconditional attorney's fees, because William and his Estate never appealed same and thus no appellate court reversed the trial court's judgment of award of attorney's fees for services rendered for Kay at both the trial and appellate levels. Accordingly, the instant probate court was without any authority whatsoever to grant William and his Estate such relief. *McVeigh v. Lerner, supra*, 849 S.W.2d at 913-914 (holding failure to assign error in an unconditional attorneys' fee award means "such error ... is no longer susceptible of correction... When the Texas Supreme Court denied the ... application for a writ of error from the judgment of the ... Court of Appeals, that judgment was dispositive of any claim for declaratory relief that [appellant] raised or

4

could have raised in the district court concerning the attorneys' fees involved") (citations omitted);

d. At the October 1st hearing of Kay's Claims, William's Estate provided no authority or evidence for awarding Kay zero for the trial and appellate attorney's fees that Kay incurred in the Divorce Action, that the Final Divorce Judgment awarded to Kay, and that the Mandate affirmed; and

e. Likewise, at the October 1st hearing of Kay's Claims, William's Estate provided no authority or evidence for awarding Kay zero for the trial and appellate attorney's fees that Kay incurred and will incur to pursue payment of Kay's Claims in this probate proceeding.

Any of the aforementioned grounds support the setting aside of the October 2nd Order and the ordering of a new trial regarding Kay's Claims.

IV.
NO EVIDENCE FOR ZERO ATTORNEY'S FEES
UNDER DIVORCE JUDGMENT

7. The October 2nd Order effectively provides that the Estate should not pay any attorney's fees to Kay under the Final Divorce Judgment, notwithstanding William's Estate's waiver and the unequivocal affirmance of the Final Divorce Judgment in the Mandate. Notably, at the October 1st hearing of Kay's claims, William's Estate did not produce one iota of evidence to support the court finding that Kay should be awarded zero trial or appellate attorney's fees under the Final Divorce Judgment. Accordingly, there was no "evidence" supporting the October 2nd denial of Kay's Claims.

V.
NO EVIDENCE FOR ZERO ATTORNEY'S FEES
TO PURSUE KAY'S CLAIMS

8. The October 2nd Order effectively provides that the Estate should not pay any attorney's fees for Kay's pursuit of Kay's claims, because Kay sought such fees in her *Supplemental Request* (item e in paragraph 1. above). At this October 2nd hearing, William's

5

Estate never provided evidence that Kay should not be awarded Five Thousand dollars ($5,000.00) at the probate trial level for pursuing Kay's claims, then an additional Twenty-Five Thousand dollars ($25,000.00) for an appeal to the court of appeals, and a final Fifteen Thousand dollars ($15,000.00) for an appeal to the Texas Supreme Court, to protect that probate court award of trial level award of attorney's fees. Accordingly, a new trial should be awarded at which the instant court awards Kay the trial and appellate attorney's fees Kay incurred in pursuing Kay' Claims in this probate action—which sums should be the amounts that Kay proved at the October 1st hearing without any controverting proof from William's Estate.

## VI.
## AWARD OF ZERO ATTORNEY'S FEES FOR PURSUIT OF KAY'S CLAIMS ARE MANIFESTLY TOO SMALL

9. New trials may be granted when the damages are manifestly too small. TEX. R. CIV. P. 320. The undersigned counsel testified without contravening proof at the October 1st hearing of Kay's Claims that Five Thousand dollars ($5,000.00) of attorney's fees were reasonable and necessary to pursue Kay's Claims—and that another Twenty-Five Thousand dollars ($25,000.00) for an appeal to the court of appeals, and a final Fifteen Thousand dollars ($15,000.00) for an appeal to the Texas Supreme Court, to protect that probate court award of trial level award of attorney's fees. William's Estate did not controvert those sums, or provide any countervailing proof. Accordingly, a new trial should be awarded at which the instant court awards Kay the trial and appellate attorney's fees Kay incurred in pursuing Kay' Claims in this probate action— which sums should be the amounts that Kay proved at the October 1st hearing without any contravening proof from William's Estate.

6

WHEREFORE PREMISES CONSIDERED, claimant / movant KAY LYNN MAYNARD respectfully requests that this Motion be granted; that the October 2nd Order be set aside in all things; that a new trial be ordered regarding Kay's Claims as awarded in the Final Decree of Divorce and confirmed in the Mandate; that a new trial be ordered regarding Kay's claim for trial and appellate level attorney's fees that Kay incurred in pursuing Kay's Claims as Kay proved at the October 1st hearing; and that Kay be awarded any and all equitable and legal relief to which she shows herself justly entitled.

Respectfully Submitted,

JONES & GONZÁLEZ,
An Association
5601 San Dario, Suite 5
Laredo, Texas 78041
Telephone 956-723-5575
Facsimile 956-723-2025
James K. Jones, Jr.
State Bar No. 10910200
Adán A. González, III
State Bar No. 08122350

## CERTIFICATE OF CONFERENCE

I hereby certify that the Estate of William T. Booth, Deceased, opposes this Motion.

Adán A. González, III

7

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on the following counsel on November 3, 2014.

A. Chris Heinrichs                  via fax 210-366-0981
Heinrichs & De Gennaro, P.C.

_____

Adán A. González, III

# Connie Walker

| | |
|---|---|
| **From:** | Connie Walker [connie@jonesgonzalez.com] |
| **Sent:** | Friday, November 14, 2014 4:16 PM |
| **To:** | 'chrish@heinrichslaw.com'; 'mcollins@bexar.org'; 'danpozza@yahoo.com' |
| **Cc:** | 'Adan'; 'jkjjr@icloud.com' |
| **Subject:** | Kay Lynn Maynard Petition for Writ of Mandamus and Appendices |
| **Attachments:** | Kay's Appendix, Items 1 - 13.pdf; Kay's Petition for Writ of Mandamus..pdf |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | 'chrish@heinrichslaw.com' | |
| | 'mcollins@bexar.org' | |
| | 'danpozza@yahoo.com' | |
| | 'Adan' | Read: 11/14/2014 5:45 PM |
| | 'jkjjr@icloud.com' | |

See attachments.

Connie L. Walker
Legal Assistant to Adán A. González, III

The Law Offices of
JONES & GONZALEZ,
An Association
5601 San Dario Ave. Suite 5
Laredo, Texas 78041
(956) 723-5575 Telephone
(956) 723-2025 Facsimile

**Confidentiality Notice:** The information contained in this e-mail message is attorney privileged and confidential information intended only for the use of the individual or entity name above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that: Any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. **Thank You.**

11/17/2014

Print this page

# Envelope 3155292

## Case Information

| | |
|---|---|
| Location | 4th Court of Appeals |
| Date Filed | 11/14/2014 04:12:27 PM |
| Case Number | |
| Case Description | |
| Assigned to Judge | |
| Attorney | Adan Gonzalez, III |
| Firm Name | Jones & Gonzalez, An Association |
| Filed By | Connie Walker |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $4.19 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $145.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $149.19 |

## Payment

| | |
|---|---|
| Account Name | James Jones |
| Transaction Amount | $149.19 |
| Transaction Response | |
| Transaction ID | 5265849 |
| Order # | PaymentTransactionDetail |

## Original Proceeding Petition

| | |
|---|---|
| Filing Type | EFileAndServe |
| Filing Code | Original Proceeding Petition |
| Filing Description | Petition for Writ of Mandamus |
| Reference Number | Kay Lynn Maynard |
| Comments | |
| Status | Submitting |

### Fees

| | |
|---|---|
| Court Fee | $145.00 |
| Service Fee | $0.00 |

## Documents

| | | |
|---|---|---|
| Lead Document | Kay's Petition for Writ of Mandamus..pdf | [Original] |
| Attachments | Kay's Appendix, Items 1 - 13.pdf | [Original] |

## eService Details

| Name/Email | Firm | Service Type | Status | Served | Date/Time Opened |
|---|---|---|---|---|---|
| Adan A. Gonzalez, III connie@jonesgonzalez.com | Jones & Gonzalez, An Association | EServe | Not Sent | No | Not Opened |